## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OCEANA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF OCEAN ENERGY | ) | |
| MANAGEMENT, et al., | ) | C.A. No. 1:12-cv-00981-RC |
| | ) | |
| Federal Defendants, | ) | |
| | ) | **PLAINTIFFS' MOTION** |
| and | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE, | ) | |
| et al., | ) | |
| Intervenors. | ) | |
| _____ | ) | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7.1, Plaintiffs Oceana, Defenders of Wildlife, Center for Biological Diversity, and Natural Resources Defense Council respectfully move this court for an order entering summary judgment against Federal Defendants, invalidating their approval of Lease Sales 218 and 216/222 for the sale of new oil and gas leases in the Western and Central Planning Areas of the Gulf of Mexico. Defendants' approval of these sales in reliance on a flawed Supplemental Environmental Impact Statement under the National Environmental Policy Act and/or without complying with the mandates of Section 7 of the Endangered Species Act is arbitrary, capricious, and an abuse of discretion. Plaintiffs also respectfully ask this court to order Defendant National Marine Fisheries Service to complete its required Section 7 consultation pursuant to the Endangered Species Act within a reasonable time.

In accordance with Local Civil Rule 7.1, Plaintiffs are attaching a Memorandum of Points and Authorities in support of this Motion for Summary Judgment.

/s/ Michael P. Senatore
Michael P. Senatore
D.C. Bar. No.  453116

Defenders of Wildlife
1130 17th St NW
Washington, DC 20036
Phone: (202)682-9400
Email:  msenatore@defenders.org

/s/ Catherine M. Wannamaker
Catherine M. Wannamaker
        Admitted *Pro Hac Vice*

Southern Environmental Law Center
127 Peachtree St, Suite 605
Atlanta, GA 30303
Phone: (404)521-9900
Email: cwannamaker@selcga.org

Deirdre McDonnell
D.C. Bar No. 465533
Center for Biological Diversity
P.O. Box 19801
Portland, OR 97209
Phone: (971) 279-5471
Email: dmcdonnell@biologicaldiversity.org

## TABLE OF CONTENTS

<u>**PAGE**</u>

Table of Contents ...................................................................................................i

Table of Authorities ..............................................................................................iv

Introduction ............................................................................................................1

Background .............................................................................................................3

    A.    Legal Background .....................................................................................3

        1.  Outer Continental Shelf Lands Act ................................................3

        2.  National Environmental Policy Act ................................................3

        3.  Endangered Species Act ..................................................................4

    B.    Factual Background ...................................................................................5

        1.  The Gulf of Mexico Environment ..................................................5

        2.  The *Deepwater Horizon* Disaster .................................................6

        3.  The Bureau's Approval of Lease Sale 218 .....................................7

        4.  The Bureau's Approval of Lease Sale 216/222 ..............................7

        5.  Endangered Species Act Consultation ...........................................9

Standard of Review ..............................................................................................11

Argument...............................................................................................................12

    I.    THE BUREAU FAILED TO TAKE A HARD LOOK AT THE
        ENVIRONMENTAL IMPACTS OF LEASE SALES 216/222

AND FAILED TO EXAMINE A VALID NO ACTION
ALTERNATIVE .....................................................................12

A. The Bureau Failed to Gather Information Essential to a
Reasoned Choice Among Alternative, as Required by 40
C.F.R. § 1502.22 ..............................................................13

B. The Bureau Failed to Adequately Consider New Analyses
About The Risks of Catastrophic Oil Spills.......................17

1. The Bureau Failed to Incorporate New Information
into the SEIS...................................................................18

2. The Bureau's Risk Analysis Itself Does Not Take a
"Hard Look" at the Risk and Size of Oil Spills in the
Gulf After the Deepwater Horizon Spill.........................21

3. The Bureau Failed to Incorporate the Deepwater
Horizon into its Spill Modeling .......................................22

C. The Bureau Failed to Consider an Adequate No Action
Alternative As Required by 40 C.F.R. § 1402.14 ..............24

II.   THE BUREAU VIOLATED THE ENDANGERED SPECIES
ACT BY FAILING TO INSURE AGAINST JEOPARDY TO
LISTED SPECIES .....................................................................27

A. The Bureau Cannot Fulfill Its Duties Under the Endangered
Species Act Until it Completes Consultation......................28

B. The Bureau Must Consider the Best Available Scientific and
Commercial Data in Insuring Against Jeopardy, and That
Information Is Not Reflected in the 2007 Biological Opinion ..........29

1. The Bureau Ignored Key Information that the Status of
Listed Species Changed Significantly Prior to the Lease
Sales ...............................................................................30

2. The Bureau Ignored Key Evidence About Oil Spill
Risk That Changed Significantly Prior to the Lease Sales ...........32

3. The Bureau Ignored New, More Specific Information
About the Lease Sales Than Was Analyzed in 2007 ....................34

C. The Bureau's Reinitiation of Consultation Does Not Cure its
Endangered Species Act Violations ...................................................35

III.   THE FISHERIES SERVICE VIOLATED THE APA BY
UNREASONABLY DELAYING THE ISSUANCE OF THE
BIOLOGICAL OPINION ........................................................................38

A. The Fisheries Service's 3-Year Delay in Completing
Consultation Is Unreasonable..............................................................39

B. The Fisheries Service's Delay Is Unreasonable When
Judged in the Context of the Endangered Species Act's
Overall Statutory Scheme.....................................................................42

C. The Fisheries Service's Delay Is Unreasonable in Light of
the Consequences to Listed Species....................................................43

D. The Fisheries Service Cannot Claim That It Cannot
Complete Consultation Due to Error, Inconvenience,
Practical Difficulty, or Competing Priorities .....................................43

Conclusion ......................................................................................................45

Certificate of Service ........................................................................................46

# TABLE OF AUTHORITIES

## <u>CASES:</u>

*A.L. Pharma, Inc. v. Shalala*
    62 F.3d 1484, 1491 (D.C. Cir. 1995).............................................................11

*\*Ardestani v. INS*
    502 U.S. 129, 148 (1991) ..............................................................................36

*Baltimore Gas & Elec. Co. v. NRDC*
    462 U.S. 87, 88, 97 (1983) .....................................................................11, 24

*Bennett v. Spear*
    520 U.S. 154, 157 (1997) ................................................................................5

*Biodiversity Legal Found. v. Norton*
    285 F. Supp. 2d 1, 15-16 (D.D.C. 2003) .......................................................43

*California v. Block*
    690 F.2d 753, 767-68 (9th Cir. 1982)......................................................24, 26

*California v. Watt*
    683 F.2d 1253, 1260 (9th Cir. 1982) .............................................................29

*Ctr. for Biological Diversity v. Evans*
    2005 WL 1514102, \*1, \*4 (N.D. Cal. June 14, 2005)..................................43

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*
    563 F.3d 466, 483 (D.C. Cir. 2009)...............................................................29

*\*Ctr. for Biological Diversity v. U.S. Dep't of Interior*
    623 F.3d 633, 636, 642 (9th Cir. 2010) .........................................................26

*Citizens to Preserve Overton Park v. Volpe*
    401 U.S. 402, 415 (1971) ..............................................................................12

*City of New York v. U.S. Dep't of Transp.*
    715 F.2d 732, 746 (2d Cir. 1983) ..................................................................22

*Cobell v. Norton*
        240 F.3d 1081, 1096 (D.C. Cir. 2001).................................................... 38-39

*\*Conner v. Burford*
        848 F.2d 1441, 1455 (9th Cir. 1988)......................................................36, 38

*\*Cutler v. Hayes*
        818 F.2d 879, 896-987 (D.C. Cir. 1987) .................................... 38, 39, 43-44

*Defenders of Wildlife v. Envtl. Prot. Agency*
        882 F.2d 1294, 1300 (8th Cir. 1989)............................................................37

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*
        255 F.3d 1073, 1076 (9th Cir. 2001) ..................................................... 28-29

*False Pass v. Watt*
        565 F. Supp. 1123, 1156 (D. Alaska 1983)..................................................29

*Fla. Key Deer v. Brown*
        386 F. Supp. 2d 1281, 1293-94 (S.D. Fla. 2005) .........................................36

*Forest Guardians v. Babbitt*
        174 F.3d 1178, 1190 (10th Cir. 1999)..........................................................38

*Forest Guardians v. Johanns*
        450 F.3d 455, 457 (9th Cir. 2006) ...............................................................28

*Friends of Yosemite Valley v. Scarlett*
        439 F. Supp. 2d 1074, 1105 (E.D. Cal. 2006) ..............................................26

*\*Greenpeace v. Nat'l Marine Fisheries Serv.*
        106 F. Supp. 1066, 1072 (W.D. Wash. 2000) ..............................................29

*In re Int'l Chem. Workers Union*
        958 F.2d 1144, 1149 (D.C. Cir. 1992).........................................................39

*In re People's Mojahedin*
        680 F.3d 832, 837 (D.C. Cir. 2012)..............................................................40

*Inland Empire Public Lands v. U.S. Forest Serv.*
   88 F.3d 754, 758 (9th Cir. 1996) ................................................................ 19

*Lands Council v. Vaught*
   198 F. Supp. 2d 1211, 1238 (E.D. Wash. 2002) .......................................... 17

*Massachusetts v. Clark*
   594 F. Supp. 1373, 1381 (D. Mass. 1984) ................................................... 26

*MCI Telecomm. Corp. v. FCC*
   627 F.2d 322, 324-35, 338-42 (D.C. Cir. 1980) ..................................... 39, 40

*Midwest Gas Users Ass'n v. Fed. Energy Regulatory Comm'n*
   833 F.2d 341, 359 (D.C. Cir. 1987) .............................................................. 39

*Motor Vehicle Mfg. Ass'n v. State Farm Mut. Auto. Ins.*
   463 U.S. 29, 43 (1983) ................................................................................. 12

*Mount Graham Red Squirrel v. Madigan*
   954 F.2d 1441, 1450 (9th Cir. 1992) ............................................................ 28

*Muwekma Tribe v. Babbitt*
   133 F. Supp. 2d 30, 37 (D.D.C. 2000) ..................................................... 39-40

*\*N. Plains Res. Council, Inc. v. Surface Transportation Board*
   2011 U.S. App. LEXIS 25959, \*1 (9th Cir. Dec. 29, 2011) ......................... 20

*N. Slope Borough v. Andrus*
   642 F.2d 589, 594-95 (D.C. Cir. 1980) .......................................................... 3

*\*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*
   677 F.3d 596, 605 (4th Cir. 2012) ........................................................... 25-26

*Nw. Ecosystem Alliance v. Rey*
   380 F. Supp. 2d 1175, 1195 (W.D. Wash. 2005) ......................................... 20

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*
   551 U.S. 644, 622, 652 (2007) ..................................................................... 28

vi

*Nat'l Ass'n of Home Builders v. Norton*
    415 F.3d 8, 13 (D.C. Cir. 2005) ....................................................................11

*Nat'l Audubon Soc'y v. Dep't of the Navy*
    422 F.3d 174, 199 (4th Cir. 2005) ...............................................................13

*NRDC v. Daley*
    209 F.3d 747, 755 (D.C. Cir. 2000) ..............................................................11

*NRDC v. Evans*
    168 F. Supp. 2d 1149, 1154 (N.D. Cal. 2001) ...............................................11

*NRDC v. Evans*
    316 F.3d 904 (9th Cir. 2003) ........................................................................11

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
    524 F.3d 917, 930 (9th Cir. 2008) ................................................................32

*Native Vill. of Point Hope v. Salazar*
    730 F. Supp. 2d 1009, 1018 (D. Alaska 2010) .............................................14

*Ocean Mammal Inst. v. Gates*
    546 F. Supp. 2d 960, 976 (D. Haw. 2008) ....................................................26

