# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| OCEANA, *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 12-0981 (RC) |
| | : | | |
| v. | : | Re Document No.: | 60, 63, 68 |
| | : | | |
| BUREAU OF OCEAN ENERGY | : | | |
| MANAGEMENT, *et al.*, | : | | |
| | : | | |
| Defendants.[1] | : | | |
| | : | | |
| AMERICAN PETROLEUM | : | | |
| INSTITUTE, *et al.*, | : | | |
| | : | | |
| Intervenor-Defendants | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING FEDERAL-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

On April 20, 2010, the *Deepwater Horizon*, a deep-water exploratory oil rig, exploded,

caught fire, and sank in the Gulf of Mexico, resulting in the largest oil spill in the United States

in modern history. Less than two years later, the Bureau of Ocean Energy Management

("BOEM"), approved two lease sales in the area where the *Deepwater Horizon* spill occurred.

The plaintiffs bring this action challenging BOEM's approval of those lease sales under the

National Environmental Policy Act, the Administrative Procedure Act, and the Endangered

Species Act. The plaintiffs also bring suit against the National Marine Fisheries Service

---

[1] The plaintiffs originally brought suit against, *inter alia*, Kenneth Salazar, in his official capacity as Secretary of the Interior. Pursuant to Federal Rule of Civil Procedure 25(d), Sally Jewell, his successor, is automatically replaced as defendant.

("NMFS") for failing to issue a Biological Opinion in the wake of the oil spill in violation of the Administrative Procedure Act. All parties[2] moved for summary judgment. For the reasons that follow, the Court will grant all the defendants' motions for summary judgment, and deny the plaintiffs' motion for summary judgment.

## II. FACTUAL BACKGROUND

### A. Statutory Landscape

#### 1. Outer Continental Shelf Lands Act ("OCSLA")

The Outer Continental Shelf ("OCS") "is an area of submerged lands, subsoil, and seabed that lies between the outer seaward reaches of a state's jurisdiction and that of the United States." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009). In 1953, Congress enacted the Outer Continental Shelf Lands Act of 1953, 43 U.S.C. § 1331, *et seq.*, "to authorize federal leasing of the OCS for oil and gas development." *Sec'y of the Interior v. California*, 464 U.S. 312, 336 (1984). In 1978, the OCSLA was amended "to provide for the 'expeditious and orderly development, subject to environmental safeguards,' of resources on the OCS." *Id.* (quoting 43 U.S.C. § 1332(3)).

The OCSLA provides a four-step process for the development of the OCS. *See id.* at 337; *see also Ctr. for Biological Diversity*, 563 F.3d at 473. The first stage of the development process requires the Department of the Interior ("Department") to create a nationwide five-year leasing program. *See* 43 U.S.C. § 1344(a) ("The Secretary . . . shall prepare and periodically

---

[2] The Court granted several motions to intervene in this case. *See* ECF Nos. 10, 26, 38. The intervenor-defendants are: American Petroleum Institute, Independent Petroleum Association of America, International Association of Drilling Contractors, US Oil & Gas Association, Exxon Mobil Corporation, ConocoPhillips Company, Statoil Gulf of Mexico LLC, Apache Corporation, Apache Deepwater LLC, and National Ocean Industries Association. They will be referred to collectively as "intervenor-defendants." In addition, on August 23, 2013, the Court denied a motion by federal defendants to transfer the case to the Southern District of Alabama. *See* ECF No. 64.

revise, and maintain an oil and gas leasing program . . . . The leasing program shall consist of a

schedule of proposed lease sales . . . which he determines will best meet national energy needs

for the five-year period following its approval or reapproval."). The second stage allows the

Secretary to solicit bids and issue leases for offshore leasing areas. *See* 43 U.S.C. § 1337. After

a lease is approved, a lessee may conduct ancillary activities, which include geological and

geophysical explorations and development, and surveys. *See* 30 C.F.R. § 550.207. The third

stage is known as the exploration stage; during this stage, the Secretary reviews the lessee's

exploration plan ("EP"). *See* 43 U.S.C. § 1340. The final stage is known as development and

production, and during this stage, the Secretary reviews the development and production plan of

the lessee for the purposes of actually producing oil and gas from the leaseholds. *See* 43 U.S.C.

§ 1351. The phase at issue in this case is the second stage—the lease sale stage.[3]

## 2. National Environmental Policy Act ("NEPA")

NEPA was enacted in 1970 "to promote efforts which will prevent or eliminate damage

to the environment and biosphere . . . ." 42 U.S.C. § 4321. The Act provides that federal

agencies shall "include in every recommendation or report on . . . major Federal actions

significantly affecting the quality of the human environment, a detailed statement by the

responsible official on (i) the environmental impact of the proposed action; (ii) any adverse

environmental effects which cannot be avoided should the proposal be implemented, [and] (iii)

alternatives to the proposed action . . . ." 42 U.S.C. § 4332(2)(C). This is known as the

Environmental Impact Statement ("EIS"). NEPA regulations explain that the "primary purpose

---

[3]    Importantly, the OCSLA provides that a challenge to activity in the third and fourth phases (exploration and development) can only be brought in a U.S. Court of Appeals. *See* 43 U.S.C. § 1349(c)(2) ("Any action of the Secretary to approve, require modification of, or disapprove any exploration plan or any development and production plan under this subchapter shall be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located.").

of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1. The "heart of the environmental impact statement" is the analysis of alternatives. 40 C.F.R. § 1502.14. 40 C.F.R. § 1502.14 provides that the agency shall, *inter alia*, "[r]igorously explore and objectively evaluate all reasonable alternatives," "[d]evote substantial treatment to each alternative considered," and "[i]nclude the alternative of no action" in its analysis. 40 C.F.R. §§ 1502.14(a), (b), (d).

### 3. Endangered Species Act ("ESA")

Section 7(a) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species . . . ." 16 U.S.C. § 1536(a)(2). In fulfilling this obligation, "each agency shall use the best scientific and commercial data available." *Id.* If a proposed agency action "may affect" a listed species, federal agencies are required to formally consult with either the National Marine Fisheries Service ("NMFS") or the Fish and Wildlife Service ("FWS"), depending on whether the species is marine or terrestrial. *see* Pl.'s Mot. Summ. J. 5 n.3, ECF No. 60; *see also* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b); 50 C.F.R. § 402.14(a). Following formal consultation, the NMFS (in this case) must issue a written statement known as a Biological Opinion, explaining how the proposed action will affect the species or its habitat. *See Bennett v. Spear*, 520 U.S. 154, 158 (1997) (citing 16 U.S.C. § 1536(b)(3)(A)).

Section 7(d) of the ESA states that "[a]fter initiation of consultation," the relevant agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any

reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d).

## B. Lease Sales in the Gulf of Mexico

The Gulf of Mexico ("GOM") is a unique and important part of the American landscape and economy. It "includes one of the most extensive estuary systems in the world," "produces more than one-third of the nation's domestic seafood supply," and is home to many endangered species, such as the sperm whale, the West Indian manatee, several species of sea turtles, beach mice, the whooping crane, and the gulf sturgeon. *See* Am. Compl. ¶¶ 43–45. At the same time, the OCS of the Gulf of Mexico is responsible for 20% of total U.S. crude oil production. *See* Intervenor-Def.'s Cross-Mot. Summ. J. 17, ECF No. 68.

To understand the importance of the lease sales at issue here, it is helpful to wade into the Gulf of Mexico's recent OCS lease sale history. In April 2007, BOEM[4] published a Multisale EIS, which covered eleven lease sales planned for in the Gulf of Mexico. *See* Am. Compl. ¶ 46, *see also* Outer Continental Shelf (OCS), Western and Central Gulf of Mexico (GOM), Oil and Gas Lease Sales for Years 2007–2012, 72 Fed. Reg. 18,667 (April 13, 2007). Three of these eleven Lease Sales, Lease Sales 206, 216, and 222, were located in the Central Planning Area ("CPA") of the Gulf of Mexico—where the *Deepwater Horizon* spill took place. *See* Am. Compl. ¶ 46. Another one of the eleven leases was located in the Western Planning Area ("WPA") of the Gulf of Mexico, Lease Sale 218. Am. Compl. ¶ 47. In September 2008, after Congress repealed a moratorium on drilling, BOEM issued a Supplemental EIS for seven lease sales that had been covered in the 2007 Multisale EIS, called the 2009–2012 Supplemental EIS. Am. Compl. ¶ 57; *see also* AR2433–2917.

---

[4] BOEM was previously known as the Minerals Management Service, also within the Department of the Interior.

On April 20, 2010, a deep-water exploratory oil rig known as the *Deepwater Horizon*, caught fire and exploded, releasing almost five million barrels of oil into the Gulf over the course of many weeks and months. "The Deepwater Horizon blowout produced the largest accidental marine oil spill in U.S. history, an acute human and environmental tragedy." *See* National Commission on the BP Deepwater Horizon Oil Spill & Offshore Drilling, Deepwater: The Gulf Oil Disaster and the Future of Offshore Drilling, Report to the President, at 173.[5]

As of the *Deepwater Horizon*[6] oil spill in 2010, there were two lease sales remaining in the Gulf under the 2007 Multisale EIS: Lease Sale 218 and Lease Sale 222 (which was combined with Lease Sale 216 in 2012). Am. Compl. ¶ 58. In light of the spill, on November 10, 2010, BOEM issued a notice of intent to prepare a Supplemental EIS ("SEIS") for Lease Sale 216/222 and Lease Sale 218. *See* Outer Continental Shelf (OCS), Western and Central Planning Areas, Gulf of Mexico (GOM) Oil and Gas Lease Sales for the 2007–2012 5–Year OCS Program, 75 Fed. Reg. 69,122 (November 10, 2010). The purpose of undertaking the SEIS was "to consider new circumstances and information arising, among other things, from the Deepwater Horizon blowout and spill." *See* 75 Fed. Reg. at 69,122. BOEM explained that the focus of the SEIS would be "on updating the baseline conditions and potential environmental effects of oil and natural gas leasing, exploration, development, and production in the WPA and CPA." *Id.*

On July 1, 2011, BOEM issued a Draft SEIS for Lease Sale 216/222. *See* 76 Fed. Reg. 38,676 (July 1, 2011). Meanwhile, on December 14, 2011, BOEM held the first lease sale since the *Deepwater Horizon* explosion in the Gulf of Mexico—for Lease Sale 218. *See* Outer Continental Shelf (OCS), Western Planning Area (WPA) Gulf of Mexico Oil and Gas Lease Sale

[5]      *available at* http://www.gpo.gov/fdsys/pkg/GPO-OILCOMMISSION/pdf/GPO-OILCOMMISSION.pdf.
[6]      This event is hereinafter referred to either as the Deepwater Horizon spill or the "DWH" spill, for short, depending on who the speaker is.

218, 76 Fed. Reg. 70,473-01 (Nov. 14, 2011). On January 20, 2012, BOEM issued the final

SEIS for Lease Sale 216/222 ("2012 SEIS"). *See* AR5438–6673. This 2012 SEIS concluded

that "[n]o substantial new information, with the exception of archeological resources, was found

that would alter the impact conclusions as presented in the Multisale EIS and the 2009–2012

Supplemental EIS for a CPA lease sale." AR5448. BOEM also explained that "[i]t is important

to note that, barring another catastrophic oil spill, which is a low probability accidental event, the

adverse impacts associated with the proposed CPA lease sale are small, even in light of the

DWH event." AR5624.

Lease Sale 216 had been scheduled to take place in 2011 and Lease Sale 222 had been

scheduled for 2012. *See* Federal-Def.'s Cross-Mot. Summ. J. 6, ECF No. 63. Following the

*Deepwater Horizon* incident, BOEM decided to postpone proposed Lease Sale 216 and combine

it with proposed Lease Sale 222. After the 2012 SEIS was published, BOEM held Lease Sale

216/222 in June 2012. *Id.*

### C. Endangered Species Act consultation

In 2007, the NMFS completed a Biological Opinion ("BO") for five Gulf of Mexico lease

sales, including Lease Sale 218 and Lease Sale 216/222. *See* Pl.'s Mot. Summ. J. 9. In response

to the *Deepwater Horizon* spill, on July 30, 2010, the BOEM reinitiated consultation with the

FWS and the NMFS because BOEM explained that "the spill volumes and scenarios used in the

analysis for the existing NMFS BO need to be readdressed given the 'rare event' of a spill

exceeding 420,000 gallons as referenced in the current NMFS BO . . . ." AR7351. BOEM noted

that as a result, the "affects to and the status of some listed species or designated critical habitats

may have been altered as a result of the DWH incident and therefore require further

consideration." *Id.*

To date, the consultation has not yet been completed. However, BOEM and NMFS have developed an interim consultation process until the new Biological Opinion is issued. "That process gives NMFS the opportunity to review and comment on certain-post lease activities (such as exploration plans)." *See* Federal-Def.'s Cross-Mot. Summ. J. 9; *see also* DOI 7496–7501, 7557–58, 7561 (all describing the interim consultation process). NMFS anticipates a March 2015 date of completion of the BO. *See* Bernhart Decl., ECF No. 75-1.

## III. ANALYSIS

The plaintiffs, various environmental organizations,[7] brought suit against BOEM and NMFS alleging NEPA, ESA, and APA violations. They argue that (1) BOEM violated NEPA and was arbitrary and capricious in issuing its 2012 SEIS because it failed to take a "hard look" at the environmental impacts of Lease Sale 216/222 and failed to consider a no action alternative; (2) that BOEM violated the ESA by failing to insure against jeopardy to listed species in issuing Lease Sales 216/222 and 218; and (3) that NMFS violated the APA by unreasonably delaying the issuance of the Biological Opinion. The Court turns to the relevant legal standards and analyzes each argument in turn.

### A. APA Standard of Review

Under the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Agency action is considered "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

---

[7] The plaintiff organizations are Oceana, Defenders of Wildlife, Center for Biological Diversity, and National Resources Defense Council. Though the plaintiffs have included several exhibits demonstrating their members' standing, the defendants do not challenge plaintiffs' standing to bring this action.

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n v. State Farm Mutual Auto Ins.*, 463 U.S. 29, 43 (1983). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Under NEPA, the court's role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. v. NRDC,* 462 U.S. 87, 97–98 (1983). "An environmental impact statement is reviewed to ensure that the agency took a hard look at the environmental consequences of its decision to go forward with the project." *Nat'l Comm. for the New River v. F.E.R.C.*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (citations omitted). "When an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted." *Id.* (internal quotation marks and citation omitted). Meanwhile, judicial review of agency action under the ESA is governed by the arbitrary and capricious standard. *See Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) ("Since the ESA does not specify a standard of review, judicial review is governed by section 706 of the Administrative Procedure Act."); *accord WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 4 (D.D.C. 2009).