*Pub. Citizen Health Research Group v. FDA*
    740 F.2d 21, 32 (D.C. Cir. 1984) ..................................................................39

*Pub. Citizen Health Research Group v. Auchter*
    702 F.2d 1150, 1157 (D.C. Cir. 1983) ..........................................................40

*\*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*
    898 F.2d 1410, 1415-16 (9th Cir. 1990) .......................................................30

*Rock Creek Alliance v. U.S. Forest Serv.*
    703 F. Supp. 2d 1152, 1180 (D. Mont. 2010) ...............................................16

*San Luis & Delta-Mendota Water Auth. v. Salazar*
    760 F. Supp. 2d 855, 885 (E.D. Cal. 2010) ..................................................44

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*
    449 F.3d 1016, 1032 (9th Cir. 2006) ............................................................22

*\*Sec'y of Interior v. California*
    464 U.S. 312, 336 (1984) ......................................................................3, 29

*Sierra Club v. Strock*
    495 F. Supp. 2d 1188, 1254 (S.D. Fla. 2007) .................................................16

*Sierra Club v. Van Antwerp*
    709 F. Supp. 2d 1254, 1259 (S.D. Fla. 2009) .................................................14

*Sierra Club v. Van Antwerp*
    526 F.3d 1353 (11th Cir. 2008) .................................................................17

*Sierra Club v. Watkins*
    808 F. Supp. 852, 872 (D.D.C. 1991) ..........................................................26

*\*Sw. Ctr. for Biological Diversity v. Babbitt*
    215 F.3d 58 (D.C. Cir. 2000) ....................................................................44

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*
    2001 U.S. Dist. LEXIS 25027, at \*122-23 (D. Ariz. Mar. 30, 2001) ..........36

*\*Telecomm. Research & Action Ctr. v. FCC*
    750 F.2d 70, 80 (D.C. Cir. 1984) .......................................................... 38-40

*\*Tenn. Valley Auth. v. Hill*
    437 U.S. 153, 173-74 (1978) .................................................................28, 43

*\*Thomas v. Peterson*
    753 F.2d 754, 764 (9th Cir. 1985) ..........................................................28, 42

*Vill. of False Pass. v. Clark*
    733 F.2d 605, 609, 614 (9th Cir. 1984) .........................................................3

## STATUTES:

5 U.S.C. § 555(b) ...........................................................................................38

5 U.S.C. § 706(1) .......................................................................................2, 38

5 U.S.C. § 706(2)(A)......................................................................................11

16 U.S.C. § 1531 *et seq.*..................................................................................2

    16 U.S.C. § 1532(15)..................................................................................5

    16 U.S.C. § 1536(a)..................................................................................42

    16 U.S.C. § 1536(a)(2) ............................................................ 2, 4, 5, 27-28

    16 U.S.C. § 1536(b)..................................................................................39

    16 U.S.C. § 1536(b)(1)(A)-(B)...................................................................5

    16 U.S.C. § 1536(b)(1)(A)........................................................................40

    16 U.S.C. § 1536(b)(3)-(4) ........................................................................5

    16 U.S.C. § 1536(b)(3)(A)........................................................................40

    16 U.S.C. § 1536(4)(c) .............................................................................27

    16 U.S.C. § 1536(d)............................................................................. 35-37

42 U.S.C. §§ 4321 *et seq.*................................................................................1

    42 U.S.C. § 4321 .......................................................................................3

    42 U.S.C. § 4332(2)(C) .........................................................................3, 13

43 U.S.C. §§ 1331 *et seq.*...............................................................................3

    43 U.S.C. § 1337........................................................................................3

43 U.S.C. § 1344...................................................................................3

43 U.S.C. § 1340...................................................................................3

43 U.S.C. § 1351...................................................................................3

**REGULATIONS:**

30 C.F.R. § 550.105 ..............................................................................3

30 C.F.R. § 550.207 ..............................................................................3

40 C.F.R. § 1500.1(b) ...........................................................................4

40 C.F.R. § 1500.1(c)...........................................................................24

40 C.F.R. § 1501.4 ................................................................................3

40 C.F.R. § 1502.1 ................................................................................4

40 C.F.R. § 1502.14 ..........................................................................4, 24

40 C.F.R. § 1502.14(a), (d) ...................................................................4

*40 C.F.R. § 1502.22 ................................................................. 13-14, 17

40 C.F.R. § 1502.22(a).................................................................4, 15, 16

40 C.F.R. § 1502.22(b) ............................................................ 4, 14, 16-17

40 C.F.R. § 1502.22(b)(4)....................................................................17

40 C.F.R. § 1502.24 .............................................................................24

50 C.F.R. § 226.214 ..............................................................................6

*50 C.F.R. § 402.01 ..............................................................................5

50 C.F.R. § 402.02 ................................................................................4

50 C.F.R. § 402.14 ................................................................................40

50 C.F.R. § 402.14(a) .............................................................................5

50 C.F.R. § 402.14(e) ........................................................................ 40-44

50 C.F.R. § 402.14(g)-(i) ........................................................................39

50 C.F.R. § 402.14(g) ............................................................................32

50 C.F.R. § 402.14(g)(2) .........................................................................32

50 C.F.R. § 402.14(g)(3) .........................................................................32

50 C.F.R. § 402.14(g)(4) ..........................................................................5

50 C.F.R. § 402.14(i) ..........................................................................5, 42

50 C.F.R. § 402.16 ................................................................................40

46 Fed. Reg. 18,026 (Mar. 23, 1981) ...........................................................24

74 Fed. Reg. 45,353 (Sept. 2, 2009) ............................................................31

75 Fed. Reg. 61,051 (Oct. 4, 2010) ...............................................................1

76 Fed. Reg. 58,868, 58,870, 58,950 (Sept. 22, 2011) ........................................31

76 Fed. Reg. 64,432 (Oct. 18, 2011) ..............................................................1

76 Fed. Reg. 70,473 (Nov. 14, 2011) .............................................................7

77 Fed. Reg. 2991 (Jan. 20, 2012) ................................................................7

## INTRODUCTION

This action challenges the Bureau of Ocean Energy Management's ("the Bureau")[1] unlawful approval of the first offshore oil and gas lease sales in the Gulf of Mexico since the 2010 BP *Deepwater Horizon* disaster. The Bureau approved Lease Sales 218 and 216/222 ("the Lease Sales") without considering new information learned after the *Deepwater Horizon* disaster about the likelihood of oil spills, the difficulty of cleaning them up, and the impacts this spill had on the Gulf of Mexico environment.

The *Deepwater Horizon* disaster took a tremendous toll on wildlife. While most poisoned and oiled animals perished unseen, the bodies of at least 6,381 birds, including endangered piping plovers and formerly protected brown pelicans, were found. Over 1,100 dead sea turtles were found, all members of threatened or endangered populations. The bodies of 171 dead or affected dolphins and whales were also found. To this day tarballs still spoil Gulf shorelines, and there are reports of shrimp with no eyes, fish with defects, cetaceans with huge lesions, and dead stands of deep-water corals in the Gulf.   Whales and dolphins have also been stranding and dying in record numbers.  DOI 5838-39.

For the Gulf's ecosystem and local economies that depend upon it, everything changed on April 20, 2010. Despite the massive environmental destruction caused by the *Deepwater Horizon* disaster, however, the Bureau made no effort to consider lessons from the disaster in approving the Lease Sales. In approving Lease Sale 216/222, the Bureau violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* (2012), because its

---

[1] The Bureau, formerly known as the Minerals Management Service, was reorganized in 2010 and again in 2011. 75 Fed. Reg. 61,051 (Oct. 4, 2010); 76 Fed. Reg. 64,432 (Oct. 18, 2011).  The new Bureau is responsible for managing development of offshore resources; a new Bureau of Safety and Environmental Enforcement was created to enforce safety and environmental regulations. For simplicity, Plaintiffs refer to the relevant agency by its current name when discussing activities both prior to and following the *Deepwater Horizon* spill.

Supplemental Environmental Impact Statement ("the SEIS") failed to adequately consider new analyses of the risks posed by offshore drilling, particularly in deepwater; improperly addressed unavailable information essential to reasoned decisionmaking; and failed to consider a true "No Action" alternative, as required by NEPA regulations.

The Bureau's approval of both Lease Sales also violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* (2012). The Bureau cannot insure that the Lease Sales are not likely to jeopardize the continued existence of threatened and endangered species, 16 U.S.C. § 1536(a)(2), because the Bureau authorized them before it completed consultation with the U.S. Fish and Wildlife Service ("the Fish and Wildlife Service") and the National Marine Fisheries Service ("the Fisheries Service"), and without considering the best scientific and commercial data available.  Relatedly, the Fisheries Service's failure to complete a valid biological opinion almost *three years* following the reinitiation of consultation on the effects of the Bureau's Gulf of Mexico oil leasing activities – precisely because of the *Deepwater Horizon* spill – constitutes an unreasonable delay of a mandatory duty in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1) (2012).

Because the Bureau violated its statutory duties by failing to consider lessons learned from the *Deepwater Horizon* disaster, the court should declare that the Bureau has violated the National Environmental Policy Act and vacate the SEIS and the Record of Decision for  Lease Sale 216/222; declare that the Bureau has violated the Endangered Species Act and vacate the Record of Decision for both Lease Sales;   and declare that the Fisheries Service has unreasonably delayed the completion of Endangered Species Act consultation and order the agency to complete consultation within a reasonable time.

## BACKGROUND

### A.  Legal Background

#### 1.  Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.* (2012), sets forth a four-stage administrative approval process for the development of outer continental shelf resources: (1) the Secretary of the Interior's promulgation of a nationwide five-year leasing program, 43 U.S.C. § 1344; (2) lease sales, 43 U.S.C. § 1337; (3) exploration, 43 U.S.C. § 1340; and (4) development and production, 43 U.S.C. § 1351.[2]  *See Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984).  NEPA review applies to each stage in the OCSLA process, as do the requirements of the ESA.  *See Vill. of False Pass v. Clark*, 733 F.2d 605, 609, 614 (9th Cir. 1984); *N. Slope Borough v. Andrus*, 642 F.2d 589, 594-95 (D.C. Cir. 1980).  This case involves lease sales: OCSLA's second stage.  After purchasing a lease, the leaseholder can conduct activities such as seismic surveys and geological exploration. 30 C.F.R. §§ 550.207, 550.105 (2012).

#### 2.  National Environmental Policy Act

Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. The cornerstone of NEPA is the environmental impact statement ("EIS"). An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4 (2012). The EIS must provide a "full and fair discussion of significant environmental impacts and ... inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize

---

[2] In the Gulf, the Bureau combines multiple lease sales planned to occur over a 5-year period into a "multisale" plan for purposes of NEPA and ESA review.  Individual lease sales generally do not receive subsequent evaluation.

3

adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Agencies' evaluation of environmental consequences must be based on "accurate" and "high quality" scientific information.  40 C.F.R. § 1500.1(b).

Analysis of alternatives is "the heart of the environmental impact statement."  *Id.* § 1502.14. "[I]t should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  *Id.*  In an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action."  *Id.* at. § 1502.14(a), (d).

When an agency finds there is incomplete or unavailable information to conduct its NEPA analysis, the agency must include that information in the EIS if it "is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant." *Id.* § 1502.22(a). If the information "cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known," the agency must make clear in the EIS that such information is lacking; state its relevance to the evaluation of reasonably foreseeable significant adverse impacts (including low-probability but catastrophic impacts); summarize existing credible evidence relevant to evaluating those impacts; and evaluate such impacts based upon methods or approaches generally accepted by the scientific community.  *Id.* at (b).