**B. NEPA Claims**

The plaintiffs argue that BOEM violated NEPA in three ways: (1) by failing to gather information essential to a reasoned choice among alternatives in violation of 40 C.F.R. § 1502.22; (2) by failing to adequately consider new analyses of the risks of another large oil spill;

and (3) by failing to consider a true "no action" alternative. *See* Pl.'s Mot. Summ. J. 13. Each one of these arguments is addressed below.

### 1. 40 C.F.R. § 1502.22

The plaintiffs first argue that BOEM determined that certain information was essential to a reasoned choice among alternatives, and yet made no effort (1) to obtain the essential information or (2) demonstrate that the cost of obtaining it was exorbitant. *See* Pl.'s Mot. Summ. J. 15. As set forth above, under NEPA, when an agency prepares an EIS, it must "[r]igorously explore and objectively evaluate all reasonable alternatives . . . ." 40 C.F.R. § 1502.14(a). In undertaking such an analysis, "[w]hen an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an [EIS] and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22. If the missing information is "essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the [EIS]." *Id.* § 1502.22(a). If, on the other hand, the missing information cannot be obtained "because the overall costs of obtaining it are exorbitant or the means to obtain it are not known," the agency must include within the EIS: "(1) [a] statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." *Id.* § 1502.22(b).

The Council on Environmental Quality ("CEQ") promulgates binding regulations on federal agencies to help them implement NEPA. *See* National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. 15,618-01 (April 25, 1986). The CEQ explains that "[t]he term 'incomplete information' refers to information which the agency cannot obtain because the overall costs of doing so are exorbitant. The term 'unavailable information' refers to information which cannot be obtained because the means to obtain it are not known." 51 Fed. Reg. at 15,621. The CEQ regulations further note that the term "overall costs" is intended to encompass "financial costs and other costs such as costs in terms of time (delay) and personnel." *Id.* at 15,622. It also "intends that the agency interpret 'overall costs' in light of overall program needs." *Id.* Finally, the CEQ guidelines provide that the phrase "'the means to obtain it are not known' is meant to include circumstances in which the unavailable information cannot be obtained *because adequate scientific knowledge*, expertise, techniques or equipment do not exist." 51 Fed. Reg. at 15,622 (emphasis added). In addition, other NEPA regulations provide that "[i]n circumstances where the provisions of 40 C.F.R. § 1502.22 apply, bureaus must consider all costs to obtain information. These costs include monetary costs as well as other non-monetized costs when appropriate, such as social costs, delays, opportunity costs, and non-fulfillment or non-timely fulfillment of statutory mandates." 43 C.F.R. § 46.125.

In Chapter 4 of the 2012 SEIS, BOEM explained that for thirteen resources, there is "incomplete or unavailable information that is relevant to reasonably foreseeable significant adverse impacts; however, it is not essential to a reasoned choice among alternatives." AR5624.[8] For eleven other resources, however, BOEM concluded that "there is incomplete or

---

[8] The plaintiffs do not challenge BOEM's determination as to whether the unavailable information was "essential." *See* Federal-Def.'s Cross-Mot. Summ. J. 10 n.2; Pl.'s Mot. Summ. J. 13–17. As such, the Court defers to BOEM's determination on this issue.

unavailable information that is relevant to reasonably foreseeable significant adverse impacts and may be essential to a reasoned choice among alternatives." *Id.* BOEM analyzed each of those eleven resources, which are Seagrass Communities, Live Bottoms, Topographic Features, Marine Mammals (the sperm whale and the West Indian manatee, specifically), Sea Turtles, Coastal and Marine Birds, Gulf Sturgeon, Fish Resources and Essential Fish Habitat, Commercial Fisheries, Environmental Justice, and Diamondback Terrapins. *See* AR5624–25.

Because the plaintiffs take issue with BOEM's treatment of each of these eleven resources for which there was "incomplete or unavailable [yet essential] information," the Court must examine what, exactly, BOEM did to determine whether it complied with the requirements of 40 C.F.R. § 1502.22(b). With respect to Seagrass Communities, BOEM concluded the following:

> [T]here remains uncertainty regarding the impacts of the DWH event on submerged vegetation . . . . BOEM cannot definitively determine that the incomplete or unavailable information being developed through the NRDA process would not be essential to a reasoned choice among alternatives. Nevertheless, the ongoing research on submerged vegetation after the DWH event is being conducted through the NRDA process. These research projects may be years from completion, and data and conclusions have not been released to the public. Regardless of the costs involved, it is not within BOEM's ability to obtain this information from the NRDA process within the timeline of this Supplemental EIS. In light of this incomplete and unavailable information, BOEM subject-matter experts have used credible scientific information that is available and applied it using scientifically accepted methodology.

AR5709–10.

BOEM made similar statements regarding the Live Bottom (Pinnacle Trend) habitat, *see* AR5721; Topographic Features, *see* AR5781; Marine Mammals, *see* AR5839; Sea Turtles, *see* AR5858–59; Coastal and Marine Birds, *see* AR5879; Gulf Sturgeon, *see* AR5907; Fish Resources and Habitat, *see* AR5922; Commercial Fishing, *see* AR5938; Environmental Justice, *see* AR6010; and Diamondback Terrapins, *see* AR6060–61.

BOEM explained the methodologies it relied on generally, and then explained the

scientific studies it relied on specifically for each of the eleven resources. Generally, BOEM

included the following section as to its methodology in Appendix B of the SEIS:

> Two general approaches are utilized to analyze a catastrophic event under NEPA. The first approach is a bounding analysis for each individual resource category (e.g., marine mammals, sea turtles, etc.). A bounding analysis involves selecting and evaluating a different set of factors and scenarios for each resource in the context of a worst-case analysis. The second approach involves the selection of a single set of key circumstances that, when combined, result in catastrophic consequences. The second approach is used for a site-specific analysis and, consequently, its possible application is more limited. Accordingly, this analysis combines the two approaches, relying on a generalized scenario while identifying site-specific severity factors for individual resources. This combined approach allows for the scientific investigation of a range of possible, although not necessarily probable, consequences of a catastrophic blowout and oil spill in the Gulf of Mexico.

> AR6562.

On the more specific level, BOEM relied on various studies, both dated pre-and post-oil spill,

and made evaluations of the environmental impacts to the particular resource in light of those

studies. *See, e.g.*, AR5707 ("The panhandle [of Florida] was exposed to oil and tarballs from the

DWH event, but the majority of the seagrass beds in south Florida received little impact from the

DWH event (USDOC, NOAA, 2010e). It is assumed these communities will be similar to how

they were before the DWH event unless a significant delayed impact occurs."); AR5711 (citing

to, explaining, and apply various studies with respect to seagrass communities); AR5839–40

(stating that "BOEM subject-matter experts have used available scientifically credible evidence

in this analysis and based upon accepted scientific methods and approaches" and, citing to and

applying a Waring et al. (2009) study on sperm whales, to discuss the impacts of both the

proposed action and the DWH spill on sperm whales); AR5858 (citing to studies post-*Ixtoc I* oil

spill off the coast of Mexico to compare effects of spills on sea turtles in the Gulf of Mexico, and

citing to various other scientific studies both before and after the spill to discuss impacts to sea turtles of the proposed action); AR5874 ("peer-reviewed modeling of bird mortality was completed by Antonio et al. (2011) . . . . If physical oiling of individuals or local groups of birds occurs, some degree of both acute and chronic psychological stress associated with direct and secondary uptake of oil would be expected."); AR5907 ("Based on the publicly available information found in the OSAT and OSAT-2 reports (OSAT, 2010; OSAT-2, 2011), it was noted that, after August 2010, the more toxic oil components were limited to an area . . . [and] sediment samples did not reach USEPA's exceedances for aquatic life benchmarks."); AR5922 ("Based on existing research, adult fish have been observed to actively avoid contact with oil in the water column (Wannamaker and Rice, 2000). Nevertheless, information on effects of the DWH event on fisheries is unavailable or incomplete at this time . . . ."); AR5940 ("In a recent study of the concentrations of the bioavailable form of mercury in drill mud, Trefry et al. (2003) found concentrations did not vary significantly between near-platform and far-platform sites . . . . As such, any impact to commercial fisheries would likely be indistinguishable from exposure to background concentrations."); AR6061–62 (explaining effects of 1990 oil spill on population of diamondback terrapins and explaining that effects of DWH oil spill "may have potentially impacted the terrapin community" but noting that such effects cannot be quantified at this time).

### a. BOEM disclosed what was unavailable

The plaintiffs first argue that BOEM failed to comply with 40 C.F.R. § 1502.22 because it did not explain why the overall costs to obtaining the essential missing information were exorbitant. 40 C.F.R. § 1502.22 first requires that "[w]hen an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear

that such information is lacking." 40 C.F.R. § 1502.22(b) goes on to state that if the essential,

missing, information "cannot be obtained because the overall costs of obtaining it are exorbitant

or the means to obtain it are not known," then the agency must include four particular statements

in the EIS.

BOEM stated that certain information that may be essential to a reasoned choice among

alternatives was incomplete or unavailable. *See supra*, at 12. The plaintiffs argue that BOEM

did not satisfy 40 C.F.R. § 1502.22 because BOEM failed to *demonstrate or explain* why the

overall cost to obtaining the essential information was exorbitant. *See* Pl.'s Mot. Summ. J. 15;

Pl.'s Reply 3–4. But 40 C.F.R. § 1502.22 itself does not require such a demonstration—it only

requires that "[*i*]*f* the information . . . cannot be obtained because the overall costs of obtaining it

are exorbitant," *then* the agency must disclose the four enumerated statements in §1502.22(b) in

the EIS (emphasis added). §1502.22(b) does not impose a requirement that the agency *explain*

*why* the "overall costs of obtaining [the missing, essential information] are exorbitant or the

means to obtain it are not known"—just that it provide the four enumerated statements in the EIS

*if* the costs to obtaining the information are exorbitant. *See Oregon Envt'l Council v. Kunzman*,

817 F.2d 484, 495–96 (9th Cir. 1987) ("The omission of an explicit exposition of the agency's

determination of exorbitance does not warrant deeming this EIS legally inadequate.").

And regardless of whether the regulation required such an explanation, BOEM

nevertheless provided one. In the 2012 SEIS, BOEM repeatedly stated that the essential

unavailable research may take years to complete, and that it was not within BOEM's ability to

obtain the information within the timeframe contemplated by the SEIS, thus stating that "the

means to obtain [missing information] are not known." 40 C.F.R. § 1502.22(b). BOEM also

repeatedly stated that "[r]egardless of the costs of acquiring these data, given the realities of the

NRDA process,[9] these data will not be available within the timeframe contemplated for this NEPA analysis." AR5941. *See also* AR5942 (explaining that, with respect to the impact on commercial fisheries, "impacts from the DWH event may be difficult or impossible to discern from other factors. Therefore, it is not possible for BOEM to obtain this information within the timeframe contemplated in this Supplemental EIS"); AR5623–24 ("Credible scientific data regarding the potential short-term and long-term impacts on CPA resources is slowly becoming available but remains incomplete at this time, it could take many years before this information becomes available via the Natural Resources Damage Assessment (NRDA) process, BOEM's Environmental Studies Program, and numerous studies by academia."). BOEM also referenced the experience of the *Exxon Valdez* oil spill, and the fact that it took so many years to get viable scientific information after that disaster, as an example. *See, e.g.*, AR5839 ("even 20 years after the Exxon Valdez spill, long-term impacts to marine mammal populations are still being investigated (Matkin et al., 2008). Therefore it is not possible for BOEM to obtain this

---

[9] The Oil Pollution Act of 1990 created a process called the Natural Resource Damage Assessment ("NRDA") to "assess natural resource damages" in the case of damage from oil spills. *See* 33 U.S.C. §§ 2702(a), 2706(c). The President designates certain federal agencies, states, and Indian tribes, as trustees to evaluate the impacts of oil spills on natural resources. *See id.* § 2706(b). The NRDA for the *Deepwater Horizon* spill is currently underway, and BOEM was *not* designated a trustee for the *Deepwater Horizon* NRDA process. In an email from Joe Christopher, BOEM's Regional Supervisor for the Gulf of Mexico leasing program, to Michael Bromwich, the Director of BOEM at the time, he explained that because BOEM is not a trustee of NRDA, they "did not have a seat on the NRDA committee" and thus "have had little success in accessing, either in the planning of studies, or in the sharing of data." *See* AR3232. He requested that they be allowed to become a trustee to join the committee, to help develop a robust SEIS. *Id. See also* AR5855 ("Due to NMFS's and FWS's role in the [NRDA] investigation, BOEM does not have the ability to obtain its own data on stranded animals."). The record therefore reflects that BOEM attempted to get involved in the NRDA process, but was denied access through no fault of its own. Moreover, even if BOEM could have become a trustee on the Board, "there is no indication that information would be available and usable by BOEM as part of the 2012 SEIS," *see* Federal-Def.'s Cross-Mot. Summ. J. 12, as the relevant scientific data was, and still is being developed.

information within the timeline contemplated in this Supplemental EIS,[10] regardless of the cost

or resources needed.").

BOEM thus explained that the reason the information could not be obtained was because

of the ongoing research being conducted post-oil spill, and that regardless of cost, it was not

within BOEM's ability to obtain the information from the NRDA process. BOEM's discussion

of its inability to obtain the essential information because the data was not yet available from the

NRDA, and might not be for years, therefore suffices for purposes of demonstrating that the

"means to obtain[ing]" the information were not known. And BOEM's discussion of the delay

in timing of the information being available suffices for purposes of determining whether "the

overall costs" were exorbitant (regardless of whether BOEM had to "demonstrate" exorbitance

or not), per the CEQ guidelines.[11]

---

[10]     The plaintiffs argue that it was arbitrary and capricious for BOEM to set its own SEIS-development timeline. However, agencies have discretion to set up their own timelines when undertaking an environmental impact statement. *See* 40 C.F.R. § 1501.8 ("Federal agencies are encouraged to set time limits appropriate to individual actions."). *See also id.* § 1501.8(b)(2)(i)-(vii) (allowing an agency to set up a time limit for all parts of the environmental impact statement analysis); *Wyoming v. U.S. Dep't of Agriculture*, 661 F.3d 1209, 1239 (10th Cir. 2011) ("absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and methods of inquiry permitting them to discharge their multitudinous duties") (internal citations and quotation marks omitted). BOEM spent thirteen months developing the 2012 SEIS, from November 2010 when it issued its notice of intent to prepare an SEIS for Lease Sale 216/222 to January 2012 when it issued the Final SEIS for Lease Sale 216/222. The Court defers to the agency's timeline and does not find it arbitrary and capricious. While BOEM was assuredly intent on proceeding with the lease sales, it nevertheless took time to develop a Draft SEIS, prepare a new Oil Spill Risk Analysis, accept comments, respond to comments, and publish the Final SEIS.