### 3.  Endangered Species Act

The ESA requires federal agencies to "insure" that the actions they fund, authorize, or undertake "[are] not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of those species' designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (2012). In fulfilling this

duty, "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). If a proposed action "may affect" a listed species, Federal agencies are required to formally consult with either the Fisheries Service or the Fish and Wildlife Service.[3] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Unless the Services take action to extend the period, consultation must be completed within 90 days. 16 U.S.C. § 1536(b)(1)(A)-(B).

Following formal consultation, the expert agency must provide the action agency with a written statement, known as a biological opinion "explaining how the proposed action will affect the species or its habitat." *Bennett v. Spear*, 520 U.S. 154, 158 (1997) (citing 16 U.S.C. § 1536(b)(3)(A)). The biological opinion must determine whether the agency's "action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species," 50 C.F.R. § 402.14(g)(4); *see also* 16 U.S.C. § 1536(b)(3)-(4), and include measures to minimize and monitor impacts to species that are likely to occur. 50 C.F.R. § 402.14(i).

### B. Factual Background

#### 1. The Gulf of Mexico Environment

The Gulf of Mexico is a "rich, productive marine environment" with "abundant and diverse marine life." Nat'l Comm'n on the BP *Deepwater Horizon* Oil Spill & Offshore Drilling, Deepwater: The Gulf Oil Disaster and the Future of Offshore Drilling, Report to the President (hereinafter "Commission Report") at 174.[4] The region is home to federally-listed threatened and endangered species, including sperm whales, sea turtles, bird species, and the Gulf sturgeon, *see* DOI 1497, 1507, 1517, 1523-26, and includes federally designated critical habitat for the Gulf

---

[3] The Fish and Wildlife Service is primarily responsible for terrestrial species and the Fisheries Service primarily for marine species. *Id.* § 1532(15); 50 C.F.R. § 402.01.

[4] The Commission Report is available at http://www.oilspillcommission.gov/sites/default/files/documents/DEEPWATER_ReporttothePresident_FINAL.pdf. (last visited June 28, 2013).

sturgeon. *See* 50 C.F.R. § 226.214. The Gulf Coast includes "one of the most extensive estuary systems in the world," stretching from the Rio Grande River to Florida Bay. DOI 2539. Its wetland habitats and seagrass beds provide habitat for numerous plants, invertebrates, fishes, reptiles, birds, and mammals and are a critical nursery grounds for fish and shellfish. DOI 2562 & 2575. The Gulf is also home to significant commercial fisheries. DOI 5639.

### 2. The *Deepwater Horizon* Disaster

In recent years, the oil industry has drilled in ever deeper waters of the Gulf. Operations at these depths pose unique risks, exposing equipment to strong ocean currents, low temperatures and high pressures. *See* Commission Report at 51. In addition, "knowledge about localized geology, types of hydrocarbons, and pressure profiles in ultra-deepwater wells is still not thoroughly developed." *Id.* at 52.

On April 20, 2010, one such deepwater exploratory rig, the *Deepwater Horizon,* exploded, caught fire, and sank. The resulting 206 million gallon oil spill dwarfed both the approximately 11 million gallon 1989 *Exxon Valdez* oil spill, the previous largest oil spill in the United States, and the 140 million gallon 1979 *Ixtoc I* oil spill, the previous largest spill in the Gulf of Mexico. Commission Report at 231, 346 n.76; DOI 5622.[5]

The spill caused significant impacts to the ecology of the Gulf. Thousands of injured or dead animals, including listed species, were discovered, and impacts continue to be unearthed. The spill also resulted in severe economic harm to the Gulf region. Commission Report at 185. Government officials responded to the spill "by closing huge portions of the Gulf" – 88,522

---

[5] The details of the *Ixtoc* spill can be found at this Bureau website: http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=33598 (last visited June 28, 2013).

square miles, or one-third of the Gulf – to commercial and recreational fishing. *Id.* at 187. Gulf tourism was similarly impacted. *See id.* at 185.

In the aftermath of the spill, the Presidentially-appointed National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling ("Commission") described the Bureau as an agency that was "unable to . . . [keep] pace with the changing risks and volume of offshore activity." Commission Report at 79. The Commission found that the spill was linked to the "culture of complacency with regard to NEPA [that] developed within [the Bureau]." *Id.* at 82.

### 3.   The Bureau's Approval of Lease Sale 218

Lease Sale 218, held on December 14, 2011, was the first lease sale held in the Gulf of Mexico since the *Deepwater Horizon* spill. The sale auctioned nearly all of the remaining unleased blocks within the Western Planning Area, or approximately 18.3 million acres. 76 Fed. Reg. 70,473 (Nov. 14, 2011).

### 4.   The Bureau's Approval of Lease Sales 216/222

On January 20, 2012, the Bureau issued the final SEIS for Lease Sale 216/222, covering the site of the *Deepwater Horizon* disaster. 77 Fed. Reg. 2,991 (Jan. 20, 2012). The final SEIS relies on and tiers to the pre-spill 2007 Multisale EIS, DOI 1337-2261, and 2008 Multisale Supplement, DOI 2433-2917. These earlier environmental reviews largely dismissed the significance of a potential oil spill in the Gulf. For example, the maximum spill amount predicted by the earlier analyses – 26,500 barrels – is a mere 0.5% of the estimated amount spilled at the *Deepwater Horizon* site. The Bureau also concluded in the earlier analyses that the majority of impacts to species would be "sublethal," DOI 1445-47, while in fact the *Deepwater Horizon* killed over 6,100 coastal and marine birds, 600 sea turtles, and 500 marine mammals. Fish and

Wildlife Service, Deepwater Horizon Response Consolidated Fish and Wildlife Collection Report (Apr. 20, 2011) (hereinafter "Fish and Wildlife Service Fish & Wildlife Table").[6]

Even after the *Deepwater Horizon* disaster, the Bureau adopted the untenable position in its final SEIS for Lease Sale 216/222 that "[n]o substantial new information, with the exception of archaeological resources, was found that would alter the impact conclusions" presented in the pre-spill analyses. *See* DOI 5448. There are three striking things about the Bureau's SEIS that run contrary to common sense and the evidence that was before the agency.

First, the Bureau conceded in its SEIS that "relevant information on reasonably foreseeable significant adverse impacts is incomplete or unavailable, *and may be essential* to a reasoned choice among alternatives" for eleven resources. DOI 5624 (emphasis added). Despite the essential nature of this information, the Bureau charged forward in the face of uncertainty, exactly the type of approach that NEPA should foreclose.

Second, the Bureau also failed to take a hard look at the risks of a large oil spill. The Bureau prepared an updated analysis of oil spill risks to replace the admittedly "outdated" analysis and data it used in the 2007 Multisale EIS, but failed to incorporate critical information from this into its SEIS. Nor did it make the new spill risk analysis publically available. DOI 6730. Instead, the Bureau continued to summarize outdated analyses and conclusions from the 2007 Multisale EIS. *See, e.g.,* DOI 5577, 5710, 5866, 5895, 5914. These outdated descriptions at times directly contradicted the data from the new analyses. *Compare, e.g.,* DOI 6471 (Table 3-5), *with* DOI 5622 (incorrectly describing results in Table 3-5). Moreover, the Bureau

---

[6] The Table is available at http://www.fws.gov/home/dhoilspill/pdfs/ConsolidatedWildlifeTable042011.pdf (last visited June 28, 2013).

significantly downplayed the importance of the Gulf spill, and also ignored the concerns expressed by expert agencies.

Finally, the Bureau failed to consider a true "no action" alternative, fundamentally undermining its alternatives analysis. Under the Bureau's analysis leasing would eventually take place under all of the alternatives considered, including the "no action" alternative.  DOI 5541.

### 5. Endangered Species Act Consultation

The *Deepwater Horizon* oil spill yielded new information about the impact of offshore drilling on endangered species and their habitats, which led the Bureau to reinitiate ESA consultation in 2010. Nonetheless, the Bureau authorized the Lease Sales without the benefit of a new biological opinion. To this day, no new biological opinion has been produced.

In 2007, the Fisheries Service completed a biological opinion for five Gulf of Mexico lease sales, including Lease Sales 218 and 216/222 ("2007 Biological Opinion"). *See, e.g.*, DOI 7039 & 7185. The 2007 Biological Opinion considered, but largely dismissed, the threat posed by oil spills to endangered and threatened species. For example, it found that "the coastal waters inhabited by the Gulf sturgeon are not expected to be at any significant risk from oil spills." DOI 7073. In reliance on the Bureau's modeling, the Fisheries Service concluded that "[t]he probability of an oil or chemical spill reaching designated Gulf sturgeon critical habitat is so low, it is considered discountable." *Id.*

Despite the Fisheries Service's findings concerning the minimal risks posed by oil drilling, it still determined that many protected species would be subjected to and potentially harmed by oil spills, vessel strikes, and seismic surveys during the 40-year lifetime of the proposed actions. *See* DOI 7111-21; 7139.   It estimated that 8 leatherback turtles, 49 green turtles, 25 Kemp's ridley turtles, 153 loggerhead turtles, and 1 hawksbill turtle would be taken as

a result of oil spills over that period, with 66 of those takes being lethal.  *See* DOI 7117-19.  Oil spills were also expected to lead to two lethal and two non-lethal takes of Gulf sturgeon, as well as 11 non-lethal takes of sperm whales.  *See* DOI 7120.

The Fisheries Service also examined other non-spill threats to listed species, most notably vessel strikes and seismic surveys.  The Fisheries Service expected vessel strikes to take over 500 sea turtles – approximately one-third of those being lethal.  *See* DOI 7139.  Seismic surveys were expected to cause harassment of sperm whales "through disruption of important biological behaviors" which may adversely affect the whales, though minimization measures were believed to prevent actual loss of any whales.  DOI 7111.  Despite these findings, the Fisheries Service determined that the lease sales and related actions, including drilling, would "not appreciably reduce the likelihood of survival and recovery of" any listed species.  DOI 7138.[7]

On July 30, 2010, in response to the *Deepwater Horizon* disaster, the Bureau requested that the Fisheries Service and the Fish and Wildlife Service reinitiate consultation under Section 7(a)(2) of the Endangered Species Act on the effects of the Gulf Multisale.  The Bureau explained that the spill (1) called into question the assumptions that formed the basis for the government's oil spill modeling used in earlier consultations and (2) may have affected the status of listed species and critical habitats. DOI 7351.

The Fisheries Service and the Fish and Wildlife Service agreed that reinitiation was warranted. The Fisheries Service noted that "it is clear that we have underestimated the size, frequency, and impacts associated with a catastrophic spill." DOI 7359. The Fish and Wildlife

---

[7] The Bureau consulted informally with the Fisheries Service and the Fish and Wildlife Service on the 2008 Multisale Supplement. Both agencies issued written concurrences stating that "the additional potential impacts analyzed for [the lease sales remaining in the 2007-2012 Multisale] do not alter the findings of the previous consultations and therefore do not trigger a reinitiation of consultation under the Endangered Species Act." DOI 2761.

Service stated that the "incident and resulting oil spill represent new information regarding potential adverse effects to endangered and threatened species," and acknowledged that "the status of some listed species or designated critical habitats may have been altered." DOI 7362.

More than three years since the *Deepwater Horizon* spill, the new consultation has not yet been completed.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if the movants establish that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Pursuant to the APA, the reviewing court must set aside the challenged action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action that violates NEPA or the ESA necessarily is "not in accordance with law" and must be set aside under the APA's standard of review. *See NRDC v. Evans,* 168 F. Supp. 2d 1149, 1154 (N.D. Cal. 2001), *rev'd in part on other grounds by* 316 F.3d 904 (9th Cir. 2003); *see also Nat'l Ass'n of Home Builders v. Norton,* 415 F.3d 8, 13 (D.C. Cir. 2005) (applying the APA standard of review to NEPA and ESA claims).