[11]     The plaintiffs argue that BOEM's exorbitance explanation is a post-hoc litigation position, and as such, is afforded no deference. *See* Pl.'s Reply 3–4. The Court finds this argument unpersuasive, because, as set forth above, the 2012 SEIS itself did contain explanations for why the information was not available and why it was unobtainable regardless of costs. And any additional information it has provided in its motion papers is not new, but rather, clarifying. *See Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996) ("[t]he rule against post-hoc rationalizations does not prevent a court from considering a more detailed explanation of an agency's action in response to a legal challenge. As long as the agency does

The CEQ regulations further provide that "one of the costs that must be weighed by decisionmakers is the cost of uncertainty—i.e., the costs of proceeding without more and better information." 51 Fed. Reg. at 15,624 (quoting *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978), *vacated on other grounds by Western Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978)). To be sure, BOEM could have waited until all the essential post-oil spill data became available before it moved forward with the lease sales. But nothing in 40 C.F.R. § 1502.22 requires the agency to halt action in the face of uncertain information—it just requires disclosure that such information is lacking, and commands the agency to provide as comprehensive an analysis it can with the information available to it. Courts have recognized that "NEPA does not require that complete information about the environmental impact of a project be obtained before a project is undertaken." *N. Slope Borough v. Andrus*, 486 F. Supp. 326, 330 (D.D.C. 1979); *see also Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996) ("It is not required . . . that action be deferred until all studies have been done that might be done."). The administrative record shows that BOEM gathered as much information as it could and comported with the initial requirements of 40 C.F.R. § 1502.22.

### b. BOEM evaluated impacts based on theoretical approaches or research methods generally accepted in the scientific community

The plaintiffs next argue that even if BOEM had satisfied the requirement to demonstrate that it could not obtain essential information due to exorbitant cost, *see* Pl.'s Reply 4, it still failed to comply with the final step[12] of 40 C.F.R. §1502.22(b), which required BOEM to

---

not present a new basis for its action, it may supply a clearer or more detailed explanation.") (citing *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1233 n.11 (D.C. Cir. 1994)).

[12] It is not disputed by the parties that BOEM met the requirements of 40 C.F.R. § 1502.22(b)(1)–(3). And the Court finds that those requirements are met here. First, BOEM explains that certain information is unavailable: "the impacts of DWH" on a particular species or resource. Second, BOEM states the relevance of that information: that it may be essential to a

"evaluat[e] . . . such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. §1502.22(b)(4). Contrary to the plaintiffs' argument that the agency did not use the scientific methodologies to make a "true prediction of impacts based on" the methodologies it studied, *see* Pl.'s Reply 5 n.3, the Court finds that BOEM did evaluate impacts based on "theoretical approaches or research methods generally accepted in the scientific community." For each of the eleven resources for which BOEM determined there was essential, unavailable information, BOEM analyzed the impacts to those species in light of the information it did have available to it.

For instance, with respect to sea turtles, BOEM cited an OSAT 2010 study and then determined that "[i]t is likely that there were effects on individual sea turtles in the vicinity of the DWH event spill caused by spilled oil and/or response activities . . . . [but] [w]ithout any further data than what exist [sic] from NMFS and FWS (which have jurisdiction over sea turtles in water and on land, respectively), it is impossible to determine if the spill has led to population-level effects or if sea turtles are experiencing chronic effects or persistent adverse impacts from the spill at the population level." AR5854. With respect to the gulf sturgeon, BOEM cited to an OSAT 2010 and 2011 study as well as an FWS study from 2010 that discussed the effects of the oil spill on the gulf sturgeon's critical habitat. AR5912. BOEM then concluded that "critical habitat from Lake Borgne to the Florida/Alabama State line has at least been exposed to oil from the DWH event . . . . but did not exceed USEPA's benchmarks for aquatic life in either sediments or water." *Id.* For birds, BOEM explained that it had no peer-reviewed studies of the impacts of oil spills on birds in the Gulf of Mexico, but in place of that, "investigations of spills

---

determination of a reasoned choice among alternatives. Third, BOEM summarizes "existing credible scientific evidence which is relevant" in each of the eleven sections that it analyzes, as well as in Appendix B.

in other areas, mathematical modeling, and laboratory tests (e.g., toxicity tests and veterinarian studies of rehabilitation) are used for insight into DWH impacts on all life history stages of birds . . . . Although information from the DWH event would be useful, it is not expected to significantly change this existing body of science." AR5885. BOEM thus applied the scientific information it had before it to discuss what impacts Lease Sale 216/222 would have on the effected resources.

Moreover, BOEM included a Catastrophic Spill Event Analysis in Appendix B of the 2012 SEIS. There, BOEM cited its general "Methodology," quoted above (*see* AR6562), and proceeded to apply that methodology to the rest of Appendix B, which analyzed the effects of a Catastrophic Spill on every resource identified in the Gulf of Mexico. *See* AR6563–6612. BOEM also included a 100-page bibliography in Appendix B, compliant with CEQ guidelines for "literature searches and peer review," *see* 51 Fed. Reg. at 15,622, illustrating that BOEM's subject matter experts relied upon consultation with outside sources, including scientists, to complete the 2012 SEIS. *See* AR6315–6412. BOEM then spent over fifty pages *evaluating* the environmental impacts of a catastrophic spill based upon the various sources of credible scientific evidence it cited. *See* AR6563 ("[T]his analysis, based on credible, scientific evidence, identifies the most likely and most significant impacts from a high-volume blowout and oil spill that continued for an extended period of time."). 40 C.F.R. § 1502.22(b)(4) requires that the agency "use[] available data to explore the potential impacts and articulate[] the basis for its decision." *Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv.*, 465 F. Supp. 2d 1067, 1100 (D. Mont. 2006). BOEM did just that. As such, it complied with 40 C.F.R. § 1502.22, and did not violate NEPA on these grounds.

BOEM did repeatedly state in somewhat boilerplate fashion that "BOEM subject-matter experts have used available scientifically credible evidence in this analysis and based it upon accepted scientific methods and approaches." *See supra*, at 12. The plaintiffs argue that "[i]t is insufficient for BOEM to simply state that it used such methodologies without record evidence," *see* Pl.'s Reply 5. But Chapter 4 of the 2012 SEIS, along with Appendix B reference numerous studies and evaluate what information BOEM did have in light of the proposed impact of the lease sales going forward. Just because BOEM did not specifically re-cite and evaluate those studies in the sections where the above-quoted language comes from does not mean that it did not make the requisite evaluations at all. On the contrary, BOEM stated *generally* that it was relying on accepted scientific methods and approaches and *then specifically* applied relevant studies for each effected resource it examined throughout the 2012 SEIS.

Finally, the plaintiffs argue that BOEM did not gather the essential information required by 40 C.F.R. § 1502.22. The vast administrative record and foregoing discussion undermines this contention. To be sure, BOEM lacked certain information, which it disclosed in the SEIS, because many of the effects of the oil spill on the environment are still unknown. However, in every place it reasonably could, BOEM updated its analyses in light of the information it did have available. BOEM took a hard look at the effects of the *Deepwater Horizon* oil spill and incorporated all the information it reasonably could in the 2012 SEIS. As such, it did not violate 40 C.F.R. § 1502.22.

### 2. BOEM considered new analyses about the risks of catastrophic oil spills

The plaintiffs next argue that BOEM failed to adequately consider new information about the risks of future oil spills. Pl.'s Mot. Summ. J. 17. Specifically, the plaintiffs argue that BOEM (1) failed to incorporate critical information from its new spill risk analysis prior to the

completion of the SEIS, (2) significantly downplayed the Gulf spill in the analysis it did perform, and (3) failed to conduct new modeling in light of the spill and its new analysis. *Id.* at 18.

Before diving into the depths of the studies and tables, some background information is useful. NEPA regulations provide that agencies are allowed to "tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." *See* 40 C.F.R. § 1502.20. As BOEM explained, the 2012 SEIS "tiers from" the 2007 Multisale EIS and the 2009–2012 Supplemental EIS. AR5445. The main oil spill study relied upon by BOEM in the 2007 Multisale EIS, the 2009–2012 Supplement, and the Draft SEIS was a study by Anderson and Labelle (2000). AR5556. The Anderson and Labelle study was updated by BOEM's own draft report, entitled "Update of Oil Spill Occurrence Rates for Offshore Oil Spills" [hereinafter "Draft Report"]. *See id.* ("Anderson and Labelle (2000) have [sic] been updated by DOI's draft report, *Update of Oil Spill Occurrence Rates for Offshore Oil Spills* (USDOI, BOEMRE, 2011a)."). BOEM also explained that in light of this update, "[p]latform and pipeline spill rates and likely spill sizes published in the Multisale EIS have thus become outdated. Readers should note that Tables 4-13, 4-14, 4-16, and 4-35 of the Multisale EIS and Table 3-6 of the 2009–2012 Supplemental EIS use the 2000 spill rates and sizes rather than the 2011 spill rates and sizes." *Id.*

The Draft Report incorporated new data based on the *Deepwater Horizon* spill (called the "Macondo" spill in the report) into BOEM's figures for oil spill occurrences. *See* DOI REF 48326–48339. BOEM generally structures its analysis in terms of oil spill size. The relevant spill sizes for purposes of this case are the larger spill sizes: $\geq 1,000$ bbl and $\geq 10,000$ bbl (bbl standing for barrel). After updating its calculations to include oil spills up through 2010 (including the Macondo spill), BOEM concluded, *inter alia*, that:

(1)	spill rates[13] for OCS Platforms were unchanged for spills ≥ 1,000 bbl at 0.32 spills per bbl, but improved from 0.12 to 0.06 spills ≥ 10,000 bbl when examined over the entire record (1964–2010) and adjusted for a trend. DOI REF 48326.

(2)	spill rates for OCS platforms doubled when comparing the most recent 15 years [of] data (1996–2010 data) to the last 15 years [of] data in the previous analysis (Anderson & LaBelle 2000: 1985–1999 data) from 0.13 to 0.25 spills per bbl for spills ≥ 1,000; and from 0.05 to 0.13 spills per bbl for spills ≥ 10,000 bbl. These rates are still relatively low and include a spill from Hurricane Rita (2005) and the Macondo spill in 2010.

*Id.*[14]

The 2012 SEIS references this Draft Report in the following places (that either the Court can find or that the parties cite to): AR5556, AR5575, AR5576, AR6471.[15]

---

[13]	As BOEM explained, "[s]pill rates were calculated based on the assumption that spills occur in direct proportion to the volume of oil handled and are expressed as number of spills per billion barrels of oil handled." AR5576. Moreover, in the Draft Report, BOEM defines "spill rate" as "[e]stimated occurrence rates for oil spills based on historic spill occurrences and associated volume of oil produced and transported." *See* DOI REF 48328.

[14]	The Draft Report has since been finalized, is available on BOEM's website, and BOEM is using it in the 2012–2017 Five-Year Lease Program. The Final Report arrives at the same conclusions the Draft Report did. *See* http://www.boem.gov/uploadedFiles/BOEM/ Oil_and_Gas_Energy_Program/Leasing/Five_Year_Program/2012-2017_Five_Year_Program/Update%20of%20Occurrence%20Rates%20for%20Offshore%20Oil%20Spills.pdf. The only substantive difference is that the Final Report more clearly explains how including the Macondo spill in the average drastically changes the statistics for a typical event. *See id.* at 37–39.

[15]	It is also provided in the administrative record to this case at DOI REF 48326–48377.

### a. BOEM incorporated new information

The plaintiffs first argue that BOEM completed an updated risk analysis in light of the *Deepwater Horizon* spill—the Draft Report—and yet did not provide data from that new analysis in the 2012 SEIS. *See* Pl.'s Mot. Summ. J. 19. The plaintiffs' argument focuses on Table 3-5, provided at AR6471. Table 3-5 is entitled "Mean Number and Sites of Spills Estimated to Occur in OCS Offshore Central Planning Area Waters from an Accident Related to Rig/Platform and Pipeline Activities Supporting a CPA Proposed Action Over a 40-Year Time Period." *See id.* The significance of the table is that it provides "[t]he risk of various sizes of oil spills occurring in the CPA." *See, e.g.*, AR5822.

The plaintiffs take issue with Table 3-5's exclusion of the ≥ 10,000 bbl category from the table's body itself. In the 2007 Multisale EIS, the risk of various oil spills occurring in the CPA was provided in Table 4-35, and in the 2009–2012 Supplement EIS performed, it was moved to Table 3-6. *See* AR5578. As BOEM explained in the 2012 SEIS, these figures use the 2000 spill rates rather than the updated 2011 spill rates. AR5556. In these prior iterations, the tables provided a category for oil spills ≥ 10,000 bbl. In addition, the SEIS for Lease Sale 218 as well as the Draft SEIS for Lease Sale 216/222 include a table that includes a ≥ 10,000 bbl category. Essentially, of all the EISs or SEISs performed in the Gulf of Mexico CPA and WPA for the 2007–2012 leasing period, the 2012 SEIS is the only one that excludes a ≥10,000 bbl category in the table *body* estimating mean number and sizes of oil spills. Instead, in the notes section directly under the table, BOEM states "[a] spill size group for ≥ 10,000 bbl was not included in the table, because the catastrophic Deepwater Horizon oil spill (4.9 million bbl) was the only spill this size range during 1996-2010, and thus meaningful statistics (such as median spill size)

could not be calculated."  AR6471.  In the Draft Report, BOEM gave the following explanation

for its treatment of the ≥ 10,000 bbl category:

> In the case of OCS Platform spills, spill size averages and medians were calculated *through to 2009 rather than 2010.* [sic] because the Macondo spill size overwhelms the rest of the record in any calculation using spill volume.  The Macondo well spilled an estimated 4.9 million barrels in the Gulf of Mexico – about 8.5 times the roughly 750,000 bbl of petroleum previously spilled (spills ≥ 1 bbl) between 1964 and 2009 from OCS oil and gas activities.  Unfortunately, the Macondo spill was a 'worst case' spill – a complete loss of well control due to multiple failures on a well with a very large reservoir under very high pressures that released uncontrolled for months.  Few wells would be capable of this size release even under the worst of circumstances.  *It is appropriate to count the Macondo spill in the spill rates for spills of 1,000 and 10,000 bbl or greater.* Means (averages) and medians are statistical measures that are frequently used to characterize a 'typical' event.  *In the interest of characterizing the size of a 'typical' or 'representative' OCS spill it would be best to exclude the Macondo spill volume in the calculation of mean (average) or median spill size*.

DOI REF 48339 (emphasis added).

Thus, BOEM *included* the Macondo spill in Table 3-5 for *spill rates* statistics for spills ≥

1,000 bbl, but *excluded* the Macondo spill from *median spill size* statistics for spills ≥ 1,000,

explaining that using the 4.9 million barrel figure would overwhelm the record.  And BOEM did

not include separate statistics in the table for spills ≥ 10,000 bbl at all, because it determined that

it could not meaningfully provide them, given that the Macondo spill was the only spill in that

category for the relevant 15-year period.