In addition to rejecting agency decisions that violate the ESA or NEPA, this Court must reject agency actions that breach the APA's requirements for reasoned decisionmaking. The agency is required to articulate a "rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 105 (1983). Although this standard is deferential, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the [APA].'" *NRDC v. Daley,* 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1491 (D.C. Cir. 1995)). The APA's standard of review "require[s] the reviewing court to engage in a substantial

inquiry" and subjects the agency action to a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 (1971).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins.,* 463 U.S. 29, 43 (1983).[8]

## **ARGUMENT**

### I.    THE BUREAU FAILED TO TAKE A HARD LOOK AT THE ENVIRONMENTAL IMPACTS OF LEASE SALES 216/222 AND FAILED TO EXAMINE A VALID NO ACTION ALTERNATIVE.

Despite the dire environmental consequences of the *Deepwater Horizon* disaster, the Bureau rushed to return to business as usual in the Gulf of Mexico.  This rush to proceed with leasing – regardless of the continuing impacts of the spill or what it taught us about the risks of deepwater drilling –  resulted in a purely paper NEPA exercise that presented neither information nor alternatives that would have informed decisionmakers and the public about the choices at hand.  Because the Bureau violated NEPA in a number of ways, the SEIS must be vacated.

The Bureau ostensibly developed the SEIS challenged here to analyze new information brought forth by the *Deepwater Horizon* disaster and incorporate it into decisionmaking about new drilling in the Gulf. *See, e.g.*, DOI 5621-22 ("This Supplemental EIS was prepared in consideration of the potential changes to the baseline conditions of the environmental, socioeconomic, and cultural resources that may have occurred as a result of the [*Deepwater Horizon*] event.").   Yet the Lease Sale 216/222 SEIS does not achieve this result.   Rather, it remarkably concludes that "[n]o substantial new information, with the exception of

---

[8] Plaintiffs have standing to bring the claims asserted in this matter, in support of which they have filed, with this memorandum, institutional and member declarations establishing injury from Defendants' violations of law. *See* Exs. 1-6.

archaeological resources, was found that would alter the impact conclusions" presented in the Bureau's pre-spill NEPA analyses.  DOI 5448.

The Bureau violated NEPA by (1) failing to gather information essential to a reasoned choice among alternatives; (2) failing to adequately consider new analyses of the risks of another large oil spill; and (3) failing to consider a true "no action" alternative.  These NEPA violations stem from one key fact – the Bureau was determined to proceed with the Lease Sales regardless of the NEPA process.  The Bureau's flawed analysis cannot pass muster. *See Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 199 (4th Cir. 2005) ("Where an agency has merely engaged in post hoc rationalization, there will be evidence of this in its failure to comprehensively investigate the environmental impact of its actions and acknowledge their consequences.").

### A.  The Bureau Failed to Gather Information Essential to a Reasoned Choice Among Alternative, as Required by 40 C.F.R. § 1502.22.

To the extent that the Bureau did not have full information about the impacts of the oil spill, it ignored its duty to obtain the information or to provide a rationale for why it is absent. Moreover, the Bureau failed to demonstrate, as required by NEPA regulations, that it used generally accepted theoretical approaches or research methods to address areas where it lacked information. Accordingly, the Bureau violated NEPA.

NEPA requires federal agencies to fully consider and disclose the environmental consequences of any proposed action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.22.  "When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impacts statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." 40 C.F.R. §

1502.22.  If this incomplete or unavailable information is "essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the [EIS]." *Id.* at (a). If the costs of obtaining the information are exorbitant, the agency must make clear that such information is lacking, state its relevance, summarize existing credible evidence relevant to evaluating impacts, and evaluate such impacts based upon methods or approaches generally accepted by the scientific community. *Id.* at (b). The burden is on the Bureau to demonstrate that it has complied with section 1502.22. *Native Vill. of Point Hope v. Salazar*, 730 F. Supp. 2d 1009, 1018 (D. Alaska 2010) (finding that Bureau failed to determine whether missing information was essential, and whether the cost of obtaining it was exorbitant).

In defiance of the principle that "[a]ccurate scientific analysis" is "essential to implementing NEPA," *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1259 (S.D. Fla. 2009), the Bureau's SEIS suffers from pervasive and crippling data gaps due to incomplete information on the impacts of the *Deepwater Horizon* spill.  The Bureau was well aware that it lacked critical information necessary to prepare its SEIS.  *See, e.g.*, DOI 3232 (internal email describing the need for more data, and stating that NRDA data could be "extremely useful in the preparation of the SEIS."). The Environmental Protection Agency noted in particular:

> In many instances, the environmental impacts of the oil spill upon key resources of concern are presented as either minor, based on a lack of data, or as unknown, due to studies and assessments that are still underway.…Without waiting for the ecological resource impact data to become available, without independently verifying the news reports, or without conducting interviews with the scientists studying the oil spill impacts, it may be difficult understanding how this document is fully satisfying public disclosure as envisioned by the CEQ regulations for implementing the NEPA.

DOI 5091.[9]

---

[9] Since the EPA has a broad suite of environmental responsibilities and expertises due to the extensive set of environmental laws that it administers, it is virtually always involved in the development of other agencies' EISs. *See What is the Nat'l Envtl. Policy Act*, EPA, *available at*

The Bureau forged ahead in the face of these data gaps, acknowledging in the SEIS that it had incomplete information concerning essentially all environmental resources at issue – marine mammals, sea turtles, birds, fish, Gulf sturgeon, beach mice, water quality, submerged vegetation, wetlands, barrier beaches, *Sargassum* communities, deepwater benthic communities, air quality, and the recreational and commercial fishing industries in the Gulf.  DOI 5849, 5861, 5879, 5929, 5919, 5865, 6019, 5626, 5643, 5714, 5689, 5681, 5970, 5805, 5721, 5750, 5781, 5816, 5946, 5949.

The Bureau determined that several categories of this information were essential to a reasoned choice amongst alternatives.   *See id.* at 5624-5 (evaluating missing information regarding impacts to seagrass communities, live bottoms, marine mammals, sea turtles, birds, Gulf sturgeon and fisheries). Yet the Bureau made no effort to obtain the essential information, nor did it demonstrate that the cost to obtain it was "exorbitant." *See* 40 C.F.R. § 1502.22(a). Only in precise circumstances can an agency avoid its duty to obtain such information, and it must meet all four regulatory criteria to be excused: (1) affirmatively disclose that the information is unavailable; (2) explain the information's relevance; (3) summarize existing credible scientific evidence relevant to the agency's evaluation of significant adverse environmental impacts; and (4) evaluate the impacts based upon theoretical approaches or research methods generally accepted in the scientific community. *Id*. at (b). Rather than attempt to meet these criteria, the Bureau stated merely that scientific information on spill impacts was "slowing becoming available," DOI 5623, and that additional information "was not available absent exorbitant expenditures or could not be obtained regardless of cost in a timely manner."

---

*h*ttp://yosemite.epa.gov/r10/ecocomm.nsf/b9d67f6000e5b58888256e5900642421/e68df0446ae6 daeb88256c3d006599fa!OpenDocument (last visited June 27, 2013).

DOI 5624; s*ee also* DOI 5857 (missing info "cannot be obtained within the timeframe of this Supplemental EIS").

These conclusory statements do not satisfy the Bureau's duty to demonstrate that the cost to obtain more information would have been "exorbitant" or "the means to obtain it are not known," *see* 40 C.F.R. §1502.22(b), particularly in light of its acknowledgment that more information about spill impacts was "slowly becoming available." DOI 5623.   Moreover, the record demonstrates that commenters suggested ways for the Bureau to obtain additional information. *See* DOI 5091 (EPA suggesting that the Bureau independently verify news reports or conduct interviews with scientists studying spill impacts); DOI 3232 (Bureau staffer suggesting that the Bureau become a NRDA trustee in order to obtain access to NRDA data for the SEIS). The Bureau failed to attempt any of these options, but instead forged ahead in the face of missing, essential information. This approach violates section 1502.22.  *See, e.g., Sierra Club v. Strock*, 495 F. Supp. 2d 1188, 1254 (S.D. Fla. 2007) (finding that the Corps' "rush to judgment" "guarantee[d]" non-compliance with 40 C.F.R. § 1502.22) (quotation marks omitted), *vacated and remanded by Sierra Club v. Van Antwerp*, 526 F.3d 1353 (11th Cir. 2008);[10] *see also Rock Creek Alliance v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1180 (D. Mont. 2010) (where agency knew that information was inadequate, it should have been included in the FEIS, and could not be "updated" years after the ROD).

---

[10] *Strock* was vacated by the Eleventh Circuit because the district court had applied the incorrect level of deference and on remand the district court found that the agency had violated NEPA even under the arbitrary and capricious standard. *See Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1273-74 (S.D. Fla. 2009). Furthermore, in making this ruling, the court again found that the agency had failed to include essential information in its NEPA analysis, as required by 40 C.F.R. § 1502.22. *See id*. at 1271.

Even if the Bureau had satisfied the requirement to demonstrate that it could not obtain essential missing information, it failed to comply with the final step of 40 C.F.R. § 1502.22, which required the Bureau to evaluate adverse impacts from the oil spill "based on theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. 1502.22(b)(4). The SEIS vaguely stated that the Bureau used "scientifically credible information" and "accepted scientific methodologies" in place of essential missing information, FEIS at 5624; 6278. The Bureau never identified or described these methodologies, however, leaving the public to speculate as to precisely what methodologies the Bureau employed to assess essential information regarding impacts on virtually all Gulf resources. This violates NEPA and 40 C.F.R. § 1502.22(b). *See, e.g., Lands Council v. Vaught*, 198 F. Supp. 2d 1211, 1238 (E.D. Wash. 2002) ("For an environmental impact statement to contain high quality information, it must include a description of the methodologies it relies upon.").

In sum, the Bureau violated NEPA's requirements to use the best available data and to obtain missing information essential to a reasoned choice among alternatives. Without this information, it was impossible for the Bureau to adequately evaluate the environmental impacts of new lease sales for deepwater drilling in the same location as the *Deepwater Horizon* disaster.

## B. The Bureau Failed to Adequately Consider New Analyses About The Risks of Catastrophic Oil Spills.

The Bureau also irrationally failed to adequately consider new information about the risks of future oil spills. In the wake of the *Deepwater Horizon* disaster, experts and the public urged the Bureau to improve its methods for determining the likelihood of a large oil spill, the possible size of such a spill, and its potential impacts to the environment. They called on the Bureau to take what it learned from the Gulf spill to 1) update its spill risk *analyses* to consider a range of spills, including catastrophic spills and spills in deepwater; and 2) use those improved analyses

to conduct better *modeling* of the impacts of large spills in the Gulf.  *See, e.g.*, DOI 3837 (Fish and Wildlife Service stating that spill volumes and scenarios "need to be re-addressed given the 'rare event' of a spill exceeding 420,000 gallons."); DOI 3655 (Fisheries Service calling for "revised spill probabilities and modeling of different sized spills, including catastrophic spills for the Gulf of Mexico for sources of spills in offshore and nearshore environments" including "both surface and deepwater sources"); DOI 3834 (Fish and Wildlife Service urging the Bureau to revise spill probabilities and modeling of different sized spills, including catastrophic spills, and stressing that models "must include both surface and deepwater sources."); DOI 5144 (La. Dept of Natural Resources comments);  DOI 6750-56 (Plaintiffs' comments).