The plaintiffs' concern with this category's exclusion from the body of the table is

understandable.  Given that every prior version of the table includes the ≥ 10,000 bbl category,

the Court is puzzled as to why BOEM decided in the 2012 SEIS—which was only undertaken to

account for changes in light of the *Deepwater Horizon* spill (a spill ≥ 10,000 bbl)—to exclude

that figure from the table body itself.  While the Court likely would not have relegated that

category to the "Notes" section of the table, and, for the sake of consistency, have kept the

category in the table as it appeared in the Draft SEIS (with updated figures—regardless of

whether or not they were "meaningful"), *see* AR4861, the Court cannot say that BOEM excluded

the category from consideration in the 2012 SEIS altogether, as the plaintiffs would have the

Court find.  Even if the body of Table 3-5 itself does not provide statistics for a ≥ 10,000 bbl

category spill occurring, *the 2012 SEIS still does*.  For instance, in Chapter 4 of the SEIS, BOEM

states repeatedly that "[t]he risk of various sizes of oil spills occurring in the CPA is presented in

Table 3-5.  The possibility of a spill over 10,000 bbl in the OCS of the CPA is estimated to be

<1-1 spill, over the 40-year cycle for the proposed action for the 5-Year Program."  AR5807,

AR5622 (same); *see also* AR5822 ("The possibility of a spill > 10,000 bbl in the CPA is

estimated to be up to one spill in the 40-year period for the proposed action."), AR5831 (same).[16]

And even though the body of Table 3-5 itself does not include the ≥ 10,000 bbl category, the

note directly under it does, stating that "[a] spill size group for ≥ 10,000 bbl was not included in

this table, because the catastrophic Deepwater Horizon oil spill (4.9 million bbl) was the only

---

[16]        The plaintiffs are correct that there are some discrepancies between the Table and
how it is cited to in the 2012 SEIS.  For instance, at AR5622, BOEM states that "[t]he number of
spills ≥ 1,000 bbl and ≥ 10,000 bbl estimated to occur as a result of the CPA proposed action is
provided in Table 3-5.  The mean number of spills estimated for the proposed action in the CPA
is 1-3 spills (≥ 1,000 bbl) and <1-1 spill (≥ 10,000 bbl)."  This "< 1-1" estimated mean number
of spills figure for oil spills ≥ 10,000 bbl is not provided in Table 3-5, as the parties so zealously
dispute.  There also appears to be a typographical error at AR5576, where BOEM states that
"[a]s shown on Table 3-5, the mean number of spills estimated for the CPA proposed action is
<1-1 spill ≥ 1,000 bbl."  AR5576.  The actual estimated number of spills for a CPA proposed
action ≥ 1,000 bbl is 1-2 spills.  The <1-1 figure is the figure from the ≥ 10,000 bbl category that
is excluded in this rendition of the table, but was included in the Draft SEIS.  Notwithstanding
what appear to be typographical oversights on the part of BOEM when it went from Draft to
Final version of the SEIS, the Court still finds that as a whole, BOEM "took a hard look at the
environmental consequences of its decision to go forward with the project."  *Nat'l Comm. for the
New River v. F.E.R.C.*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (citations omitted).  And moreover,
the errors are harmless.  *See Nevada v. Dep't of Energy*, 457 F.3d 78, 90–91 (D.C. Cir. 2006)
(explaining that under the harmless error standard, the court would not "order the DOE to revise
the FEIS" because doing so would be tantamount to "a meaningless gesture."); *accord Oregon
Envt'l Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) ("The reviewing court may not fly
speck an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies"
(citation omitted)).

spill size in this size range during 1996-2010, and thus meaningful[17] statistics (such as median

spill size) could not be calculated." *See* AR6471. Thus, the relevant figures are not hidden from

the public, but rather, they just appear in a different place. And the $\geq$ 1,000 bbl category's *spill*

*rate* accounts for the Macondo spill. *See* DOI REF 48339. Moreover, BOEM thoroughly

considered the $\geq$ 10,000 bbl spill category in its Draft Report, which it cited to several times, and

included in the administrative record. While the plaintiffs argue that the Draft Report was not

disclosed, and the record reflects that BOEM may have been hesitant about sharing it—perhaps

because it was in draft form, the Report was ultimately included in the administrative record, and

was referred to in the 2012 SEIS. *See* AR5556, AR5575, AR5576, AR6471, DOI REF 48326–

48377; *see also* AR6141 (explaining that the Anderson and LaBelle (2000) study has been

recently updated, even though it is still in draft form).

      Though BOEM did not necessarily create a table and conduct its analysis the way the

Court might have, it still took a "hard look" at the $\geq$ 10,000 bbl category, and in turn the

*Deepwater Horizon* spill in the 2012 SEIS generally. As such, BOEM was not arbitrary and

capricious in excluding the $\geq$ 10,000 bbl category from the body of the table itself—a single

table within an SEIS of over 1,100 pages in length. *See Bowman Transp., Inc. v. Arkansas-Best*

*Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("While we may not supply a reasoned basis for

the agency's action that the agency itself has not given, we will uphold a decision of less than

ideal clarity if the agency's path may reasonably be discerned.") (internal quotation marks and

citations omitted); *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 59 (D.D.C. 2009) ("The

court's role is to ensure that the agency takes a 'hard look' at the environmental consequences of

---

[17] Presumably, by "meaningful" statistics, BOEM means that because there was only one spill $\geq$ 10,000 between 1996 and 2010 to occur, a median spill size could not be calculated for that category (because an average by definition, requires more than one figure). Thus, the Court defers to the agency in its determination of "meaningful" statistics.

an action, not to interject its own judgment as to the course of action to be taken.") (quoting *Hammond v. Norton*, 370 F. Supp. 2d 226, 240 (D.D.C. 2005)); *see also Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) ("courts must be extremely deferential when an agency's decision rests on the evaluation of complex scientific data within the agency's technical expertise . . . . although a reviewing court may not rubber stamp an agency decision, it must look at the agency's decision not as the chemist, biologist, or statistician that it is qualified neither by training nor experience to be, but as a reviewing court exercising . . . certain minimal standards of rationality") (internal quotation marks and citations omitted). BOEM took a hard look at the *Deepwater Horizon* event in the 2012 SEIS and its exclusion of a ≥ 10,000 bbl category from Table 3-5 does not undermine that conclusion.[18] *See Oregon Envt'l Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) ("The reviewing court may not fly speck an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies" (citation omitted)).

### b. *BOEM considered impacts of deepwater drilling*

The plaintiffs next argue that BOEM ignored its duty to assess the risks of deepwater drilling. *See* Pl.'s Mot. Summ. J. 21. The administrative record shows that BOEM did consider the risks of deepwater drilling, throughout the 2012 SEIS. BOEM first noted that "[i]n response to increasing deepwater activities in the GOM, this Agency developed a comprehensive strategy to address NEPA compliance and environmental issues in the deepwater areas. A key component of that strategy was the completion of a Programmatic EA [environmental

---

[18]     The plaintiffs argue that the exclusion of the ≥ 10,000 bbl category represents a deviation from BOEM's past practice of considering a ≥ 10,000 bbl category. *See* Pl.'s Reply 7–8 (citing, *e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). However, this is not a situation where the agency has departed from a prior policy without explanation. First, BOEM did not depart from a prior policy entirely—it only changed one of the categories that it usually includes in its table on estimated oil spills (but still considered it, as set forth above). Second, even if doing so marked a departure from prior policy, BOEM explained why it did so. Therefore, the line of cases cited by plaintiffs is inapposite.

assessment] to evaluate the potential effects of the deepwater technologies and operations."
AR5488. BOEM also explained that it "prepared a series of technical papers that provide a
summary description of the different types of structures that may be employed in the
development and production of hydrocarbon resources in the deepwater areas of the GOM (Regg
et al., 2000). The Programmatic EA and technical papers were used in the preparation of this
Supplemental EIS." *Id.*

The Draft Report, relied upon by BOEM in the 2012 SEIS, also discussed the move into
deepwater drilling. BOEM stated that spill rates for OCS platform spills ≥ 1,000 bbl increased
over time, "due to the Macondo spill." DOI REF 48335. BOEM explained, "[t]hese rates are
still relatively low . . . . Prior to these two spills, the last OCS Platform spill ≥ 1,000 bbl occurred
in 1980, and the last OCS Platform spill ≥ 10,000 bbl occurred in 1970." DOI REF 48326.
BOEM acknowledged that "[i]t is worth noting that this most recent 15-year period spans the
move of OCS oil production into deepwater ( > 1,000 ft water depth). In 1996, deepwater oil
production in the Gulf of Mexico was just under 20% of the total oil production in the region. In
2010, that percentage had increased to 81%." DOI REF 48335. In addition, BOEM explained
that it calculates spill rates "based on the assumption that spills occur in direct proportion to the
volume of oil handled and are expressed as number of spills per billion barrels of oil handled."
AR5576. And in the Draft Report, BOEM found that after taking the *Deepwater Horizon* spill
into account, "tests indicate the volume of oil handled between OCS platform spills still appears
to be nonrandom," thus showing that spills are correlated with the *volume* of production, not with
the *depth* of production. *See* DOI REF 48334.

BOEM thus explained that the increase in spill rates over the 15-year period was
attributable almost exclusively to the Macondo spill, and not to any other trend in the data

suggesting that as offshore drilling goes into deeper water so too does the frequency of oil spills.

*See id.*; *see also* AR6280 ("BOEM uses data on past OCS production and spills, along with estimates of future production, to evaluate the risk of future spills. Data on the numbers, types, sizes, and other information on past spills, including those that are relevant to ultra-deepwater wells, were reviewed to develop the spill scenario for analysis in this Supplemental EIS. Past spill data used in the model *indicate that there is no trend of increased number of spills* based on exploration in deeper water prior to Macondo.") (emphasis added).

In their comments to the draft SEIS, but not in their briefs, the plaintiffs indicated that high pressure and high temperature wells, which occur in deepwater in the Gulf of Mexico "are extremely dangerous and add exorbitant risk to drilling, completion, and workover operations." AR7435. In the 2012 SEIS, BOEM addressed this deepwater concern, explaining that "[n]either high-temperature/high-pressure conditions nor water depth are used to calculate the risk of future spills because these are postlease operational issues that cannot be reasonably predicted at the lease stage without site-specific information. In the postlease stage, applicants submit site-specific data on conditions, and BOEM technical staff reviews this data to determine whether conditions on approval, based on well data are appropriate." AR6280. As the intervenor-defendants persuasively argue, and as discussed *infra*, this is "consistent with the staged environmental review dictated by the structure of offshore leasing under the OCSLA." *See* Intervenor's Reply 15 n.3 (citing *Ctr. for Biological Diversity*, 563 F.3d at 483). In light of the fact that there was no trend indicating the increased risk of oil spills in deepwater, and BOEM's

consideration of the risks of deepwater spills in both the 2012 SEIS, and the Draft Report, it is evident that BOEM did take a hard look at the risks of deepwater spills.[19]

### c. BOEM incorporated Deepwater Horizon into its spill modeling

The plaintiffs also argue that "the Bureau failed to conduct a new OSRA run taking the Deepwater Horizon spill into account." Pl.'s Mot. Summ. J. 22. OSRA is the Oil Spill Risk Analysis Model BOEM uses "to estimate the likely trajector[y] of hypothetical offshore spills $\geq$ 1,000 bbl. The trajectories, combined with estimated spill occurrence, are used to estimate the risk of future spills occurring and contacting environmental features." AR5577. In the wake of the Deepwater Horizon disaster, BOEM conducted a "special OSRA run . . . in order to estimate the impacts of a possible future catastrophic or high-volume, long-duration oil spill." AR6635. BOEM explained that "overall OSRA is designed for use as a risk-based assessment, [but] for this analysis, only the conditional probability, the probability of contact to the resource, was calculated. The probability of a catastrophic spill occurring was not calculated; thus the combination of the probability of a spill and the probability of contact to the resources from the hypothetical spill locations were not performed." *Id.* BOEM continued by noting that "[r]esults from this trajectory analysis provide input to the final product by estimating where spills might travel on the ocean's surface and what land segments might be contacted if and when another catastrophic spill occurs, *but it does not provide input on the probability of another catastrophic*

---

[19] Moreover, in addition to undertaking the 2012 SEIS, in the wake of the *Deepwater Horizon* event, BOEM implemented new safety requirements to insure that oil and gas operators have systems in place "that would be adequate to promptly respond to a blowout or other loss of well control." AR5593–94. While none of those agency actions are before the Court today, it is evident that BOEM took immediate action in the wake of the *Deepwater Horizon* event to make deepwater drilling safer. *See* Oil and Gas and Sulphur Operations on the Outer Continental Shelf—Increased Safety Measures for Energy Development on the Outer Continental Shelf, 77 Fed. Reg. 50,856, 50,858 (Aug, 22, 2010) (explaining that one of the purposes of the Final Rule is to "[e]stablish new requirements for specific well-control training to include deepwater operations").

*spill* occurring." *Id.* (emphasis added). In the results section, BOEM notes that "[i]t should be reiterated that these are conditional probabilities;[20] the condition being that a spill is assumed to have occurred." AR6638.

The plaintiffs take issue with BOEM's concession that "the probability of a catastrophic spill occurring was not calculated." AR6636; *see also* Pl.'s Mot. Summ. J. 23. They cite to a 2010 internal document that explained that "[d]ue to time constraints and catastrophic spills not being the focus of the supplemental EIS, OSRA will not be rerun for spills > 1,000 barrels."[21] AR3005. That same document stated "[d]ue to the remote possibility of a catastrophic spill occurring, 'conditional' results will be used. 'Combined' probabilities will not be useful." *Id.* BOEM and the intervenor-defendants argue that the OSRA "run was conducted in order *to estimate the impacts* of a possible future catastrophic or high-volume, long-duration oil spill,"

---

[20] As explained by BOEM in the 2012 SEIS, there is a difference between combined probabilities and conditional probabilities. "The probability that an oil spill will contact a specific land segment within a given time of travel from a certain location or spill point is termed a conditional probability; the condition being that a spill is assumed to have occurred." AR6636. Meanwhile, "the probability of a spill occurring as a result of a proposed action and contacting the environmental resource of concern" is often referred to as a "combined probability" because "they combine the risk of occurrence of a spill ≥ 1,000 bbl from OCS sources and the risk of such a spill contacting environmental resources." AR2513.