The Bureau failed to heed those calls and instead was driven by the "rapid schedule" that it arbitrarily established for going forward with Lease Sales 216/222.  DOI 2931.  The Bureau's errors with respect to its consideration of oil spill risk are threefold: 1) While the Bureau completed a spill risk analysis prior to the completion of its SEIS, it arbitrarily failed to incorporate critical information from that analysis into its SEIS; 2) the risk analysis itself in no way addresses the concerns of expert agencies and actually significantly downplays the Gulf spill; 3) and compounding these errors, the Bureau failed to conduct new modeling in light of the spill and its new analysis.  As a result of these errors, the agency arbitrarily trivialized the *Deepwater Horizon*'s relevance in determining the risks and impacts of a future large spill.

### 1.  The Bureau Failed to Incorporate New Information into the SEIS.

After the Gulf spill, the Bureau conceded that its previous risk analyses of oil spill rates and sizes, completed in 2000, were outdated, as were the portions of previous EISs that relied on

the 2000 data.  DOI 5556.  The Bureau completed a risk analysis on oil spill probabilities prior to

the release of its new SEIS.  *See* Bureau Oil Spill Risk Analysis, attached hereto as Ex. 7.[11]

Inexplicably, however, the Bureau's revised risk analysis is not provided in the SEIS.[12]

The only information that purports to incorporate this risk analysis is Table 3-5 of the SEIS.

DOI 6471.   And not only is the inclusion limited, but it's also misleading as the Bureau

selectively removed key information from the SEIS.  Size matters when it comes to oil spills.

But instead of *improving* its disclosure of the likelihood and potential size of a catastrophic spill,

the Bureau irrationally *removed* the "catastrophic" spill size category that was in its risk analysis,

stating that its consideration in the SEIS would not be "meaningful."  DOI 6471.  The Bureau did

this even though the most recent and relevant spill was in this category, and even though prior

EISs included a greater than 10,000 bbls category,[13] as did the Bureau's underlying risk

analysis.[14]  Indeed, the risk analysis included this data and stated that it was appropriate to count

---

[11]  The Bureau cited this analysis in the SEIS, but failed to include it in the Administrative
Record.  DOI 6471. The analysis was provided to Plaintiffs during the comment period on the
final EIS. DOI 6730.

[12]  Moreover, this risk analysis is not publicly available, violating one of NEPA's main tenets
regarding the importance of public disclosure. *See Inland Empire Pub. Lands Council v.
U.S.F.S.*, 88 F.3d 754, 758 (9th Cir. 1996) (holding that the goals of NEPA are to ensure the
agency will have available and will carefully consider detailed information concerning
significant environmental impacts and to guarantee that information is available to the public).
The analysis was only provided to Plaintiffs begrudgingly after several requests. *See* DOI 6730
("HQ didn't want to release the draft report and following multiple discussions, necessary
information was given to OCEANA").

[13]  The 10,000 barrels category was included in the 2007 Multisale EIS (*see* DOI 2386 at Table 4-
16), despite the fact that there were only 2 spills reported for this category; the 2009
Supplemental EIS (*see* DOI 2891, Table 3-6); and the Final SEIS for Lease Sale 218, page A-29,
Table 3-5, *available* at http://www.boem.gov/BOEM-
Newsroom/Library/Publications/2011/2011-034-v2.aspx.

[14]  In Table 3-5, the Bureau claims that it is unable to include this spill category because the
*Deepwater Horizon* spill would be the only spill considered, so "meaningful statistics (such as

the *Deepwater Horizon* spill in spill rates for 1,000 and 10,000 bbl or greater spills. *See* Ex. 7 at 14. This over 10,000 bbl number appears to have been stricken from Table 3-5 of the SEIS at some point *after* it was drafted, since in some places in the SEIS, the stricken data for spills over 10,000 bbl is referred to. *See, e.g.*, DOI 5622; 5807. There are also instances where the numbers in Table 3-5 do not match the numbers in the body of the SEIS. *Compare, e.g.*, DOI 6471 with DOI 5576 (incorrectly stating the mean number of spills for the proposed action).

While the Bureau claims that it conducted an "impartial analysis" of new information obtained after the spill, *see* DOI 5509, the record shows that instead, the Bureau did everything possible to portray the *Deepwater Horizon* as an outlier, going so far as to exclude it from its publicly available charts and tables. Instead of using the analysis it undertook for the SEIS, the Bureau arbitrarily relied on outdated information. *See, e.g.*, DOI 5558 (citing 2000 spill rates and Multisale Table 4-13); DOI 5577 (citing pre-spill data for the probability of a spill occurring); DOI 5866 (same); DOI 5892 (same); DOI 5914 (same). The Bureau's reliance on this outdated data is arbitrary and capricious and cannot satisfy NEPA's hard look requirement. Moreover, the Bureau cannot use outdated information when better, more recent information is available. *See, e.g., N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086-87 (9th Cir. 2011), ("Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious."); *Nw. Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175, 1195 (W.D. Wash. 2005) ("Relying on outdated data … [is] grounds for setting aside an EIS.").

median spill size) could not be calculated." DOI 6471. In contrast, the risk analysis that the Bureau relied on in preparing Table 3-5 included such a category, and provided these exact statistics, undercutting the Bureau's purported excuse for withholding this data from the public. *See* Ex. 7 at Table 14. The authors of this risk analysis did not in any way suggest that these statistics were not "meaningful."

> 2. **The Bureau's Risk Analysis Itself Does Not Take a "Hard Look" at the Risk and Size of Oil Spills in the Gulf after the *Deepwater Horizon* Spill.**

In addition to not fully incorporating the updated risk analysis into the SEIS, there are also problems with the risk analysis itself. As noted above, experts strongly urged the Bureau to update its analyses to consider a range of factors that make spills more likely and more large. *See, e.g.,* DOI 3655; 3834; 5144. But the Bureau's risk analysis did not carry this out.

While the Bureau had information about the number and depths of wells that would be drilled as a result of this lease sale, and found that the majority would be in deepwater, DOI 6469,[15] the Bureau ignored its duty to assess those risks in the risk analysis. Instead, it continued to estimate oil spill occurrence based largely on the number of historic spills and the volume of oil handled. Ex. 7 at 3. As Plaintiffs and others commented, the Bureau's outdated methodology disregards important risk factors that are particularly relevant in light of the Bureau's admission that the majority of wells resulting from this lease sale will be in deepwater. DOI 6469; 5489.

Moreover, the Bureau manipulated the presentation of evidence in the new risk analysis to obscure environmental impacts. The new risk analysis excluded the *Deepwater Horizon* spill from the mean and median spill volume calculations, instead opting to calculate spill size averages and medians through 2009 rather than 2010 "because the Macondo spill size overwhelms the rest of the record in any calculation using spill volume." Ex. 7 at 14. As a result, it in no way accounts for the size of the *Deepwater Horizon* spill, which the Bureau

---

[15] The Bureau projects that 65 to 121 exploration and delineation wells will be drilled as a result of this lease sale and 60-69 percent of these will be deeper than 656 feet. DOI 5550.

21

dismisses as a "worst case" spill. *Id*. And the public has no way to know that this data has been excluded, since the underlying analyses were not made publicly available.[16]

The Bureau wholly fails to explain any methodologies or calculations used to support its rationale that the *Deepwater* Horizon spill is an outlier (particularly taking into account the growth of deepwater drilling and numerous reports highlighting the higher risks for bigger spills in this context). Commission Report at 260-261.

### 3.   BOEM Failed to Incorporate the *Deepwater Horizon* into its Spill Modeling.

Finally, in addition to improving its spill probability analyses, the expert agencies also urged the Bureau to conduct revised *modeling* of oil spills in the Gulf. *See* DOI 3655; 3834; s*ee also* DOI 5142 (Fish and Wildlife Service recommending inclusion of a catastrophic event in the Bureau's modeling).

The model at issue here is the Bureau's Oil Spill Risk Analysis (OSRA) model, which allows the agency to estimate the likely trajectories of large oil spills. These trajectories, which incorporate the spill occurrence data discussed previously, are used to estimate the risk of future spills occurring and contacting the environment. DOI 1844. The previous OSRA model run relied on the now-outdated oil spill probabilities that the Bureau completed in 2000. *See* DOI 1844; 1841.

Not only did the Bureau fail to make suggested improvements to its modeling, it failed to even *conduct* a new OSRA run taking the *Deepwater Horizon* spill into account. DOI 5577.

---

[16] The Bureau may not categorize large oil spills as low probability events and fail to disclose their impacts on this basis. Instead, the Bureau has an obligation to analyze and disclose the impacts of even lower probability, but high consequence, events. *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1032 (9th Cir. 2006); *see City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 746 (2d Cir. 1983) (significance determination requires agency to "undertake risk assessment: an estimate of both the consequences that might occur and the probability of their occurrence").

The Bureau claims to have conducted an OSRA run of a catastrophic spill.   DOI 5578. However, in an appendix to the SEIS, the Bureau explains that "[a]lthough overall the OSRA is designed for use as a risk-based assessment, for this analysis … [t]he probability of a catastrophic spill occurring was not calculated."  DOI 6636.   Rather, the Bureau continued to rely on the OSRA run conducted for the 2007 Multisale, noting that conducting a full OSRA run with respect to this lease sale "would not be expected to substantially affect probabilities" compared to the previous run.   DOI 5577.   The Bureau disregarded the fact that this "run" was based on its admittedly outdated spill risk analysis.  *See* DOI 1841, 1845.

The record further illuminates the Bureau's reasons for this shortcut in a 2010 internal document: "[d]ue to time constraints and catastrophic spills not being the focus of the supplemental EIS, OSRA will not be rerun for spills > 1,000 barrels."  DOI 3005.   As a result, Appendix C fails to assess the likelihood of a catastrophic spill in light of the *Deepwater Horizon*.  DOI 6636.

In all this, the Bureau failed to disclose the *likelihood* of a spill greater than 10,000 barrels in light of the *Deepwater Horizon*, and if it occurred, *how large* it could be.  Again, it is as if the reason for the new analysis never existed.  The result is that the SEIS for this proposed sale incorporates the *Deepwater Horizon* spill into the >1,000 spill size group but excludes average spill size for this group, and also leaves out the >10,000 spill size altogether.   This means that the only information given to the public is that the spill rate for an oil spill over 1,000 barrels is 1.13 and the estimated spill size is 2,200 bbl, which is actually *lower* than the spill size stated in the 2007 Multisale EIS.   *Compare* DOI 5576 *to* DOI 1842.  This number cannot – and does not – accurately represent the probability of a large oil spill, nor the size of such a spill.

In sum, the Bureau's oil spill risk analysis does not satisfy NEPA's requirement for scientific integrity or informed decisionmaking. *See* 40 C.F.R. §§ 1502.24 (requiring NEPA analyses to have "scientific integrity"); 1500.1(c) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."). In light of these errors and omissions, the Bureau's SEIS cannot satisfy the dual goals of NEPA "to consider every significant aspect of the environmental impact of a proposed action [and ensure] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (internal citation omitted).

### C. The Bureau Failed to Consider an Adequate No Action Alternative As Required by 40 C.F.R. § 1402.14.

Finally, the Bureau failed to consider a "no action" alternative as required by 40 C.F.R. § 1502.14. An EIS's discussion of alternatives should be "the heart of the environmental impact statement." *Id*. Clear alternatives are meant to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." *Id*. Agencies are required to include a "no action" alternative in their analyses, in which "the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward." 46 Fed. Reg. 18,026 (Mar. 23, 1981). In essence, the "no action" alternative is designed to allow the public and decision makers to understand the environmental implications of the proposed action compared to the status quo. The "touchstone" for a court's inquiry into whether there is a valid no action alternative is "whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *California. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (citation omitted).