[21] While OSRA may not have been rerun for spills ≥ 1,000 barrels in the 2012 SEIS, BOEM's predecessor, the Minerals Management Service ("MMS") reran OSRA when it did its Supplemental EIS for the 2009–2012 Lease Sales. AR2768. MMS concluded that "[f]or this SEIS, the OSRA model was rerun due to the revised geographic area and increased oil production estimates in comparison with those used for the Multisale EIS. Results from this OSRA run confirmed that the revised geographic area and increased oil production estimates did not substantially affect probabilities in comparison with those obtained from the previous OSRA run." *Id.; see also* AR2514. And, as BOEM explained in the 2012 SEIS, "[a] new OSRA run based on just the last CPA proposed lease sale in this Supplemental EIS scenario would not be expected to substantially affect probabilities in comparison with those obtained from the previous OSRA run." AR5577. BOEM thus provided two reasoned explanations for not rerunning OSRA in this 2012 SEIS: (1) time constraints, and (2) its belief that probabilities would likely not change, given that they had not for the last OSRA run performed in the 2009–2012 Multisale SEIS.

and was "never intended to estimate the risk of future spills occurring." Federal-Def.'s Cross-Mot. Summ. J. 22 (emphasis in original).

The plaintiffs do not persuasively explain why BOEM had to calculate the probability of a catastrophic oil spill within the OSRA run. They argue that the failure to calculate the probability of a ≥ 10,000 bbl spill occurring in the OSRA run means that "the only information given to the public is that the spill rate for an oil spill over 1,000 bbls is 1.13 and the estimated spill size is 2,200 bbl, which is actually lower than the spill size stated in the Multisale EIS 2007. *Compare* AR5576 to 1872." Pl.'s Mot. Summ. J. 23. But the public was provided with more information than just that regarding spill rates. As set forth above, though the four corners of Table 3-5 itself do not provide an estimated spill rate for spills ≥ 10,000 bbl, the notes underneath the table disclose to the public the size of the Deepwater Horizon spill (4.9 million bbls), and the table includes the Deepwater Horizon spill in the data for *spill rates* for spills ≥ 1,000 bbl. *See* DOI REF 48339. And in several places, the 2012 SEIS references the probability of a catastrophic oil spill occurring. *See, e.g.*, AR5822 ("The possibility of a spill > 10,000 bbl in the CPA is estimated to be up to one spill in the 40-year period for the proposed action."); AR5831 (same). Thus, the failure to calculate the probability of a catastrophic oil spill occurring within the OSRA run did not preclude BOEM from making meaningful disclosures about probabilities and updating its data in light of the Deepwater Horizon event in the 2012 SEIS.

As to the smaller spill size identified in Table 3-5, BOEM explained that the 2,200 bbl figure was based on updated data from the Draft Report, which included information up through 2010, whereas the previous version only included information from 1985–1999, *see* AR5576, and that the smaller number in Table 3-5 was due to the fact that Table 3-5 only represents median spill size for that particular area of the CPA, whereas prior versions of the table represent

median spill size for the entire CPA and the WPA. *See* Federal-Def.'s Cross-Mot. Summ. J. 23. On technical calculations such as these, the Court must defer to the agency.[22] *See Miami-Dade Cnty.*, 529 F.3d at 1065 ("although a reviewing court may not rubber stamp an agency decision, it must look at the agency's decision not as the chemist, biologist, or statistician that it is qualified neither by training nor experience to be, but as a reviewing court exercising . . . certain minimal standards of rationality") (internal quotation marks and citations omitted).

More importantly, however, BOEM took a "hard look" at the Deepwater Horizon spill because it still conducted a special OSRA run for the specific purpose of "estimat[ing] the impacts of a possible future catastrophic spill." AR6636. BOEM assumed—a 100% probability in other words—that a catastrophic spill would occur and sought out to analyze the impacts of such a spill. BOEM's approach was therefore not arbitrary and capricious—it took a hard look at the Deepwater Horizon event by running a catastrophic spill run in the first instance to determine what the impacts of another catastrophic spill occurring would be.

The plaintiffs conclude their "hard look argument" by arguing that BOEM's "oil spill risk analysis does not satisfy NEPA's requirement for scientific integrity or informed decisionmaking" citing 40 C.F.R. § 1502.24. *See* Pl.'s Mot. Summ. J. 24. 40 C.F.R. § 1502.24 requires that agencies "insure the professional integrity, including the scientific integrity, of the

---

[22]    Again, the Court notes that it likely would have done things differently here, by including the Macondo spill in the 2,220 bbl figure, regardless of whether it distorted the statistics. However, BOEM has provided a reasoned explanation for its exclusion, as set forth above, and under arbitrary and capricious review, the Court must defer to that determination. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal quotation marks and citations omitted); *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 59 (D.D.C. 2009) ("The court's role is to ensure that the agency takes a 'hard look' at the environmental consequences of an action, not to interject its own judgment as to the course of action to be taken.") (quoting *Hammond v. Norton*, 370 F. Supp. 2d 226, 240 (D.D.C. 2005)).

discussion and analyses in environmental impact statements." The D.C. Circuit has explained that this provision "does not require that an agency employ the best, most cutting-edge methodologies." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 511 (D.C. Cir. 2010). In that case, BLM had relied on a methodology called the Scheffe method to measure air quality analyses in its EIS. *Id.* at 510. In response to criticism that the method was outdated, BLM admitted that the method "used outdated measurements and assumptions" but explained that it was nevertheless an "overly conservative screening level modeling tool." *Id.* (internal quotation marks omitted). BLM also considered the fact that a newer method was being developed, but "given the many months required to conduct full analysis with the new data," decided to press forward with the older method. *Id.* at 511 (internal quotation marks omitted). The court found that BLM was not arbitrary and capricious in relying on the older method because "[g]iven the Bureau's conclusion that the Scheffe method was an acceptable and conservative method when the analysis was carried out, the Bureau reasonably decided to retain the old estimates rather than undertake a new air quality analysis." *Id.*; *see also Village of Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006) ("The method that the FAA chose, creating its models with the best information available when it began its analysis and then checking the assumptions of those models as new information became available, was a reasonable means of balancing those competing considerations, particularly given the many months required to conduct full modeling with new data.").

Similarly here, BOEM admitted that "[p]latform and pipeline spill rates and likely spill sizes published in the Multisale EIS have thus become outdated" because the studies relied upon "have been updated by DOI's draft report." AR5556; *see also* AR6141. However, as set forth above, BOEM explained that "[f]uture OSRA runs will use this updated historical spill rate

information," and noted, as set forth above, that "[a] special OSRA run was conducted in order to estimate the impacts of a possible future catastrophic spill." AR6141. Though BOEM did not rerun OSRA to account for a new > 1,000 bbl spill, it did not have to employ the "best, most cutting-edge methodolog[y]," because it reasonably concluded that a "new OSRA run . . . would not be expected to substantially affect probabilities in comparison with those obtained from the previous OSRA run." AR5577. And because BOEM conducted a special OSRA run assuming a catastrophic spill would occur, BOEM did take a hard look at the problem. BOEM reasonably relied upon information that was available to it at the time it made its decision, and "particularly given the many months required to conduct full analysis with the new data," its decision to do so was not arbitrary and capricious. *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 273 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010) (internal quotation marks omitted).

### 3. BOEM considered an adequate no action alternative

The plaintiffs next argue that BOEM violated NEPA by not considering a true no action alternative in the 2012 SEIS. As a threshold matter, the intervenor-defendants argue that the plaintiffs have waived this argument because they failed to raise it with BOEM at the administrative level. *See* Intervenor-Def.'s Cross-Mot. Summ. J. 42–43. "As the Supreme Court has long admonished, '[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Nevada v. Dep't of Energy*, 457 F.3d 78, 88 (D.C. Cir. 2006) (quoting *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764 (2004)). Though the intervenor-defendants argue that the plaintiffs did not raise the no action issue in their comments to the Draft SEIS, the Court disagrees. Specifically, in its

"overarching problems" section of its comments submission, the plaintiffs stated that "[t]he DSEIS does not analyze a reasonable range of alternatives.  Additional alternatives that should be analyzed include . . . [d]elaying leasing until complete information regarding the damage caused by the Deepwater Horizon spill is available."  AR6240–41.  BOEM responded as follows in the SEIS: "The Center for Biological Diversity commented that BOEM should consider an alternative suspending leasing until complete information about the damage caused by the DWH spill is available.  This is essentially the same as the No Action Alternative (Alternative D), where a lease sale would not be held at this time; thus, *the Center's requested course of action has been analyzed* in this Supplemental EIS."  AR6277 (emphasis added).  BOEM, therefore, equated one of the plaintiffs' comments with the no action alternative, and was therefore on notice that the plaintiffs were not satisfied with its reasonable range of alternatives discussion, including the alternative of no action, *i.e.*, delaying the lease sale.[23]  As such, the Court concludes that plaintiffs have not waived this argument.

Having found that the plaintiffs did not waive their no action alternative argument, the Court now turns to the discussion of that issue on the merits.  The no action alternative requirement is found in 40 C.F.R. § 1502.14(d).  That section provides that analysis of alternatives is "the heart of the environmental impact statement."  40 C.F.R. § 1502.14.  This section demands that the agency "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action."  *Id.* §§ 1502.14(a), (d).  CEQ put forth a memorandum explaining the concept of "no action" as "instances involving federal decisions on proposals for projects. 'No action' in such cases would mean the proposed activity would not

---

[23]        Moreover, in its comments to the Final SEIS, the plaintiffs included a large section where they questioned BOEM's treatment of its "suspending leasing" comment, as well as the no action alternative generally.  *See* AR6757–59.  Therefore, the intervenor-defendants cannot really say that the no action issue was never raised at the administrative level.

take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward." *See* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026-01, 18,027 (March 23, 1981). That guideline goes on to explain that "[w]here a choice of 'no action' by the agency would result in predictable actions by others, this consequence of the 'no action' alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the 'no action' alternative." *Id.*

In the 2012 SEIS, BOEM analyzed four alternatives: Alternative A (The Proposed Action of Lease Sale 216/222), Alternative B (The Proposed Action Excluding the Unleased Blocks Near Biologically Sensitive Topographic Features), Alternative C (The Proposed Action Excluding the Unleased Blocks within 15 Miles of the Baldwin County, Alabama, Coast), and Alternative D (No Action). *See* AR5446–47. BOEM described the No Action Alternative as follows:

> Alternative D is the cancellation of the proposed CPA lease sale. The opportunity for development of the estimated 0.801-1.624 BBO and 3.332-6.560 TcF of gas that could have resulted from the proposed lease sale would be precluded or postponed. Any potential environmental impacts resulting from the proposed lease sale would not occur or would be postponed.

AR5541. In the "Summary of Impacts" statement for Alternative D, BOEM explained that "[c]anceling the lease sale would eliminate the effects described for Alternative A. The incremental contribution of the proposed lease sale to cumulative effects would also be avoided, but effects from other activities, including other OCS lease sales, would remain." *Id.* The conclusion, however, went on to explain that "the resulting development of oil and gas would

most likely be postponed to a future sale; therefore, the overall level of OCS activity in the CPA would only be reduced to a small percentage, if any. Therefore, the cancellation of the proposed lease sale would not significantly change the environmental impacts of overall OCS activity." *Id.* BOEM goes on to note that "[o]ther sources of energy may substitute for the lost production" of oil and gas and "[r]evenues collected by the Federal Government (and thus revenue disbursement to the States) would be adversely affected also." *Id.*

Given the language and explanation in the 2012 SEIS of Alternative D, the Court finds that BOEM did consider a true no action alternative as mandated by NEPA, and that its analysis was reasonable. BOEM analyzed what the environmental impact would be if the proposed action, Lease Sale 216/222, was cancelled. That conclusion was that "[a]ny potential environmental impacts resulting from the proposed lease sale would not occur or would be postponed." AR5541. However, BOEM further explained that the environmental impact of cancelling this particular lease "would not significantly change" because the Central Planning Area of the Gulf of Mexico is a hotbed for oil and gas leases generally. And, practically speaking, if this particular lease sale did not go forward, another lease sale in the same area eventually would (because BOEM is statutorily tasked with developing the OCS)[24] and that would likely end up having the same environmental impact as the action-alternative, Alternative A. NEPA requires that the agency use the "rule of reason," which is exactly what BOEM did here. *See Nevada*, 457 F.3d at 93 ("We have recognized that a 'rule of reason' applies both to an

---

[24] In fact, BOEM has already implemented another 5-year Leasing Program for 2012–2017 for the Central Planning Area of the Gulf of Mexico. *See* Notice of Availability of the Proposed Final Five Year Outer Continental Shelf (OCS) Oil and Gas Leasing Program, 77 Fed. Reg. 41,448 (July 13, 2012); *see also* http://www.boem.gov/Five-Year-Program-2012-2017/. It is therefore very likely that even if this particular lease sale was cancelled, another lease sale in the same area would likely present the same environmental risks, albeit further into the future.

agency's identification of the available alternatives and to its examination of their relative merits.") (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196–97 (D.C. Cir. 1991)). BOEM simply recognized that even if it cancelled this lease sale, another lease sale in the same area would likely eventually go forward, and therefore cancelling the lease sale would not significantly change the impact to the environment.

And moreover, the CEQ encourages agencies to include in the no action alternatives analysis situations "where a choice of 'no action' by the agency would result in predictable actions by others." 46 Fed. Reg. 18,026, 18,027 (Mar. 23. 1981). Courts have upheld such analyses. *See Young v. Gen. Serv. Admin.*, 99 F. Supp. 2d 59, 74 (D.D.C. 2000) (finding the GSA's no action alternative analysis reasonable because "where, as here, a decision by the government not to consolidate its facilities on undeveloped land would result in significant private commercial and residential development on the vacant property, the consequences of that alternative development should be addressed"); *see also Communities, Inc., v. Busey*, 956 F.2d 619, 626 (6th Cir. 1992) (explaining that with or without the federal government taking its proposed action, local governments still planned on demolishing the local area, and the FAA's inclusion of that reality in its no action alternative did not render it unreasonable).

The plaintiffs analogize this case to *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010) and *N. Carolina Wildlife Fed. v. N. Carolina Dep't of Transp.*, 677 F.3d 596 (4th Cir. 2012). In *Center for Biological Diversity*, the plaintiffs brought suit against the Department of the Interior challenging the Bureau of Land Management's ("BLM") approval of a land exchange in Arizona. 623 F.3d at 636. The EIS at issue had a "No Action Alternative" but it stated that "foreseeable uses of the selected lands are assumed to be the same for all alternatives." *Id.* at 640 (internal quotation marks omitted). Because the EIS made such an

assumption, it contained "no comparative analysis of the environmental consequences of the land exchange and the no action alternative." *Id.* The court found that BLM acted arbitrarily and capriciously in assuming that the environmental impacts on the land at issue would be the same regardless of who owned the lands—a private entity or the federal government—because in reality the manner and extent of the mining activity allowed differed depending on landowner, due in large part to different obligations imposed on those two entities by the Mining Law of 1872. *Id.* at 642–43. The court therefore held that BLM failed to take a hard look at the environmental consequences of the exchange in violation of NEPA by "failing to perform a comparative analysis of the likely environmental consequences of the proposed land exchange, on the one hand, and the no action alternative, on the other." *Id.* at 650.