24

In evaluating Lease Sale 216/222, the Bureau considered four alternatives: Alternative A, the Bureau's preferred alternative, which offered virtually all unleased blocks within the Central Planning Area of the Gulf for sale; Alternatives B and C, which excluded blocks located near biologically sensitive topographic features and near the shore of Baldwin County, AL, respectively; and Alternative D, termed the "no action" alternative.   DOI 5509-10.     But the Alternative D, was not really a "no action" alternative – instead, it assumed that leasing and development in the Central Gulf would continue. DOI 5541.   In describing Alternative D, the Bureau concluded that "[i]f the lease sale would be canceled, the resulting development of oil and gas would most likely be *postponed* to a future sale." *Id.* (emphasis added); DOI 5509; 5510. Agency staff also asserted in their Information Memorandum to the Director that Alternative D "was not selected because if the proposed lease sale were to be canceled, the resulting development of oil and gas *would most likely be postponed to a future sale* and the overall level of OCS activity in the [Central Planning Area] would only be reduced by a small percentage and it would not significantly change the environmental impacts of overall [Outer Continental Shelf] activity." DOI 6778 (emphasis added).   Thus, the Bureau failed to consider a true "no action" alternative, but rather assumed that the sale would go forward at some point in the future. This sort of false "no action" alternative implies that the impacts of lease sales 216/222 are somehow inevitable and does not foster informed decisionmaking.

Courts have rejected similar alternatives analyses based on an agency's failure to consider a no action alternative and conclusory assumptions that environmental impacts are inevitable. In *North Carolina Wildlife Federation v. North Carolina Department of Transportation,* 677 F.3d 596 (4th Cir. 2012), the Fourth Circuit found that the agencies erred in calculating their "no build" baseline for purposes of assessing alternatives to a proposed road

project because the agencies relied on data that assumed that the road project would be built, thereby conflating the "no build" and "build" scenarios. *Id.* at 605. The Ninth Circuit's decision in *Center for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 636 (9th Cir. 2010), is also instructive. There, plaintiffs challenged the Bureau of Land Management's EIS for a land exchange with a mining company. In its alternatives analysis, BLM assumed that the manner and extent of mining operations would be the same whether or not the land was sold, so the environmental consequences of "no action" were identical to the proposed action. The Ninth Circuit found that this violated NEPA. *Id.* at 636, 642.

Similarly here, the Bureau violated NEPA when it assumed that development of the proposed resources will merely be postponed under its "no action" alternative – as in *North Carolina Wildlife Federation*, the Bureau included an "action" baseline into the "no action" alternative. *See, e.g.,* DOI 5541. This violates NEPA. *See N.C. Wildlife Fed'n,* 677 F.3d at 596; *Ctr. for Biological Diversity*, 623 F.3d at 636*; Friends of Yosemite Valley v. Scarlett*, 439 F. Supp. 2d 1074, 1105 (E.D. Cal. 2006) (finding that the baseline alternative should not have "assume[d] the existence of the very plan being proposed"); *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 976 (D. Haw. 2008) ("[T]he No Action Alternative is a true 'no action' alternative in name only; in reality, this option would allow the Navy . . . to engage in exercises using MFA sonar at much the same level and frequency as the preferred alternatives.").[17]

For all of these reasons, the Bureau's SEIS must be invalidated.

---

[17] Notably, the SEIS finds not only the "no action" and preferred alternatives to have the same environmental impacts, but that *all* of the alternatives have this same environmental impact. *See e.g.,* DOI 5540. The Bureau cannot so skew its presentation of alternatives that it is left with no choice at all, as it has done here.   *See Massachusetts v. Clark*, 594 F. Supp. 1373, 1381 (D. Mass. 1984); *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991) ("the agency must consider a range of alternatives that covers the full spectrum of possibilities); *State of Cal. v. Block*, 690 F.2d 753, 767-68 (9th Cir. 1982) (rejecting range of eight alternatives that all assume the same level of roadless area development as "end[ing] its inquiry at the beginning").

## II.   THE BUREAU VIOLATED THE ENDANGERED SPECIES ACT BY FAILING TO INSURE AGAINST JEOPARDY TO LISTED SPECIES.

The Bureau cannot be permitted to move forward with new offshore leasing without first evaluating the impacts of its actions on endangered species in the wake of the *Deepwater Horizon* disaster. The ESA commands the Bureau (1) to insure against jeopardy to listed species through consultation, and (2) to use the best scientific and commercial data available in meeting this duty. 16 U.S.C. § 1536(a)(2). Under the Act, consultation results in the production of a biological opinion that includes specific measures to minimize the impacts of the action and monitor them over time. *Id*. at 1536(4)(c). The Bureau did not comply with these commands, and instead authorized the Lease Sales without the benefit of a biological opinion assessing important new information. Three years after the oil spill, this proposition is untenable.

Only by completing consultation, not just reinitiating it, can the agency fulfill the substantive requirements of Section 7. Yet instead, the Bureau reinitiated consultation with the Fisheries Service while purporting to rely on an admittedly outdated pre-spill 2007 Biological Opinion. This biological opinion does not reflect the significant changes in the Gulf of Mexico that occurred between 2007 and the Lease Sales, including the *Deepwater Horizon* disaster, changes in endangered species status, and changes in the extent and intensity of the Lease Sales. Accordingly, it is impossible for the 2007 document to satisfy either the Bureau's duty to insure against jeopardy, or its duty to use the best available science in doing so. The Bureau's reinitiation of consultation does not cure these defects.  The Bureau must complete consultation with the Fisheries Service to insure that the current action will comply with the Act. The Bureau's decision to proceed with the Lease Sales without doing so is arbitrary and capricious and in violation of law.

A.   **The Bureau Cannot Fulfill Its Duties Under the Endangered Species Act Until it Completes Consultation.**

The Bureau did not comply with section 7 of the ESA because it authorized the Lease Sales without completing consultation. While the Bureau reinitiated consultation on the 2007 Biological Opinion, the Bureau can only satisfy its duty to insure against jeopardy by obtaining a valid and updated biological opinion from the Fisheries Service. 16 U.S.C. § 1536(a)(2).

The Supreme Court stated that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) [hereinafter "*TVA*"]. Critically for this case,

> Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora. Section 7(a)(2) provides that '[e]ach Federal agency shall, in consultation with and with the assistance of [the Fisheries Service or the Fish and Wildlife Service], insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652, (2007) [hereinafter "*NAHB*"] (quoting 16 U.S.C. § 1536(a)(2)); *see also id.*, 551 U.S. at 662 (noting that the "imperative" nature of the § 7 "mandate is to be carried out through consultation and may require the agency to adopt an alternative course of action"). As the court explained in *Forest Guardians v. Johanns*, "'the strict substantive provisions of the ESA justify more stringent enforcement of its procedural requirements.'" 450 F.3d 455, 457 (9th Cir. 2006) (quoting *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1995)). Accordingly, "[r]einitiation of consultation requires either the [Fish and Wildlife Service] or the [Fisheries Service] to issue a new Biological Opinion before a project may go forward." *Mount Graham Red Squirrel v. Madigan*, 954 F. 2d 1441, 1451 (9th Cir. 1992); *see also Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F. 3d 1073, 1076 (9th Cir. 2001) ("Reinitation of consultation requires ... [the Fisheries Service] to issue a

new [biological opinion] before the agency action may continue."). "In the absence of a completed comprehensive biological opinion [the action agency] has not, and cannot, insure that [the action] will not result in harm to endangered [species]." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066, 1072 (W.D. Wash. 2000).

As the Supreme Court stated, the "[r]equirements of the … Endangered Species Act **must be met first"** before "the issuance of offshore leases." *Sec'y of Interior v. California*, 464 U.S. 312, 338 (1984) (emphasis added). This is because the "leasing stage presents a unique opportunity to take a hard look at the anticipated and potential risks to endangered species at every stage of activity [because] . . . decisions made at the lease sale stage . . . establish the basic scope and charter for subsequent development and production . . . critical decisions are made as to the size and location of the tracts, the times of the sale, and the stipulations to which the lessees would be subject." *False Pass v. Watt*, 565 F. Supp. 1123, 1156 (D. Alaska 1983) (quoting *California v. Watt*, 683 F.2d 1253, 1260 (9th Cir. 1982) (internal quotation marks omitted)); *see also Ctr. for Biological Diversity v. U.S. Dep't of Int.*, 563 F. 3d 466, 483 (D.C. Cir. 2009) (holding that consultation is not required at the nationwide planning stage, but will be at the lease sale stage when it is known what areas will be for sale).

Despite this admonishment, the Bureau has not completed a biological opinion on any action in the Gulf of Mexico since the *Deepwater Horizon* disaster.

### B. The Bureau Must Consider the Best Available Scientific and Commercial Data in Insuring Against Jeopardy, and That Information Is Not Reflected in the 2007 Biological Opinion.

The Bureau authorized the Lease Sales, subsequent to the *Deepwater Horizon* disaster, without considering new and significant information on species, the environmental baseline, and

oil spill risk, all of which make relying on the 2007 Biological Opinion irrational. The Bureau also failed to consider new information concerning the extent and intensity of the Lease Sales.

An agency carrying out an action must make a judgment whether it is rational to rely on a biological opinion when carrying out that action, and its "decision to rely on [an expert agency's] biological opinion must not have been arbitrary or capricious." *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Such reliance is arbitrary and capricious, for example, if there is "data which undermines seriously [the Fisheries Service's] opinions" or new information that the Fisheries Service failed to take into account. *Id.* at 1416. By irrationally relying on the 2007 Biological Opinion subsequent to the *Deepwater Horizon* disaster, the Bureau acted arbitrarily, capriciously, and not in accordance with law.

### 1. The Bureau Ignored Key Information That the Status of Listed Species Changed Significantly Prior to the Lease Sales.

First, the Bureau knew or should have known that the best available information on listed species had changed significantly since the 2007 Biological Opinion and that reliance on that information was improper.

For example, it is arbitrary for the agency to blithely ignore the impacts of the oil spill and other factors on Gulf of Mexico sea turtles. Hundreds of sea turtles were killed by the spill, *see* Fish and Wildlife Service Fish & Wildlife Table, far exceeding the oil spill-related takes estimated by the Fisheries Service for the entire 40-year lifetime of the 2007 to 2012 lease sales. DOI 7140  (anticipating lethal takes of 42 loggerhead turtles, 2 leatherback turtles, 9 Kemp's ridley turtles, and 13 green turtles). The Bureau itself admits that "[t]he extent and scope of the spill caused by the [*Deepwater Horizon*] event represents new information not assessed in the consultations on the 2007-2012 leasing program," DOI 7351, and that "the status of some listed

species or designated critical habitats may have been altered" and "therefore require further consideration." *Id.*

Moreover in 2011, loggerhead sea turtles in the Gulf of Mexico were reclassified as a distinct population segment and no longer part of a global population, meaning that they are treated as a separate species for purposes of consultation. 76 Fed. Reg. 58,868, 58,870, and 58,950 (Sept. 22, 2011). In 2009, data showing that sea turtle takes had "substantially exceeded" the legal amount prompted the Fisheries Service to issue an emergency closure of the bottom longline fishery in the eastern Gulf.   DOI 5850 (citing recovery plan). Despite this record evidence, the Bureau determined that it could nonetheless proceed with the Lease Sales without first considering this evidence in a completed consultation.