Similarly, in *North Carolina Wildlife Federation*, plaintiffs challenged two agencies' decision to approve construction of a new twenty-mile toll road in North Carolina. 677 F.3d at 598. The agencies prepared an EIS that analyzed five different alternatives to building the road, including a "no build" (no action) scenario. *Id.* at 602. The plaintiffs challenged the EIS on the grounds that the agencies "conflated the 'no build' and 'build' scenarios" because in their "no build" analysis, they included data that "assumed the existence of the" toll road. *Id.* The court found that the agencies had acted arbitrarily and capriciously by evaluating the "no build" data under the assumption that the toll road construction would go forward. *Id.* at 602–603. The court held that by failing to disclose "the [no-build] data's underlying assumptions" that the toll road would be built, "the Agencies failed to take the required hard look at environmental consequences," and violated NEPA. *Id.* at 605 (citations omitted). The plaintiffs also cite *Friends of Yosemite Valley v. Scarlett*, for the proposition that "[a] no action alternative in an EIS is meaningless if it assumes the existence of the very plan being proposed." 439 F. Supp. 2d

1074, 1105 (E.D. Cal. 2006), *aff'd sub nom. Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008).

Because the cases plaintiffs cite are distinguishable, the Court is not persuaded that BOEM's no action alternative analysis was unreasonable. In *North Carolina*, for instance, the no-build alternative was unreasonable because it incorporated data whose underlying statistical assumption was that the toll road would be built. The *North Carolina* court was troubled by the fact that the *scientific methodology* underlying the no-build data did not actually account for a no action alternative. And the agency there recognized as much, by admitting that its methodology did not actually account for a no-build scenario. Such an underlying flaw in methodology is not present here. *Center for Biological Diversity* is also distinct. In that case, BLM's flaw was in assuming that regardless of the owner of certain land involved in a land exchange, the environmental impact on the land would remain the same, and therefore there was nothing to consider in the no action analysis. The BLM, however, was wrong in making this assumption because the Mining Law of 1872 imposed different statutory commands on the federal government as owner of the lands, versus private entities as owners of the land, and the impact to the environment, would have in fact been different.

In this case, by contrast, the OCSLA mandates that the Secretary, who delegates authority to BOEM, implement lease sales of the OCS in 5-year increments. *See* 43 U.S.C. § 1344. As such, regardless of this particular lease sale going forward, in all likelihood, another one eventually will in the CPA of the Gulf of Mexico. The plaintiffs present no facts or argument undermining that assumption. BOEM here did not make an incorrect assumption, but rather acknowledged a practical reality of the OCSLA statutory scheme. And moreover, it did undertake a separate analysis in consideration of the no action alternative that was different from

its analysis for the other alternatives. *Compare* AR6068–6069 (Alternative D analysis) w*ith* AR5514–5539 (Alternative A analysis).[25] Thus, unlike the agencies in *North Carolina* and *Center for Biological Diversity*, BOEM did consider a true no action alternative in its analysis of alternatives, and that analysis was reasonable.

* * *

In sum, BOEM did not violate NEPA. It complied with 40 C.F.R. § 1502.22, incorporated all the new data it had into the 2012 SEIS, considered the effects of deepwater drilling, ran a special OSRA model run to account for impacts of an assumed catastrophic oil spill, and considered a true no action alterative. Though the Court may have done things a little differently with respect to Table 3-5, BOEM still considered the ≥ 10,000 bbl category in its analysis, and therefore took a "hard look" at the effects of the *Deepwater Horizon* spill in the 2012 SEIS.

### C. ESA Claims

The plaintiffs also bring claims under the ESA. They argue that BOEM did not comply with the ESA's requirement to insure against the jeopardy of endangered species by approving the lease sales without the benefit of a Biological Opinion assessing important new information. *See* Pl.'s Mot. Summ. J. 27. Plaintiffs argue (1) that BOEM had to complete consultation with

---

[25]     The quote taken out of context in *Friends of Yosemite* might give the Court pause about BOEM's assumption of the "existence of the very plan being proposed." 439 F. Supp. 2d at 1105. However, the quote read in context reveals that the cases are distinguishable. In that case, the National Park Service ("NPS") relied on a prior management plan in its updated EIS that the Ninth Circuit had previously vacated. The court agreed with the plaintiff "that because the Ninth Circuit held the [previous plan] to be illegal, NPS cannot properly include elements from that plan in the no action alternative as the status quo." *Id.* For that reason, the no action alternative was meaningless, because it assumed the existence of the very plan it was proposing that had already been struck down. In contrast, the no action alternative in this case does not rely on an invalid plan or assumption, but instead recognizes a practical reality of suspending the lease sales.

NMFS, not just re-initiate it; and (2) that BOEM did not consider the best available science by relying on NMFS's 2007 Biological Opinion. The defendants counter that BOEM did not need to complete consultation because of section 7(d) of the ESA, which allows agencies to proceed with agency action so long as it does not constitute an irreversible or irretrievable commitment of resources. In addition, the defendants argue that BOEM complied with section 7(a) by relying on updated science, in addition to the 2007 Biological Opinion included in the 2007 Multisale EIS.

### 1. BOEM did not need to *complete* consultation

The first ESA issue is whether BOEM violated the ESA by failing to *complete* consultation with the NMFS before proceeding with Lease Sales 216/222 and 218. Section 7(a) of the ESA requires that "[e]ach federal agency shall, *in consultation* with and with the assistance of the Secretary, *insure* that any action authorized, funded, or carried out by such *agency is not likely to jeopardize the continued existence of any endangered species* or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2) (emphasis added). Section 7(a)(2) "imposes two obligations upon federal agencies. The first is procedural and requires that agencies consult with the FWS [or NMFS] to determine the effects of their actions on endangered or threatened species and their critical habitat. The second is substantive and requires that agencies insure that their actions not jeopardize endangered or threatened species or their critical habitat." *Fla. Key Deer v. Paullson*, 522 F.3d 1133, 1138 (11th Cir. 2008). With respect to the procedural requirement, 50 C.F.R. § 402.14(a) provides that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required."

In this case, BOEM and the NMFS engaged in a formal consultation during the 2007 Multisale EIS phase that resulted in the 2007 Biological Opinion issued by the NMFS. *See* Federal-Def.'s Cross-Mot. Summ. J. 8. That BO concluded that the proposed action in the 2007 Multisale "will not appreciably reduce the likelihood of survival and recovery of the listed species considered in this biological opinion." AR7138. On July 30, 2010, in the wake of the *Deepwater Horizon* event, BOEM contacted the NMFS to reinitiate consultation. *See* Bernhart Decl. ¶ 4, ECF No. 63-1. Since then, the agencies have been working closely to issue a new BO. *See id.* Thus, the procedural aspect of section 7(a)(2) has been met. The BO, however, has not yet been issued, and NMFS anticipates a March 2015 date of completion. *See* Bernhart Decl. ¶¶ 5–6, ECF No. 75-1.

While the plaintiffs argue that under the ESA, BOEM had to *complete* its consultation with the NMFS before it issued its Record of Decision for Lease Sales 216/222 and 218,[26] neither the ESA nor the case law interpreting the ESA require completion of a BO before action

---

[26] The plaintiffs cite three cases for the proposition that "[r]einitiation of consultation requires the Fish and Wildlife Service to issue a new Biological Opinion before a project may go forward." *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992); *Envt'l Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001) ("Reinitiation of consultation requires either the FWS or the NMFS to issue a new Biological Opinion before the agency action may continue."); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066, 1072 (W.D. Wash. 2000) ("In the absence of a completed comprehensive biological opinion NMFS has not, and cannot, insure that continued fishing in designated critical habitat will not result in harm to endangered Stellar sea lions."). The first two cases are not persuasive because those statements appear in dicta and the relevant quotes are dropped in the legal standard sections with no explanation or citation whatsoever. The Eleventh Circuit agreed in *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.*, stating that "[w]e decline to give this statement any weight since ESA has no such requirement." 684 F.3d 1242, 1252 n.4 (11th Cir. 2012). In addition, *Greenpeace* is distinguishable because, in that case, the NMFS had issued a Biological Opinion that was invalidated by a prior court ruling. *See* 106 F. Supp. 2d at 1069–70. As such, the NMFS was allowing commercial fishing to continue in the absence of *any* valid Biological Opinion being in place. That is not the case here, where the NMFS and BOEM continue to rely on the 2007 Biological Opinion that has neither been held invalid, nor is being challenged in the present action.

in all instances. Section 7(d) of the ESA allows agencies to take action during the reinitiated

consultation, so long as that action does not constitute an "irreversible or irretrievable

commitment of resources." Section 7(d) provides that "*after initiation of consultation* required

under subsection (a)(2) of this section, the Federal agency and the permit or license applicant

shall not make any irreversible or irretrievable commitment of resources with respect to the

agency action which has the effect of foreclosing the formulation or implementation of any

reasonable and prudent alternative measures . . . ." 16 U.S.C. § 1536(d). As one court has

helpfully explained, "under § 7(d), an agency is not forbidden from taking *all* action while

consultation is underway, but is simply barred from irreversibly or irretrievably committing

resources during that interval. The purpose of § 7(d) is to ensure that the status quo is

maintained during consultation, so as to avoid a circumstance in which a large-scale commitment

of resources is made during the consultation process, which resources cannot be diverted or

redirected to other productive uses if the outcome of consultation is that the project would violate

the 'no jeopardy' requirement of § 7(a)." *Defenders of Wildlife v. Bureau of Ocean Energy

Mgmt.*, 871 F. Supp. 2d 1312, 1326 (S.D. Ala. 2012), *appeal dismissed*, No. 12-13709 (11th Cir.

July 24, 2012).

All courts considering lease sales under the OCSLA have concluded that "lease sales do

not constitute an 'irreversible or irretrievable commitment of resources' within the meaning of

section 7(d)." *Vill. of False Pass v. Watt*, 565 F. Supp. 1123, 1163 (D. Alaska 1983), *aff'd sub

nom. Vill. of False Pass v. Clark*, 733 F.2d 605 (9th Cir. 1984); *see also N. Slope Borough v.

Andrus*, 642 F.2d 589, 611 (D.C. Cir. 1980) ("Plainly, the preliminary activities permitted by this

lease sale entail no 'irreversible or irretrievable commitment of resources with respect to the

Agency action which has the effect of foreclosing . . . alternative measures which avoid

jeopardizing the continued existence of any endangered or threatened species . . . .'");

*Conservation Law Foundation of New England, Inc. v. Andrus*, 623 F.2d 712, 714–716 (1st Cir.

1979) (rejecting appellants' argument that the lease sale stage constituted an irreversible or

irretrievable commitment of resources for purposes of a preliminary injunction); *Defenders of*

*Wildlife*, 871 F. Supp. 2d at 1326 ("Nothing in BOEM's mere approval of bids for Lease Sale

213 could reasonably be viewed as constituting an irreversible or irretrievable commitment of

resources under § 7(d).")[27]

This conclusion is due primarily to the structure of the OCSLA, which provides for ESA

review at each stage of the process. *See Village of False Pass*, 733 F.2d at 609 ("it is clear that

OCSLA prescribes three distinct stages for offshore oil and gas activities: leasing, exploration,

---

[27]     *Center for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009) and *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43 (D.C. Cir. 1999) are not to the contrary. In *Wyoming Outdoor Council*, the D.C. Circuit held that "the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued." 165 F.3d at 49. Similarly, in *Center for Biological Diversity*, the D.C. Circuit, relying largely on *Wyoming Outdoor*, found that the lease sale stage was the "critical stage where an irreversible and irretrievable commitment of resources" occurs. 563 F.3d at 480 (internal quotation marks omitted). But those decisions arose in the context of a ripeness analyses for purposes of NEPA review, not ESA review. The courts in those cases never interpreted the meaning of "irreversible and irretrievable commitment" under section 7(d) of the ESA. And moreover, the court's analysis of the OCSLA in *Center for Biological Diversity* supports this Court's finding that the lease sales at issue here do not constitute an irreversible and irretrievable commitment of resources. As that court explained, "[g]iven the multi-stage nature of leasing programs under OCSLA, we must consider any environmental effects of a leasing program on a stage-by-stage basis, and correspondingly evaluate ESA's obligations with respect to each particular stage of the program." 563 F.3d at 483. And at this stage of the lease sale process, nothing irreversible has been done. The Secretary and BOEM must still review any exploration and development plans to ensure that those plans comport with NEPA and the ESA before drilling can be done. *See* 43 U.S.C. §§ 1334(a)(1)–(2) & 1351. And if at any point during interim consultation in this case the Secretary determines that activities that follow the lease sale (exploration and production) would result in jeopardy to a species, it could "deny or rescind any drilling plan or permit approval," or "suspend all activities allowed under those plans." AR7503. Thus, the lease sale itself does not constitute an irreversible commitment of resources here, because any jeopardizing activity that follows it, if at all, can be undone.

and development and production.  ESA appears to apply equally to each stage of its own force and effect."); *accord Ctr. for Biological Diversity*, 563 F.3d at 474; *Defenders of Wildlife*, 871 F. Supp. 2d at 1328.  And, as BOEM notes in its brief, the Department of Interior retains "strict control" over all operations conducted under leases, and the OCSLA expressly authorizes the Department to suspend any operation or activity conducted under the lease sales if there is a threat to any marine life or the surrounding environment.  *See* 43 U.S.C. §§ 1334(a)(1)(B) & (2)(A)(i) (allowing the Secretary to suspend any operation or activity pursuant to any lease if "there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life)" or to cancel a lease if "continued activity pursuant to such lease or permit would probably cause serious harm or damage to life (including fish and other aquatic life) . . . .").

The two courts most recently confronting this particular issue have found that BOEM did not have to complete consultation with the NMFS before it could continue its operations in the Gulf of Mexico post-*Deepwater Horizon* spill, precisely because of the structure of the OCSLA. *See Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1253 (11th Cir. 2012) (explaining that at the exploration plan stage, "the ESA does not require BOEM to delay approval of the Shell EP until results of reinitiated consultation are received.");  *Defenders of Wildlife*, 871 F. Supp. 2d at 1327 (explaining that at the lease sale stage, "this is not a case in which the § 7(d) prohibition on irreversible or irretrievable commitments of resources foreclosed BOEM from taking action with respect to Lease Sale 213 pending the conclusion of the reinitiated consultation with expert agencies.").[28]  Similarly here, the lease sales at issue do not

---

[28]     The plaintiffs note that BOEM, and not NMFS, made a unilateral section 7(d) determination in this case that the lease sales did not constitute an irreversible and irretrievable commitment of resources.  *See* NMFS AR4527–4531.  They say that such a determination by

constitute an irreversible commitment of resources—they simply represent the "opportunity to try to obtain exploration and development rights in accordance with the procedures and under the standards in the [*inter alia*, OCSLA]." *Mobil Oil Exploration & Producing Southeast, Inc. v. U.S.*, 530 U.S. 604, 620 (2000). Because the OCSLA provides for ESA review at two subsequent stages of the oil and gas production process, and allows the Secretary to suspend any and all activity in the OCS at any time if she determines that endangered species are at risk, the lease sale stage does not represent an irreversible or irretrievable commitment of resources. As such, BOEM was not required to complete consultation before it approved the lease sales at issue here. *See N. Slope Borough*, 642 F.2d at 609 ("satisfaction of the ESA mandate that no endangered life be jeopardized must be measured in view of the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof").