The status of other Gulf protected species also changed. The Fisheries Service has declared an unusual mortality event for cetaceans.   DOI 5838-39. Also, at the time of the 2007 Biological Opinion, sperm whales were treated as a single species throughout their global range. DOI 7091-91. However, the Bureau recognized in its 2012 Lease Sale 216/222 SEIS that genetic data "confirm[s] that the Gulf of Mexico sperm whales constitute a distinct stock from other Atlantic sperm whale stocks." DOI 5836. Evidence also demonstrates that the Bureau knew that the 2007 Biological Opinion was outdated with respect to endangered fish. Endangered smalltooth sawfish received critical habitat protections in the Gulf of Mexico in 2009. 74 Fed. Reg. 45,353 (Sept. 2, 2009). Also, in contrast to findings in the 2007 Biological Opinion that Gulf sturgeon were at "relatively low risk of exposure to oil," DOI 7120, studies from 2008 and 2010 found that "Gulf sturgeon spend more time than previously thought at mid-depth as opposed to being strictly utilizing the bottom [sic]," DOI 5911, thereby "provid[ing] more opportunity for vessel strikes" and oil spill impacts.  DOI 5909.

31

The Bureau's failure to consider this information is contrary to regulations governing consultation requiring agencies to evaluate the impacts of an action against the current environmental baseline. *See* 50 C.F.R. § 402.14(g). The environmental baseline is "a snapshot of the factors affecting the species and includes federal, state, tribal, local, and private actions already affecting the species, or that will occur contemporaneously with the consultation in progress." DOI 7097. The ESA's mandatory inquiry into the status of the environmental baseline is not just a paper exercise; it serves as the foundation for the agency's analysis, and is thus critical to the findings of a biological opinion, which must "[e]valuate the current status of the listed species," 50 C.F.R. § 402.14(g)(2), and "[e]valuate the effects of the action and cumulative effects on the listed species," *id.* § 402.14(g)(3).

Despite the Bureau's awareness that the baseline was impacted by the spill and other changes in species status, it made no attempt to reassess the baseline prior Lease Sales 218 and 216/222. Without updating this information through the consultation process, the Bureau cannot determine whether a species is already in jeopardy of extinction, causing its actions to deepen the jeopardy, or whether the activities under Lease Sale 218 and 216/222 will "tip a species from a state of precarious survival into a state of likely extinction." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008). This is particularly true for Lease Sale 216/222, which authorizes leasing in the exact same area where the *Deepwater Horizon* disaster occurred. The Bureau violated its duty to consider the best available scientific and commercial data, and acted arbitrarily when it relied on the 2007 Biological Opinion.

### 2. The Bureau Ignored Key Evidence About Oil Spill Risk That Changed Significantly Prior to the Lease Sales.

Second, the *Deepwater Horizon* disaster brought to light substantial new information about oil spill risk that ran contrary to the agency's decision to rely on the 2007 Biological

Opinion. Most obviously, the Fisheries Service informed the Bureau that the outdated 2007 Biological Opinion "underestimated the size, frequency, and impacts associated with a catastrophic spill under the 2007-12 lease sale program." NMFS 7359 (also noting that prior assumptions made in the consultation "did not sufficiently address the potential risks of a spill of this magnitude occurring and the risks posed to listed species and their habitats"). The Fisheries Service also acknowledged the multiple flaws in its own past assumptions regarding technological safeguards, probabilities of spills occurring, fate of oil in environment, capabilities of spill response containment, and the estimates of size and impacts of spills on listed species. *Id.* Likewise, the Fish and Wildlife Service conceded that its prior analysis must be revisited, noting in response to the Bureau's request for reinitiation of consultation that (1) "[t]he [Deepwater Horizon] incident and resulting oil spill represent new information regarding potential adverse affects [sic] to endangered and threatened species that has not previously been assessed"; and (2) "the potential spill volumes and scenarios used in the analysis for the existing consultation do need to be re-addressed."  NMFS 7362.

As the expert agencies admit, the old assumptions were proven conclusively wrong by the spill. For instance, the Bureau assumed that a large spill would only be 4,600 barrels, would last one day, would occur 200 miles from shore, would produce an oil slick with a maximum size of 350 acres, that the oil would weather (naturally disperse) long before reaching shore, and that only 19-31 miles of shoreline would be affected.  *See* DOI 2326-29 & 2332. Within a week of the *Deepwater Horizon* disaster, these assumptions had been proven wrong.  The spill amounted to roughly 60,000 barrels of oil per day, lasted at least 87 days, occurred only 52 miles from shore and did not naturally disperse but rather washed ashore, oiling more than 650 miles of shoreline.  *See* Commission Report at 146, 165, 176. In other words, the Bureau underestimated

the volume of oil spilled per day by 92%, the duration of the leak by 99%, and the amount of oiled shoreline by 95%.

The Bureau failed to consider the best available data about oil spill risk prior to the authorization of the Lease Sales. The Bureau accordingly violated its duty to consider the best available scientific and commercial data, and acted arbitrarily when it relied on the 2007 Biological Opinion.

### 3.  The Bureau Ignored New, More Specific Information about the Lease Sales Than Was Analyzed in 2007.

Third, the Bureau irrationally relied on information in the 2007 Biological Opinion in authorizing the Lease Sales, even though the outdated biological opinion lacked sufficiently specific information about the Lease Sales. The 2007 Biological Opinion does not contain information about the size and tract location of the Lease Sales, nor does the opinion provide the timing of the Lease Sales aside from estimates of the sale year.   DOI 7043-45. Only rough estimates of a "typical" regional lease sale are given, *id.*, yet the intensity of offshore oil and gas has intensified substantially.  Production estimates for Lease Sale 216/222 changed significantly since 2007, with the upper end of both oil and gas production estimates increasing by 25%, representing 332 million more barrels of oil and 1.33 trillion more cubic feet of gas.  DOI 5447. Additionally, the original sale areas of Central Gulf Lease Sales 208, 213, 216, and 222 were expanded after 2007 to include areas that had previously been under moratorium. DOI 2456. Thus the 2007 Biological Opinion did not address the specific Lease Sales as they came to be developed in the years since the biological opinion.

The Bureau irrationally failed to consider the best available information about the extent and intensity of the Lease Sales prior to authorizing them, in violation of its duty to consider the

best available scientific and commercial data, and acted arbitrarily when it relied on the 2007
Biological Opinion.

### C. The Bureau's Reinitiation of Consultation Does Not Cure its Endangered Species Act Violations.

Finally, the Bureau's reinitiation of consultation does not cure its ESA violations.  While
new information will sometimes allow an agency to reinitiate consultation and continue an
ongoing action for a limited time while consultation is pending, the substantive provisions of
Section 7 continue to apply during this time.  Moreover, the Act envisions that consultation will
be completed within a limited and defined timespan.  *See infra*, Section III, A.  Given the delay
in completing consultation presented in this case, the Bureau appears to be relying on its
reinitiated consultation to operate indefinitely – approving leases, drilling, and other OCSLA
activities in the Gulf – without a new biological opinion. To accept its approach would be to
write out of the ESA the specific requirements for a biological opinion.

Following reinitiation of consultation, the Bureau, not an expert agency, issued a finding
pursuant to Section 7(d) of the Act that no activities associated with Gulf of Mexico drilling
would make any "irretrievable commitment of resources" which would foreclose the formulation
or implementation of any reasonable and prudent alternative which would prevent jeopardy to
those species. 16 U.S.C. § 1536(d);  NMFS 4527.  It is this self-issued blanket document,
together with the 2007 Biological Opinion, on which the Bureau has relied in its approval of
every Gulf drilling activity since the *Deepwater Horizon* spill.  In developing this document,
"[the Bureau] elected not to send their draft memo to [the Fisheries Service] for review or
concurrence," NMFS 4515-16.  Indeed, the Fisheries Service noted further that "[the Bureau] is
not expecting us to comment on the draft 7(d) determination, nor any future determinations they

35

make." NMFS 4503.  The Bureau also has not reexamined its 7(d) determination based on new information acquired since early 2011 when the memo was issued.

The Bureau's self-serving 7(d) determination deserves no deference.  The Supreme Court has made clear that "reviewing courts do not owe deference to an agency's interpretation of statutes outside its particular expertise and special charge to administer." *Ardestani v. INS*, 502 U.S. 129, 148, (1991).  Indeed, another district court noted in a situation very similar to that before the court, "[a]lthough the Forest Service has unilaterally determined that continued grazing on these allotments would comply with Section 7(d), these unilateral determinations are afforded no weight." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2001 U.S. Dist. LEXIS 25027, at *122 (D. Ariz. Mar. 30, 2001); s*ee also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053-54 (9th Cir. 1994).  Because the Bureau is not charged with administering the ESA, it cannot unilaterally determine whether its actions violate a provision of that statute and expect this court to defer to its conclusion.

The Bureau's section 7(d) determination also does not insulate the agency from liability for its section 7(a)(2) violations as "[s]ection 7(d) does not excuse federal agencies from meeting the requirements of Section 7(a)(2)." *Fla. Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1293-94 (S.D. Fla. 2005). Section 7(d) relates to the foreclosure of reasonable and prudent alternatives, not to the duty to insure against jeopardy. The Ninth Circuit in *Conner v. Burford* made clear:

> Section 7(d) does not amend section 7(a) to read that a comprehensive biological opinion is not required before the initiation of agency action so long as there is no irreversible or irretrievable commitment of resources. *See* 16 U.S.C. § 1536(d). Rather, section 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process.

848 F.2d 1441, 1455 n.34 (9th Cir. 1988). Thus, the 7(d) determination does not validate the Bureau's decision to rely on the 2007 Biological Opinion.

As discussed above, the facts of this case – the *Deepwater Horizon* disaster, the significant changed circumstances, and passage of time – fundamentally undermine the Bureaus's compliance with Section 7(a)(2), and show that this is not like any other reinitiation in light of new information. The information before the agency here was a game changer that invalidated the Bureau's ability to rely on previous findings. *See, e.g., Defenders of Wildlife v. Envtl. Prot. Agency*, 882 F.2d 1294, 1300 (8th Cir. 1989) ("The ultimate burden remains on the acting agency to insure any action it pursues is not likely to jeopardize protected species.") (internal quotation marks omitted).

Indeed, it is questionable whether 7(d) should even apply in this case where the agency is undertaking an entirely new lease sale, rather than continuing with an ongoing previously analyzed and authorized activity. Although the Lease Sales were discussed in the 2007 Biological Opinion, that is only because the agency decided to group them together for purposes of analysis. The Records of Decisions for these Lease Sales were not signed until 2011 and 2012, meaning that the actions were not even approved, much less ongoing when the Bureau requested reinitation with the Fisheries Service in 2010. Thus, there was no reason not to undergo a new consultation to meet the agency's Section 7 obligations before the Lease Sales. *See, e.g., Conner*, 848 F.2d at 1455 ("Appellants ask us … to carve out a judicial exception to ESA's clear mandate that a comprehensive biological opinion … be completed before initiation of the agency action. They would have us read into the ESA language to the effect that a federal agency may be excused from this requirement if, in its judgment, there is insufficient information available to complete a comprehensive opinion and it takes upon itself incremental-step consultation …. We reject this invitation to amend the ESA.").

The Bureau's reinitiation of consultation and corresponding 7(d) determination do not cure its failure to complete consultation with the Fisheries Service, as required by Section 7 of the Endangered Species Act.  The agency's reliance on this determination is arbitrary and capricious, and cannot be used as the blank check to excuse compliance with the Endangered Species Act that the Bureau attempts to use it as.

### III.   THE FISHERIES SERVICE VIOLATED THE APA BY UNREASONABLY DELAYING THE ISSUANCE OF THE BIOLOGICAL OPINION.

Following the *Deepwater Horizon* oil spill, the Bureau requested the Fisheries Service to reinitiate consultation as explained above.  NMFS  7351.  The Fisheries Service agreed, finding that "it is clear that we have underestimated the size, frequency, and impacts associated with a catastrophic spill."  NMFS  7359. Yet despite clear timelines in the Endangered Species Act to ensure that consultation is completed expeditiously, the Fisheries Service still has not completed a biological opinion over 3 years following the *Deepwater Horizon* disaster.