## 2. BOEM complied with section 7(a)

The plaintiffs further argue that, regardless of the implications of section 7(d), the re-initiation of consultation does not render BOEM necessarily compliant with section 7(a). To be sure, BOEM has an independent obligation to comply with section 7(a)(2) regardless of whether section 7(d) applies. *See Defenders of Wildlife,* 871 F. Supp. 2d at 1327 ("As the Federal Defendants properly recognize, avoiding irreversible or irretrievable commitment of resources under § 7(d) does not necessarily discharge their obligations as to the no jeopardy requirement of

---

BOEM—the action, not the expert agency—deserves no deference because "these unilateral [7(d)] determinations are afforded no weight." *Sw. Ctr. for Biological Diversity v. U.S. Forest Svc.*, 2001 U.S. Dist. LEXIS 25027, at *122 (D. Ariz. March 30, 2001) (citing *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053–54 (9th Cir. 1994)). Those cases are inapposite because in those cases, there was no Biological Opinion at all available, and therefore the action agency's 7(d) determination, absent *any* expert agency section 7(d) determination was afforded no deference. Moreover, "neither the [ESA] nor any other court decision . . . even suggests that federal agencies must obtain the concurrence of the Wildlife Service [or Fisheries Service] prior to relying on Section 7(d)." *Sw. Ctr. for Biological Diversity v. U.S. Forest Svc.*, 82 F. Supp. 2d 1070, 1079–80 (D. Ariz. 2000).

§ 7(a). . . . [t]he point is that BOEM's actions with respect to Lease Sale 213 could still violate § 7(a), notwithstanding their compliance with § 7(d).”); *see also Florida Key Deer v. Brown,* 386 F. Supp. 2d 1281, 1293–94 (S.D. Fla. 2005) (“Section 7(d) does not excuse federal agencies from meeting the requirements of Section 7(a)(2).”).

However, BOEM has met the requirements of both 7(d) and 7(a)(2) in this case. Under section 7(a), BOEM must insure that its actions do not cause jeopardy to any endangered species. In the OCSLA lease sale context, courts across the board hold that lease sales are not jeopardy-inducing agency actions. *See Defenders of Wildlife*, 871 F. Supp. 2d at 1329–30 (“The inescapable fact of the matter is that BOEM's approval of a bid, and the issuance of a lease to an oil drilling/development/exploration company, is a narrowly circumscribed event, in terms of its repercussions for listed species and their habitat . . . . It does not authorize full scale exploration, development, or production.”); *see also id.* (“The purchase of an OCS lease, standing alone, entails no right to explore, develop, or produce oil and gas resources on the OCS.”) (quoting *Sec'y of the Interior*, 464 U.S. at 340); *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1194–95 (9th Cir. 1988) (“We once again note that the risks to endangered species during the lease sale stage are *virtually nonexistent*. Only limited preliminary activities are permitted during this stage, such as geological, geophysical and other surveys ‘which do not result in any physical penetration of the seabed of greater than 500 feet and which do not result in any significant adverse impact on the natural resources of the [OCS].’”) (quoting Final Rule, Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 53 Fed. Reg. 10596, 10704 (April 1, 1988)) (emphasis added); *Village of False Pass*, 733 F.2d at 611 (“The lease sale decision itself could not directly place gray or right whales in jeopardy.”). Similarly here, there is nothing about these particular lease sales that would jeopardize the endangered species located in the Gulf of

Mexico. It is at later stages of OCS development that jeopardy, if at all, is more likely to occur. *Cf. Ctr. for Biological Diversity*, 563 F.3d at 483 ("The welfare of animals is, by design, only implicated at later stages of the [OCSLA] program, each of which requires ESA consultation and additional environmental review by Interior.").

Moreover, BOEM took efforts to insure that Lease Sale 216/222 itself would not jeopardize any listed species, while it awaited (awaits) NMFS's Biological Opinion. First, BOEM included stipulations in Lease Sale 216/222 to provide for the protection of certain species. *See* AR1100–11, AR1096 (map showing areas where stipulations made). For instance, with respect to live bottoms, lessees, "[p]rior to any drilling activities or the construction or placement of any structure for exploration or development on this lease . . . will submit to [BOEM-Regional Director ("RD")] a live-bottom survey report." AR1101. "If it is determined that the live bottoms might be adversely impacted by the proposed activity, the BOEM-RD will require the lessee to undertake any measure deemed economically, environmentally, and technically feasible to protect the pinnacle area. These measures may include, but are not limited to . . . relocation of operations, and monitoring to assess the impacts of the activity on the live bottoms." *Id.* And with respect to endangered species generally, BOEM included a list of six actions lessees must take to insure that its lease activities "prevent or minimize harm to the environment," including "maintain[ing] a distance of 90 meters or greater from whales," and "employ[ing] mitigation measures . . . for all seismic surveys." AR1110. Such lease stipulations show that BOEM set out to minimize harm to the endangered species in the Gulf of Mexico, and therefore insure no-jeopardy.

In *North Slope*, for instance, the D.C. Circuit found that certain lease stipulations "represent part of the Secretary's attempt to protect wildlife from the outset . . . [and] are

intended to ensure, as much as possible, the continued prosperity of marine life in the area." 642 F.2d at 595–96. That court found this to be an important factor is assessing whether the agency had comported with the ESA. *Id.* at 610 ("We hold that section 7(a)(2) was not violated as the Secretary incorporated in the 'final notice of sale' the suggested alternatives that NMFS indicated could ensure the freedom from jeopardy for the endangered whales. These savings alternatives, of course, constituted the bulk of the lease stipulations and the mitigating measures subsumed under 'Information to Lessees.'").

Second, BOEM also developed new safety regulations for deepwater drilling, as set forth above, to insure that another blowout spill would not occur. *See* Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Increased Safety Measures for Energy Development on the Outer Continental Shelf, 75 Fed. Reg. 63,346 (Oct. 14, 2010) (Interim Final Rule with request for comments); Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Increased Safety Measures for Energy Development on the Outer Continental Shelf, 77 Fed. Reg. 50,856 (Aug. 22. 2012) (Final Rule).

The plaintiffs in reply argue that BOEM did not insure that the ancillary activities[29] allowed at the lease sale stage cause no jeopardy. *See* Pl.'s Reply 16. They argue that "[v]ulnerable species harmed by the spill may, in fact, be jeopardized by the preliminary activities" authorized at the lease sale stage. *Id.* at 17. Though, as set forth above, courts have found that lease sales are not jeopardy-causing activities, no court has yet considered whether ancillary activities may jeopardize species made more vulnerable post-oil spill. For plaintiffs to

---

[29]     It is unclear such ancillary activities can even be challenged here, as the plaintiffs did not make claims about the ancillary activities in their First Amended Complaint, or arguments about them in their opening brief. *See* Am. Compl. ¶¶ 23, 63; Pl.'s Mot. Summ. J. 3, 9–10. Nevertheless, the Court still finds that the plaintiffs have not provided any evidence that such activities cause jeopardy, whereas BOEM has shown that it has taken steps to minimize harm to the endangered species from these activities, as set forth above.

be successful on this claim, however, they must put forth new evidence, showing that relying on the 2007 information on ancillary activities, *see* Federal-Def.'s Reply 17–19, is arbitrary and capricious. *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) ("even when the FWS's opinion is based on 'admittedly weak' information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no 'new' information—i.e., information the Service did not taken into account—which challenges the opinion's conclusions."). Here, the plaintiffs failed to carry their burden because they did not proffer any new evidence that ancillary activities jeopardize species made more vulnerable post oil-spill. As such, this argument, to the extent it can even be raised, fails.

Moreover, ancillary activities themselves undergo a multi-step review wherein a lessee must insure to the BOEM regional supervisor that its activities will not cause harm to the environment. 30 C.F.R. § 550.207 provides that after a lease is approved, a lessee may conduct ancillary activities, which include geological and geophysical explorations and development, and surveys. Before a lessee can conduct any ancillary activities, however, it must notify the Regional Supervisor of BOEM in writing and, *inter alia*, "[d]escribe the potential adverse environmental effects of the proposed activity and any mitigation to eliminate or minimize these effects on the marine, coastal, and human environment." 30 C.F.R. § 550.208(d)(4). The Regional Supervisor then reviews the notice "to ensure that [the] ancillary activity complies with the performance standards listed in 550.202(a), (b), (d), and (e)." 30 C.F.R. § 550.209. Under 30 C.F.R. § 550.202(e), a lessee must demonstrate that its activities do "not cause undue or serious harm or damage to the human, marine, or coastal environment." Thus, there are statutory

safeguards in place to insure that ancillary activities allowed at the lease sale stage do not cause harm to the environment.

Moreover, with respect to ancillary activities, BOEM issued certain Notices to Lessees ("NTL") to insure that protective measures are taken when engaging in ancillary activity. *See* Notice to Lessees and Operators of Federal Oil, Gas, and Sulphur Leases, Outer Continental Shelf, Gulf of Mexico OCS Region, NTL No. 2009-G34, December 1, 2009.[30] Such measures include seismic survey mitigation measures and protected species observer programs. *See* JOINT NTL No. 2012-G02, January 1, 2012.[31] Thus, BOEM has taken steps to insure that its actions do not cause harm to endangered species while it engages in interim consultation with NMFS on the updated Biological Opinion. It has therefore independently insured no-jeopardy and satisfied the requirements of section 7(a) of the ESA.

### 3. BOEM considered the best available scientific data

The plaintiffs next argue that BOEM's reliance on the NMFS's 2007 Biological Opinion[32] is arbitrary and capricious because BOEM knew or should have known that that Opinion was outdated, and it should have inquired into the status of the environmental baseline pursuant to 50 C.F.R. § 402.14(g)(2), which it failed to do. *See* Pl.'s Mot. Summ. J. 31–32. The

---

[30]     *available at* http://www.boem.gov/Regulations/Notices-To-Lessees/2009/09-G34.aspx.

[31]     *available at* http://www.boem.gov/Regulations/Notices-To-Lessees/2012/2012-JOINT-G02-pdf.aspx.

[32]     The plaintiffs suggest that re-initiation of consultation somehow renders the 2007 Biological Opinion invalid. However, plaintiffs do not challenge the validity of the 2007 Biological Opinion in the instant action, and even if they did, other courts have found that re-initiation of consultation does not render a former Biological Opinion invalid. *See Defenders of Wildlife*, 684 F.3d at 1252 ("There is no precedent in our circuit to support Petitioners' argument that BOEM's choice to reinitiate consultation with NMFS and FWS automatically renders the former biological opinions invalid. The biological opinions of NMFS and FWS were reconfirmed in 2008 and 2009, and have not been withdrawn despite re-initiation of consultations.").

defendants counter that the environmental baseline requirement applies to the NMFS / FWS, not the BOEM, and that it was not arbitrary and capricious to rely on the 2007 BO. *See* Intervenor-Def.'s Cross-Mot. Summ. J. 54.

The defendants are right on their first point. 50 C.F.R. § 402.14(g) confers duties on the expert agency—NMFS or FWS—not on BOEM. *See* 50 C.F.R. § 402.12(g) ("Service responsibilities during formal consultation are as follows . . . ."). As such, its requirements are inappropriately cited by the plaintiffs.[33]

As to BOEM's reliance on the 2007 Biological Opinion, the most recent court decision considering this issue found that it was not arbitrary and capricious for BOEM to rely on the 2007 Biological Opinion, in addition to the new evidence it considered. *See Defenders of Wildlife*, 684 F.3d at 1253 ("Given the Bureau's *broad consideration of the Deepwater Horizon disaster and new safety measures*, the Bureau did not act arbitrarily when it relied on the 2007 consultation *in conjunction with more recent studies*") (emphasis added); *see also Defenders of Wildlife*, 871 F. Supp. 2d at 1331–32 ("As to the narrow lease-sale stage at issue herein, the likely effects on listed species and critical habitat appear *no different after Deepwater Horizon than before*.") (emphasis added); *Cf. N. Slope*, 642 F.2d at 610 n.131 ("It is quite clear that a favorable biological opinion may be issued even though the absence of complete data on a species makes it impossible to know with complete certainty the potential impact.").

Similarly here, in light of the fact that BOEM relied on the 2007 Biological Opinion, supplemented that with the new evidence before it, peppered throughout the 2012 SEIS, *see, e.g.*, Chapter 4 of the 2012 SEIS, and also took steps to implement new safety and mitigation

---

[33] Even if the plaintiffs were correct that under 50 C.F.R. § 402.14, BOEM had a duty to update the environmental baseline, BOEM did do that in the 2012 SEIS by considering the *Deepwater Horizon* spill effects on each resource. *See generally* Chapter 4 of the 2012 SEIS. It also did so in its Biological Assessment, provided to NMFS in February 2013. *See* AR7900.

measures, the Court finds that BOEM comported with section 7(a) of the ESA. In addition, the plaintiffs[34] have failed to show that the lease sales themselves—and not what comes *after* them—causes jeopardy, based on the best scientific data available. As such, they have not met their burden of showing that, at the narrow lease-sale stage, BOEM was arbitrary and capricious in relying on the 2007 Biological Opinion, in conjunction with the new information it also considered.

And while the plaintiffs argue that the 2007 BO lacks sufficiently specific information about the size and tract location of the lease sales, and production estimates for the lease sales, *see* Pl.'s Mot. 34–35, all of this information is somewhat speculative at the lease sale stage, thereby negating the impact of any changes since 2007 on figures such as production estimates, tract sizes, etc. *See Wilderness Soc'y*, 603 F. Supp. 2d at 60 ("limited information available at the leasing stage necessarily limits the scope of the environmental analysis"); *Tribal Village of Akutan*, 869 F.2d at 1192 ("[w]e are the least troubled by what may seem to be incomplete or speculative data at the lease sale stage."). Moreover, any changes in that production-related

---

[34]     Though the plaintiffs argue that it is the defendants' burden to prove that they insured no-jeopardy, *see* Pl.'s Mot. Summ. J. 37; Pl.'s Reply 18 n.14, the plaintiffs have brought this action challenging the agency's action, and it is therefore their burden to show that the defendants violated the ESA. *See, e.g.*, *Defenders of Wildlife v. Bureau of Ocean Energy Management*, 871 F. Supp. 2d 1312, 1330 (S.D. Ala. 2012) ("Recall that it is plaintiff's burden to show not only that BOEM's action in approving leases post-*Deepwater Horizon* were violative of the ESA, but that they were arbitrary, capricious, and an abuse of discretion within the meaning of the APA."). As explained in *Sierra Club v. U.S. Army Corps. of Engineers*, the challenger "bears a heavy burden to prove that the [agency] was arbitrary and capricious in relying upon the FWS [no-jeopardy] determination of a matter firmly within that agency's area of expertise." 295 F.3d 1209, 1222–23 (11th Cir. 2002). This is because the "ESA does not specify a standard of review," and therefore "judicial review is governed by section 706 of the Administrative Procedure Act." *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982); *accord Nat'l Wildlife Fed. v. NMFS*, 254 F. Supp. 2d 1196, 1204 (D. Or. 2003). Here, the plaintiffs bear the burden of proving that BOEM was arbitrary and capricious in relying upon NMFS's no-jeopardy finding in its 2007 Biological Opinion. They have not met that burden.

information will not change the likely impacts of ancillary activities on listed species and critical habitat at the narrow lease-sale stage.