The APA requires an agency to act "within a reasonable time," 5 U.S.C. § 555(b), and requires reviewing courts to "compel agency action" that is "unreasonably delayed." 5 U.S.C. § 706(1). "As a general rule, Section 706 of the APA 'leaves in the courts the discretion to decide whether agency delay is unreasonable.'" *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999)); *see also Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987). A "rule of reason" governs the time limit for agency action. *Telecomm. Research and Action Ctr. v. FCC,* 750 F.2d 70, 80 (D.C. Cir. 1984) [hereinafter "*TRAC*"]. "[E]xcessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the

potential effect of possible agency decisionmaking into future plans." *Cutler*, 818 F.2d at 897

(quoting *Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1034 (D.C. Cir. 1983)).

In reviewing claims of unreasonable delay under Section 706(1) of the APA, the court

considers four factors:

(1) The length of time that has elapsed since the agency came under a duty to act;

(2) The context of the statute which authorizes the agency's action;

(3) The consequences of the agency's delay; and

(4) Any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.

*Cobell v. Norton*, 240 F.3d at 1096 (quoting *In re Int'l Chem.Workers Union*, 958 F.2d 1144,

1149 (D.C. Cir. 1992)); *see also TRAC*, 750 F.2d at 80. Furthermore, the court need not find any

impropriety by the agency to hold that agency action has been unreasonably delayed. *See Pub.*

*Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984).  When the four factors

listed above are applied here, it follows that the Fisheries Service has unreasonably delayed the

issuance of a biological opinion assessing the impacts of Lease Sales 218 and 216/222 as

required by 16 U.S.C. § 1536(b) and 50 C.F.R. § 402.14(g)-(i).

**A. The Fisheries Service 3-Year Delay in Completing Consultation Is Unreasonable.**

The Fisheries Service's delay in producing its biological opinion for over 3 years since

the reinitiation of consultation is plainly unreasonable. Although there is no *per se* rule as to how

long is too long, the D.C. Circuit "has stated generally that a reasonable time for an agency

decision could encompass 'months, occasionally a year or two, but not several years or a

decade.'" *Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987) (quoting *MCI*

*Telecomm. Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980)); s*ee also Muwekma Tribe v.*

*Babbitt*, 133 F. Supp. 2d 30, 37 (D.D.C. 2000) (two-year delay unreasonable); *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) (three-year delay unreasonable); *MCI Telecomm. Corp.,* 627 F.2d at 324-35, 338-42 (four-year delay unreasonable). The three-year delay in this case is well within the range of delays found unreasonable in prior cases.

The reasonableness of the Fisheries Service's delay here must be judged in light of the ESA's specific timelines governing consultations. "While a violation of a statutory deadline does not, alone, justify judicial intervention, the Congress's timetable "may supply content for th[e] rule of reason —the first and most important of the TRAC factors. *See People's Mojahedin*, 680 F.3d 832, 837 (D.C. Cir. 2012) (internal citations and quotation omitted). Congress explicitly provides in section 7(b)(l)(A) that

> Consultation under subsection (a)(2) with respect to an agency action shall be concluded within the *90-day period* beginning on the date on which initiated or, subject to subparagraph (B) [which outlines procedures when an applicant is involved], within such other period of time as is mutually agreeable to the Secretary and the Federal Agency.

16 U.S.C. § 1536(b)(1)(A) (emphasis added).  In addition, the section 7(b)(3)(A) states:

> *Promptly* after conclusion of consultation under (2) and (3) of subsection (a) of this section, the Secretary shall provide to the Federal agency and applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.

16 U.S.C. § 1536(b)(3)(A) (emphasis added).  Additionally, the section 7 regulations address the Fisheries Service's obligations during and after consultation. *See generally* 50 C.F.R. §§ 402.14, 402.16.   These regulations contemplate a limited, defined time frame for completing consultation. *Id*. at §402.14(e) ("Formal consultation concludes within 90 days after its initiation

unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific period of time.").

Indeed, the Fisheries Service itself interprets section 7 to impose a nondiscretionary duty to timely complete a biological opinion in its Consultation Handbook, which provides internal guidance and establishes national policy for ESA Consultations.  *See* Endangered Species Act Consultation Handbook: Procedures for Conducting Section 7 Consultation and Conferences [hereinafter Consultation Handbook], U.S. Fish & Wildlife Service and National Marine Fisheries Service, March 1998.[18] The Consultation Handbook notes that "[t]he Services ensure the biological opinion, including the incidental take statement, is prepared and delivered within 135 days of initiation of formal consultation." *Id*. at 4-7. Moreover, the Fisheries Service explains that

> The consultation timeframe cannot be 'suspended.' If the Services need more time to analyze the data or prepare the final opinion, or the action agency needs to provide data or review a draft opinion, an extension may be requested by either party. Both the Services and the action agency must agree to the extension. Extensions should not be indefinite, and should specify a schedule for completing the consultation.

*Id*.

Despite these well-defined statutory and regulatory timelines, the Fisheries Service has failed to complete its consultation and issue a biological opinion for 3 years since the *Deepwater Horizon* disaster.

This delay flies in the face of the Fisheries Service's own policy for completing consultations in 135 days.   *See* Consultation Handbook at 4-7 ("[t]he Services ensure the biological opinion, including the incidental take statement, is prepared and delivered within 135

---

[18] The Consultation Handbook is available at www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf (last visited June 28, 2013).

days of initiation of formal consultation.").   Because the Fisheries Service has not completed consultation in over 3 years in the wake of the country's greatest environmental disaster, where numerous listed species were killed in dramatic numbers and the whole baseline in the Gulf has dramatically changed, the Fisheries Service's 3-year delay is unreasonable in this case.

### B. The Fisheries Service's Delay Is Unreasonable When Judged in the Context of the Endangered Species Act's Overall Statutory Scheme.

The Fisheries Service's delay in completing consultation is even more egregious when judged in the context of the ESA's statutory scheme. *See Cutler*, 818 F.2d at 897-88 (holding that the court must "examine the extent to which the delay may be undermining the statutory scheme").   The Fisheries Service's unreasonable delay has and continues to fundamentally undermine the ESA's statutory scheme to protect and recover listed species. The Fisheries Service's failure to produce a biological opinion deprives threatened and endangered species of the Gulf – the same species which suffered dire consequences as a result of the *Deepwater Horizon* spill – of the ESA provisions designed to ensure these species' protection. This is particularly true where, as here, the expert agencies acknowledge that the baseline status of these species has dramatically changed as a result of the spill. *See* DOI 7359, 7362.

As explained above, the ESA does not contemplate consultation as an afterthought in the conservation of species; the ESA's procedural provisions are an essential component to ensuring that federal actions do not jeopardize the continued existence of listed species or adversely modify the species' critical habitat. 16 U.S.C. § 1536(a); *Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir. 1985) (explaining that the consultation process is designed explicitly "to ensure compliance with the [ESA's] substantive provisions"). Furthermore, once "no jeopardy" is found and an action is allowed to proceed, the Fisheries Service must include measures that will minimize the impact of and require the monitoring of take that will occur.  50 C.F.R. § 402.14(i).

Here, the Fisheries Service's failure to complete consultation wholly undermines the ESA's statutory scheme to give the "highest of priorities" to threatened and endangered species. *TVA,* 437 U.S. at 174.

### C. The Fisheries Service's Delay Is Unreasonable in Light of the Consequences to Listed Species.

The consequence of the Fisheries Service's delay in completing consultation is that listed species in the Gulf are not being actively managed to ensure their survival and recovery in the wake of the nation's largest environmental disaster. Further delaying the biological opinion affects these species because the Bureau is moving forward with additional leasing, exploration, and production activities that may jeopardize species already harmed by the *Deepwater Horizon* disaster. *See Biodiversity Legal Found. v. Norton,* 285 F. Supp. 2d 1, 15-16 (D.D.C. 2003) (finding that the Fish and Wildlife Service's failure to revise critical habitat for endangered bird has "serious consequences" for the bird's survival and explaining that agency assertion that it would complete action "'as soon as feasible' is as good as 'never'"); *Ctr. for Biological Diversity v. Evans*, 2005 WL 1514102, *1, *4 (N.D. Cal. June 14, 2005) (finding unreasonable delay in critical habitat designation where "given that there are a few precious right whales left in the Pacific . . . delay – of any length of time – brings the species closer to extinction.").  In light of this fact, the Fisheries' Service's delay is unreasonable.

### D. The Fisheries Service Cannot Claim That It Cannot Complete Consultation Due to Error, Inconvenience, Practical Difficulty, or Competing Priorities.

In assessing whether a delay is unreasonable, the Court should also give due consideration in the balance to "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of

limited resources." *Cutler*, 818 F.2d at 898.  The Fisheries Service may argue that the agency has purposefully delayed the completion of consultation here in order to collect more post-*Deepwater Horizon* data.  *See, e.g.,* NMFS 4509 (stating that a broader consultation covering ten years of action in the Gulf will "allow more time to incorporate post DWH information").  While this may be true, it does not provide a valid excuse for delaying the completion of consultation in the face of ongoing actions that have the potential to harm listed species.

First, the Endangered Species Act is clear that Section 7 consultation is to be based on "the best scientific and commercial data *available*," 16 U.S.C. § 1536 (a)(2) (emphasis added), rather than the best data possible.  *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F. Supp. 2d 855, 885 (E.D. Cal. 2010) ("[The Fish and Wildlife Service] must apply the best 'available' science; not the best science possible."); *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58 (D.C. Cir. 2000) (overturning district court finding that the Fish and Wildlife Service had duty to gather more information). Second, it appears that the Fisheries Service's delay in completing consultation is equally motivated by a change in course to produce a much broader programmatic biological opinion and a desire to "get[] [the agency] out of having to issue a biop before the upcoming lease sales." NMFS 4509.

In sum, the Fisheries Service's 3-year delay in completing consultation on the facts here – where listed species in the Gulf have faced the most dramatic environmental disaster in history and the Bureau marches forward with actions that clearly "may affect" such species – is unreasonable and arbitrary and capricious.  The court should compel the Fisheries Service to complete consultation in a timely manner.

## CONCLUSION

For all of the reasons stated herein, the court should grant Plaintiffs' motion for summary judgment, declare that the Bureau has violated the National Environmental Policy Act and vacate the SEIS and the Record of Decision for Lease Sale 216/222; declare that the Bureau has violated the Endangered Species Act and vacate the Record of Decision for both Lease Sales; and declare that the Fisheries Service has unreasonably delayed the completion of Endangered Species Act consultation and order the agency to complete consultation within a reasonable time.

Respectfully submitted this 28th day of June, 2013,


*/s/ Michael P. Senatore*
Michael P. Senatore
D.C. Bar. No.  453116

Defenders of Wildlife
1130 17th St NW
Washington, DC 20036
Phone: (202)682-9400
Email:  msenatore@defenders.org


*/s/ Catherine M. Wannamaker*
Catherine M. Wannamaker
        Admitted *Pro Hac Vice*

Southern Environmental Law Center
127 Peachtree St, Suite 605
Atlanta, GA 30303
Phone: (404)521-9900
Email: cwannamaker@selcga.org


Deirdre McDonnell
D.C. Bar No. 465533
Center for Biological Diversity
P.O. Box 19801
Portland, OR 97209
Phone: (971) 279-5471
Email: dmcdonnell@biologicaldiversity.org

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of June, 2013, I electronically transmitted the foregoing motion to the Clerk of Court using the CM/ECF system for filing, which caused all ECF registrants to be served by electronic means as reflected on the CM/ECF Notice of Electronic Filing.


s/ Catherine M. Wannamaker

CATHERINE M. WANNAMAKER