In sum, BOEM did not violate the ESA because it relied on the best available science, it took action to insure no-jeopardy, and its actions were not tantamount to an irreversible and irretrievable commitment of resources, so it did not need to await completed consultation with NMFS before it proceeded with the lease sales.

## D. Biological Opinion Claim against the NMFS

The plaintiffs' final argument is that NMFS's delay in producing its BO in the wake of the *Deepwater Horizon* spill is unreasonable, and asks this Court to compel NMFS to complete consultation by a date-certain. *See* Pl.'s Mot. Summ. J. 39, 44. This claim fails because NMFS has not unreasonably delayed production of the BO.

As set forth above, the ESA provides for consultation between expert agencies (NMFS) and action agencies (BOEM) to insure that the action agency's action is not likely to jeopardize endangered species. 16 U.S.C. § 1536(a)(2). Following formal consultation, the NMFS must issue a written statement known as a Biological Opinion, explaining how the proposed action will affect the species or its habitat. *See Bennett v. Spear*, 520 U.S. 154, 158 (1997) (citing 16 U.S.C. § 1536(b)(3)(A)). The Biological Opinion must include "(1) "[a] summary of the information on which the opinion is based; (2) a detailed discussion of the effects of the action on listed species or critical habitat; and (3) The Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species . . . ." 50 C.F.R. § 402.14(h). Meanwhile, to comply with its consultation obligations under section 7(a), the action agency "shall conduct a biological assessment for the purpose of identifying any endangered or threatened species which is likely to be affected by such action." 16 U.S.C. § 1536(c). "The

Federal agency [BOEM] requesting formal consultation shall provide the Service [NMFS] with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." 50 C.F.R. § 402.14(d).

## 1. Background information on the consultation

As set forth above, BOEM reinitiated consultation with NMFS in July 2010. Since then, the parties have been engaged in constant communication to set up timelines for achieving the goals of consultation and for producing a new Biological Opinion. *See* AR7496–7501. They have set up an interim consultation process and timetables for achieving those goals. *See* Bernhart Decl., Ex., ECF No. 63-1. The agencies also expanded the scope of the initial consultation to include all leases currently pending, and all expected lease sales in the Gulf of Mexico up through 2022.[35] *See* Federal-Def.'s Cross-Mot. Summ. J. 8; AR7909. In February

---

[35] The plaintiffs argue that, as a result of this consolidated process, ESA consultation occurs *only* at the lease sale stage in the Gulf of Mexico, creating a "shell game where meaningful ESA review to account for the nation's largest environmental disaster is always either premature or occurred at an earlier stage." *See* Pl.'s Reply 18–19. However, this position is neither consistent with the facts of this case, nor with the multi-staged nature of the OCSLA. BOEM's and NMFS's ongoing consultation "will *look at all stages* of on-going and future oil and gas activities related to prior and proposed lease sales through 2022 in the Gulf of Mexico over the next 50 years." Federal-Def.'s Reply 22 (emphasis added). And moreover, even if it did not, under the OCLSA, "the Secretary must comply with the ESA *at every step* of the oil development process." *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1195 (9th Cir. 1988) (emphasis added); *see also Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984) ("it is clear that OCSLA prescribes three distinct stages for offshore oil and gas activities: leasing, exploration, and development and production. ESA appears to apply equally to each stage of its own force and effect."). Thus, regardless of the scope of BOEM's ESA consultation at the lease sale stage, BOEM still must comply with the ESA at the subsequent stages of the OCSLA process. Plaintiff's argument on this point has been explicitly rejected by another court. *See Defenders of Wildlife*, 871 F. Supp. 2d at 1331 ("plaintiff's insistence that BOEM will get a free ride from ESA review during the exploration, development and production stages unless those stages are scrutinized now appears both inaccurate and incompatible with the stage-by-stage environmental review process that courts have pegged as being Congress's purpose in establishing the OCSLA framework").

2013, BOEM provided the NMFS with an updated Biological Assessment, updating the environmental baseline post-*Deepwater Horizon* spill. *See* AR7900–8139.

Meanwhile, NMFS originally represented to the Court that the Biological Opinion would be completed by October 31, 2014. *See* Bernhart Decl. ¶ 4, ECF No. 75-1. NMFS later updated that date to November 18, 2014. *Id.* It has since represented to the Court that NMFS's Biological Opinion will be completed by March 18, 2015, explaining that the "most critical outstanding issue for completing the Biological Opinion concerns the nature and extent of reduction in risk of oil well blowouts and catastrophic releases of oil into the environment resulting from regulatory measures and industry incentives implemented since the *Deepwater Horizon* incident." *See* Bernhart Decl. ¶¶ 5–6.

## 2. Application of the *TRAC* factors

The APA empowers a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "Section 706 of the APA 'leaves in the courts the discretion to decide whether agency delay is unreasonable.'" *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999)). In reviewing an unreasonable delay claim, the D.C. Circuit has stated that the inquiry has taken on a "hexagonal contour[]" because there are up to six factors a court can consider, though "the standard is hardly ironclad." *Telecomms. Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984). The *TRAC* court listed the following factors as useful guidance: First, "the time agencies take to make decisions must be governed by a 'rule of reason.'" *Id.* Second, "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason." *Id.* Third, "delays that might be reasonable in the sphere

of economic regulation are less tolerable when human health and welfare are at stake." *Id.*

Fourth, "the court should consider the effect of expediting delayed action on agency activities of

a higher or competing priority." *Id.* Fifth, "the court should also take into account the nature

and extent of the interests prejudiced by delay." *Id.* Finally, "the court need not find any

impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably

delayed." *Id.* (internal quotation marks and citation omitted).

At the outset, the parties disagree on the actual length of delay in this case. The plaintiffs

argue that the Court should measure the delay from the time that consultation began, in July

2010. *See* Pl.'s Reply 23. This would make NMFS's delay in issuing its Biological Opinion

nearly four years to date, and nearly five years to projected completion. Alternatively, the

defendants argue that the Court should begin assessing the delay from the time BOEM issued its

Biological Assessment and provided it to NMFS in February 2013, based on the argument that

they could not have begun the Biological Opinion prior to the receipt of the assessment. *See*

Federal-Def.'s Reply 24; Intervenor's Cross-Mot. Summ. J. 61. By this calculation, NMFS's

delay would be approximately over one-year to date, and just over two years to projected

completion.

The Court need not reach the difficult issue of when the clock started running, because

regardless of the length of delay, the Court finds that NMFS has acted reasonably throughout the

consultation process. And moreover, because context means everything in assessing an alleged

undue delay, there is no *per se* rule as to what amount of time constitutes undue delay. *Compare*

*Sierra Club v. Thomas*, 828 F.2d 783, 799 (D.C. Cir. 1987) ("Given the complexity of the issues

facing EPA and the highly controversial nature of the proposal, agency deliberation for less than

*three years*—little more than one year since the close of the public comment period—can hardly

be considered unreasonable.") (emphasis added); *Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 16 (D.D.C. 2003) ("*Four years* have passed since the issuance of the 1999 MSRP, which gave rise to FWS's duty to revise the Cape Sable seaside sparrow's critical habitat designation. With the bird's extinction expected in less than two decades, delay will become less and less reasonable despite competing priorities. As of this time, however, the Court cannot say that FWS's delay has gone beyond the rule of reason due to the Service's 'need to prioritize in the face of limited resources.'") (citation omitted), *with In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 838 (D.C. Cir. 2012) (finding two-year delay unreasonable); *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 37 (D.D.C. 2000) (finding four-year delay unreasonable but explaining that the court does not "intend by its ruling to suggest that four years is *per se* unreasonable in all cases").

In determining whether or not the agency delay is reasonable, the Court first assesses the statutory scheme set up by Congress. *See, e.g.*, *TRAC*, 750 F.2d at 80. The relevant statutory provision here states as follows: "Consultation . . . shall be concluded within the 90-day period beginning on the date on which initiated or . . . *within such other period of time as is mutually agreeable to the Secretary and the Federal agency*." 16 U.S.C. § 1536(b)(1)(A) (emphasis added). To the extent that this scheme informs the reasonableness inquiry, it demonstrates that the agency and the Secretary have a great deal of discretion in mutually setting their own timelines. The 90-day timeline is nothing more than a default setting, and there is no limitation *in the statute* on the length of the period of time that the Secretary and the agency can agree to extend the 90-day default period.

Despite this, the plaintiffs argue that the defendants' delay is unreasonable because it "flies in the face of the Fisheries Service's own policy for completing consultations in 135 days."

*See* Pl.'s Mot. Summ. J. 41.  NMFS's policy specifically states that "[t]he Services ensure the biological opinion . . . is prepared and delivered within 135 days of initiation of formal consultation . . . . If the Services need more time to analyze the data or prepare the final opinion, or if the action agency needs time to provide data or review a draft opinion, an extension may be requested by either party.  Both the Services and the action agency must agree to the extension. Extensions should not be indefinite, and should specify a schedule for completing the consultation."  *See* Endangered Species Act Consultation Handbook: Procedures for Conducting Section 7 Consultation and Conferences, U.S. Fish & Wildlife Service and National Marine Fisheries Service, March 1998, at 4-7.[36]  Plaintiffs mischaracterize NMFS's policy, which is to complete consultations in 135 days *unless either side requests an extension*.  The policy embodied by both the statute and the regulations is thus that the agencies should set deadlines, and formally extend those deadlines if they need more time.  Here, the agencies were in constant communication regarding consultation and the timeline for producing the BO.  *See* Federal-Def.'s Ex. 1, ECF No. 63-1 (timetable with proposed deadlines).  The statutory scheme, therefore, cuts in favor of finding that NMFS's delay was reasonable, because the scope and complexity of the task merits additional time agreed to by both agencies.

The consequences of the agency's delay, the next factor in the analysis, also cuts in favor of the government here.  Delays are generally not tolerable "when human health and welfare are at stake."  *TRAC*, 750 F.2d at 80.  The plaintiffs have alleged that the delay will threaten endangered species.  *See* Pl.'s Reply 16.  But, as set forth above, the lease sales are a narrow, circumscribed event in the OCSLA scheme that will have minimal impact on endangered species.  *See Defenders of Wildlife*, 871 F. Supp. 2d at 1329–30.  And though NEPA covers

---

[36]     *available at* http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

agency action that significantly impacts the quality of the human environment, it is unclear how any delay in NMFS's BO here would harm the human environment. On the contrary, an order compelling the agency to issue its BO immediately might undermine the entire process, and arguably have even harsher consequences than any delay. As the defendants have articulated, critical new data is being analyzed and a premature decision could undermine the time already put in and "only threaten NMFS's ability to conduct a thorough and searching analysis." Federal-Def.'s Cross-Mot. Summ. J. 45.[37]

The final three factors—other agency priorities, nature and extent of interests prejudiced, and any agency impropriety or lassitude (or lack thereof)—also cut in favor of NMFS. Here, the defendants have offered several relevant explanations for the delay: (1) the scientific and regulatory questions are "staggeringly complex," and the BO examines effects 50 years into the future; (2) production of the BO requires coordination between BOEM, NMFS, and two other agencies—Bureau of Safety and Environmental Enforcement ("BSEE"), and EPA; and (3)

---

[37] The plaintiffs counter that NMFS does not need to wait for better science to develop—it just needs the best science *available*, citing *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (The "best available data" requirement makes it clear that the Secretary has no obligation to conduct independent studies . . . . Even if the available scientific and commercial data were quite inconclusive, he may—indeed must—still rely on it . . . .) (citation omitted)) and *San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F. Supp. 2d 855, 872 (E.D. Cal. 2010) ("FWS must utilize the best scientific . . . data available, not the best scientific data possible."), *aff'd in part, rev'd in part, by San Luis & Delta-Mendota Water Auth. v. Jewell*, 2014 WL 975130 (9th Cir. March 13, 2014) (internal quotation marks omitted). The plaintiffs cannot have it both ways—they repeatedly fault BOEM and NMFS for relying on "stale" science (which the Court finds they did not), and now, would have the Court rush those very agencies into producing a Biological Opinion based on uncertain, incomplete information. And moreover, plaintiffs' reliance on those cases is misplaced. *Southwestern Center for Biological Diversity* arises in the context of an ESA listing decision, not in the context of developing a Biological Opinion. And there, the circuit court reversed the district court's imposition of a requirement that the agency conduct a population count in order to develop the best available science, which was neither contemplated by the ESA or the agency itself. 215 F.3d at 60–61. Finally, *San Luis & Delta-Mendota* is no longer even persuasive authority, as the Ninth Circuit has since reversed that court's judgment.

NMFS has limited resources—its Southeast Regional Office has a staff of 16 members, only two of whom are available to work on this particular BO.  *See* Federal-Def.'s Cross-Mot. Summ. J. 40–41; *see also* Bernhart Decl. ¶¶ 4–7.  In light of the amount of information the agencies must process and analyze, the complexity of the issues, the coordination between several agencies, and the limited resources available to them, the Court finds that NMFS's delay in producing the BO has been reasonable.

The Court notes, however, that by the time NMFS produces its Biological Opinion in 2015, the *Deepwater Horizon* oil spill will be five years behind it.  The Court, though, does not question the holistic approach the agencies are taking in ambitiously assessing the environmental impact of oil and gas exploration and production on endangered and threatened species and their designated critical habitats throughout the Gulf of Mexico, rather than assessing each lease sale separately.  This approach seems sensible, even preferable.  But, of course, such an ambitious endeavor takes time.  And the time expended to date seems to have been reasonably spent.  The APA requires no more.

## IV.  CONCLUSION

For the foregoing reasons, the federal-defendants' and intervenor-defendants' motions for summary judgment are **GRANTED**, and the plaintiffs' motion for summary judgment is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 31, 2014                                                RUDOLPH CONTRERAS
                                                                                   United States District Judge